William J. Edelman (SBN 285177)
**MILBERG, PLLC**
227 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (771) 474-1121
wedelman@milberg.com

Tina Wolfson (SBN 174806)
Robert Ahdoot (SBN 172098)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave. Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com

Jean S. Martin (admitted pro hac vice)
**AYLSTOCK WITKIN KREIS
& OVERHOLTZ, PLC**
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Tel: (850) 202-1010
jmartin@awkolaw.com

*Plaintiffs' Interim Co-Lead Counsel*

# UNITED STATES DISTRICT COURT FOR THE

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Disney Worldwide Services COPPA Litigation | Case No. 2:25-CV-08410-GW-RAO<br><br>Hon. George H. Wu, presiding<br><br>**PLAINTIFFS' CONSOLIDATED COMPLAINT** |

Plaintiffs, E.A., S.A., S.K., E.K., A.F., C.R., and C.R., by and through their respective guardians, (collectively "Plaintiffs"), by and through their undersigned counsel, hereby allege as follows against Defendants, Disney Worldwide Services, Inc. ("Disney Worldwide"), Disney Entertainment Operations, LLC ("Disney Entertainment"), and The Walt Disney Company ("TWDC") (collectively, "Disney"), and Defendants Google LLC and YouTube LLC (collectively, "YouTube," and, collectively with Disney, "Defendants"):

## INTRODUCTION

1. Disney is one of the world's largest media entertainment conglomerates.

2. Disney has built a media empire based on content that is specifically made for children, including the use of globally recognized characters, franchises, and branded content to include Disney Princesses, Pixar, Marvel, and Star Wars.

3. Disney produces and distributes highly popular child-directed content through official services such as YouTube, a video-sharing platform owned by Google, LLC.

4. Since November of 2019, YouTube has required content creators such as Disney to indicate whether videos they upload to its platform are "Made for Kids" ("MFK") or "Not Made for Kids" ("NMFK"). YouTube enacted this policy ("MFK Policy") as part of a historic $170 Million settlement with the Federal Trade Commission ("FTC") and the New York Attorney General over allegations YouTube was violating the Children's Online Privacy Protection Act ("COPPA"), a U.S. law that protects the online privacy of children under 13 by requiring parental consent for the collection of their personal information.[1]

---

[1] *See* Press Release, Fed. Trade Comm'n, Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law (Sept. 4, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/09/google-youtube-

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

5.     COPPA mandates that operators of websites and online services targeting children have a privacy policy, obtain verifiable parental consent before collecting data, give parents access to their child's information, and maintain reasonable security for collected data.[2]

6.     Instead of complying with COPAA and YouTube's MFK Policy, Disney chose to unlawfully collect and profit off of the personal information, including persistent identifiers (like cookies and device IDs) and sensitive information (such as identity and location) (together, "Personal Information"), of millions of children who watched Disney's videos posted on YouTube containing content directed at children but designated NMFK.

7.     Disney engaged in intrusive and unlawful business practices by enabling the collection of Personal Information from millions of children, without first notifying parents or obtaining verifiable parental consent.

8.     From November of 2019 through the present (the "Class Period") Defendants have collected Plaintiffs' and Class Members' Personal Information in violation of COPPA and other state and federal laws.

9.     YouTube was aware of Disney's noncompliance with the MFK Policy but failed to take adequate measures to correct it.

10.     As a result, Defendants collected, retained, and used Plaintiffs' and Class Members' Personal Information without consent and profited from additional advertising and subscription revenues gained as a result.

11.     Disney also generates substantial advertising revenue from exposing its audience to YouTube's targeted advertising algorithm that applies when videos are designated NMFK.

---

will-pay-record-170-million-alleged-violations-childrens-privacy-law(last accessed Feb. 12, 2026) ("YouTube Settlement Announcement").

[2] *See* 15 U.S.C.A. §§ 6501 *et seq.*

– 2 –

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

12. In addition to having their Personal Information collected by Defendants, children who viewed the mislabeled NMFK videos were subjected to inappropriate adults-only functionality on YouTube, including the ability to interact with, make, and read public user comments, to "follow" and "like" channels, to have successive content "autoplay" when a mislabeled video finishes, and to receive targeted behavioral advertisements based on their inferred interests and behaviors, collected from their online activities.[3] All these features increase the child's value to advertisers and engagement with Disney's content, thereby increasing Disney's and YouTube's profits at the expense of children's legally protected privacy rights.

13. Moreover, by Disney's failure to properly adhere to the MFK Policy, children are often served advertisements calibrated for a general or adult audience. As research shows, 95% of early childhood videos on YouTube contain some form of advertising, and one in five videos viewed by children eight and under includes ads that are not age-appropriate—ranging from violent video games and lingerie to alcohol and political messaging. Even videos that are otherwise suitable for children still feature inappropriate ads between 9% and 22% of the time.[4]

14. Protecting children's privacy is a major concern for parents in the modern digital age. In a recent survey, more than 85% of parents believe that access to technology is important for their children's future, but more than three quarters of parents are concerned about protecting their family's security, and 73% were

---

[3] *Protecting children watching YouTube videos: Lessons learned from FTC's settlement with Disney*, Business Blog, FED. TRADE COMM'N (Sept. 2, 2025), https://www.ftc.gov/business-guidance/blog/2025/09/protecting-children-watching-youtube-videos-lessons-learned-ftcs-settlement-disney.

[4] *As Online Videos Dominate Young Kids' Screen Time, YouTube Exposes Them to Age-Inappropriate Content*, COMMON SENSE MEDIA (Nov. 17, 2020), https://www.commonsensemedia.org/press-releases/as-online-videos-dominate-young-kids-screen-time-youtube-exposes-them-to-age-inappropriate-content.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

concerned about their children's personal data being collected by third parties without their consent.[5]

15.   These concerns are well founded. "[U]p until age 18, young people are highly vulnerable to advertising."[6] In the words of one researcher:

> There's a lot of neuroscience that explains why adolescents and children are so vulnerable [to advertising]…they're much more attuned to rewards, much less attentive to consequences and risks, much more tolerant of ambiguity, much more sensitive to social cues and much more impulsive, so they don't have a lot of cognitive control…This is an advertiser's dream.[7]

16.   This is why businesses targeting child audiences must be especially careful to avoid the sharing of information about those children with advertisers, and to must be upfront with parents about the sharing of information so parents can decide whether the website is appropriate. Unfortunately, Defendants here failed to comply with their legal obligations to protect children.

17.   As a result of Defendants' conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of their data (or children's data) to third parties; (iv) loss of benefit of the bargain; (v) diminution of value of the children's private data; and (vi) loss of privacy; and (vii) statutory damages.

[5] *Polling Memo: Parents' Views on Children's Digital Privacy and Safety*, TRUSTED FUTURE (July 15, 2022), https://trustedfuture.org/childrens-digital-privacy-and-safety/.

[6] *Exposing the Dangers of Targeting Children as Consumers*, UC IRVINE PAUL MERAGE SCHOOL OF BUSINESS (July 3, 2024), https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html.

[7] *Id.*

– 4 –

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

18.    Therefore, Plaintiffs, on behalf of themselves and a class of similarly situated persons, seek to remedy these harms and asserts claims for intrusion upon seclusion, invasion of privacy, trespass to chattels, negligence, negligence per se, unjust enrichment, violations of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, violations of the Federal Wiretap Act (ECPA), 18 U.S.C. §§ 2510–2522, and violations of the Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. § 5701 *et seq*.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because the proposed Class consists of more than 100 members, at least one Class member is a citizen of a state different from at least one Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

20.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as Plaintiffs' federal claims.

21.    This Court has general and specific personal jurisdiction over Defendants because Defendants are domiciled in, incorporated in, maintain principal places of business in, and/or conduct substantial, continuous, systematic business in this District. Defendants have purposefully directed their activities toward residents of this District, have availed themselves of the privileges of conducting business here, and Plaintiffs' claims arise out of and relate to Defendants' contacts with this forum.

22.    Defendants operate, manage, and monetize official YouTube channels from offices located within California and/or within this District, maintain substantial corporate operations within this District, and/or derive substantial revenue from activities conducted in this forum, including the distribution and monetization of child-directed video content.

– 5 –

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

23. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)-(d) because Defendants reside in this District, are subject to personal jurisdiction here, conduct substantial business in this District, and/or because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

24. Plaintiffs E.A. and S.A. are minors who bring this action by and through their guardian, Brett Aronson, and are domiciled in and citizens of Colorado. During the Class Period, E.A. and S.A. viewed Disney's child-directed content that was misclassified as NMFK on YouTube, resulting in the unlawful collection, use, and monetization of their Personal Information without parental consent.

25. Plaintiffs S.K. and E.K. are minors who bring this action by and through their guardian, Richard Kester, and are domiciled in and citizens of Pennsylvania. During the Class Period, S.K. and E.K. viewed Disney's child-directed content that was misclassified as NMFK on YouTube, resulting in the unlawful collection, use, and monetization of their personal information without parental consent.

26. Plaintiff A.F. is a minor who brings this action by and through her guardian, Veronika Pikeeva, and is domiciled in and a citizen of Pennsylvania. During the Class Period, A.F. viewed Disney's child-directed content that was misclassified as NMFK on YouTube, resulting in the unlawful collection, use, and monetization of A.F.'s personal information without parental consent.

27. Plaintiffs C.R. and C.R. are minors who bring this action by and through their guardian, Kimberly Sobalvarro, and are domiciled in and citizens of California. During the Class Period, they viewed Disney's child-directed content that was misclassified as NMFK on YouTube, resulting in the unlawful collection, use, and monetization of their personal information without parental consent.

28. At all relevant times, none of the Plaintiffs or their guardians provided Defendants with verifiable parental consent to collect, use, disclose, or monetize Plaintiffs' Personal Information. Plaintiffs' guardians place significant value on their

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

children's privacy and would not have consented to the collection and use of their children's data on Disney channels, nor would they have permitted their children to access Defendants' YouTube had they known of Defendants' unlawful practices.

29.    The Walt Disney Company ("TWDC") is a Delaware corporation with its principal place of business at 500 South Buena Vista Street, Burbank, California. TWDC is the parent company of Disney Worldwide and Disney Entertainment and, at all relevant times, exercised control over the policies, practices, and monetization strategies at issue.

30.    Disney Worldwide Services, Inc. ("Disney Worldwide") is a Florida corporation with its principal place of business at 1375 Buena Vista Drive, Lake Buena Vista, Florida. Disney Worldwide maintains a California office at which all its directors and principal officers are located at 500 South Buena Vista Street, Burbank, California.[8] Disney Worldwide also maintains corporate offices at 7 Hudson Square, New York, New York. Disney Worldwide is a wholly owned subsidiary of TWDC and provides centralized administrative, operational, and business services for TWDC's various media and entertainment subsidiaries.

31.    Disney Entertainment Operations, LLC ("Disney Entertainment") is a Florida limited liability company with its principal place of business at 500 Buena Vista Street, Burbank, California. Disney Entertainment is responsible for the creation, distribution, and monetization of Defendants' digital video content, including YouTube programming.

32.    Defendants TWDC, Disney Worldwide, and Disney Entertainment operate as a unified enterprise and are agents, alter egos, and instrumentalities of one

---

[8] *See* Statement of Information filed with the Office of the Secretary of State for the State of California by Disney Worldwide Services, Inc., Entity No. 1653950 (Dec. 12, 2024), https://bizfileonline.sos.ca.gov/api/report/GetImageByNum/18222411808305411013203104714721210418412500213O.

– 7 –

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

another. Each of these Defendant exercised control over, participated in, and profited from the conduct of Disney alleged herein.

33.     Google LLC is a Delaware limited liability company with its principal place of business 1600 Amphitheatre Parkway, Mountain View, California. According to YouTube's Terms of Service, Google LLC is the entity providing the YouTube platform and the products, services and features made available as part of the platform.[9]

34.     YouTube LLC is a Delaware limited liability company with its principal place of business at 901 Cherry Ave., San Bruno, California and owns, operates, and controls the YouTube platform, including its data collection, advertising, and monetization systems. YouTube LLC is a wholly owned subsidiary of Google LLC.

## FACTUAL ALLEGATIONS

### A.     Children Are Specifically Targeted by Online Advertisers

35.     Children are prime targets of the internet's present-day mass surveillance mechanics. As reported by Vox:

> [T]oday's kids are the most at risk because they have the largest digital footprint in history. Between the Nest cameras watching kids at home, kids' games that target them with ads, and purchase preferences on Amazon and Google, their data is being harvested at an unprecedented rate.[10]

36.     Advertisers have a strong incentive to collect data from minors because children are particularly susceptible to advertising.

---

[9] *See* YouTube, Terms of Service, https://www.youtube.com/static?template=terms (last accessed October 16, 2025).

[10] Chavie Lieber, *Big tech has your kid's data — and you probably gave it to them* Vox (Dec. 5, 2018), https://www.vox.com/the-goods/2018/12/5/18128066/children-data-surveillance-amazon-facebookgoogle-apple.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

37.     Indeed, research conducted by the American Academy of Pediatrics has found that "[c]hildren are uniquely vulnerable to the persuasive effects of advertising because of immature critical thinking skills and impulse inhibition."[11] As one expert explains:

> There's a lot of neuroscience that explains why adolescents and children are so vulnerable [to advertising]…they're much more attuned to rewards, much less attentive to consequences and risks, much more tolerant of ambiguity, much more sensitive to social cues and much more impulsive, so they don't have a lot of cognitive control…This is an advertiser's dream.[12]

38.     In pursuit of this dream, advertisers spend more and more on advertising directed to children every year. In 2023, United States kids' advertising expenditures totaled nearly $3 billion – by 2031, that number is projected to reach $21 billion.[13]

39.     As a result, the National Financial Educators Council notes that:

> By the time they turn 21, young people will have been exposed to over one million advertisements – many of which are highly-sophisticated ads that encourage them to make purchases based on wants rather than needs.[14]

40.     But, if the tactics used by online advertisers are cause for concern, the products pushed onto children through those tactics are worthy of outright panic.

---

[11] Jenny Radesky, Yolanda Linda Reid Chassiakos, Nusheen Ameenuddin & Dipesh Navsaria, *Digital Advertising to Children*, 146 PEDIATRICS 1681 (Jul. 2020), available online at: https://pubmed.ncbi.nlm.nih.gov/32571990/.

[12] *Exposing the Dangers of Targeting Children as Consumers*, UC IRVINE PAUL MERAGE SCHOOL OF BUSINESS (July 3, 2024), https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html.

[13] *Stop Advertising to Kids – Stop Predatory Advertising*, NATIONAL FINANCIAL EDUCATORS COUNCIL, https://www.financialeducatorscouncil.org/stop-advertising-to-kids/ (last visited Feb. 16, 2026).

[14] *Id.*

– 9 –

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

41. Researchers have found that exposure to "newer forms of digital marketing" driven by "data collection" and "personalized behavioral marketing driven by machine learning," is "associated with unhealthy behaviors, such as intake of high calorie, low-nutrient food and beverages; use of tobacco products and electronic cigarettes; use of alcohol and marijuana; and indoor tanning."[15]

42. Online child-targeted advertising is a big problem – and without the Personal Information collected by companies like Defendants, it would not be nearly as effective.

**B.  Disney's Business Model**

43. Disney, among the world's most powerful media corporations, operates through numerous subsidiaries and divisions engaged in film and television production, streaming services, theme parks, consumer products, and digital media.

44. Disney's operations encompass film and television production (including brands like Marvel and Lucasfilm), streaming services (such as Disney+), theme parks and resorts worldwide, consumer products, and digital media platforms.

45. Founded in 1923, Disney is known for its storytelling and iconic characters, leveraging strategic acquisitions and a diversified portfolio to create a powerful entertainment ecosystem.

46. Disney has built its empire by aggressively targeting children as a primary audience and commercial demographic across multiple platforms – often without meaningful parental oversight—including television, streaming, merchandise, theme parks, and digital media. Through its vast portfolio of globally recognized characters, franchises, and branded content, Disney markets itself as a trusted source of family entertainment while simultaneously leveraging its content to cultivate brand loyalty from a young age. Indeed, Disney prides itself as one of the world's "Most Reputable Companies," claiming "Our commitment to be among

---

[15] Radesky, *supra*.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

the most admired companies in the world guides our actions as a company and our efforts to promote the happiness and wellbeing of kids and families."[16]

47.   Disney also touts that it is among the world's "Most Socially Responsible Companies" and that it "received top honors in the citizenship category for our philanthropic and environmental efforts" and "value[s] our role in being a good corporate citizen in the global community. . . ."[17]

48.   At its core, Disney's target market consists of families with young children, particularly those aged 4 to 12, who are introduced to the brand through animated films, television series, toys, merchandise, or streaming content.[18] Characters like Elsa from *Frozen* or Lightning McQueen from *Cars* are designed to appeal directly to this age group, with bright visuals, catchy music, and simple yet emotional storylines.[19] Disney leverages these characters in every facet of marketing—from merchandise to theme parks.[20] Disney designs experiences, from movie themes to theme park attractions, that appeal to this dual-layer of child excitement and parental trust.[21]

49.   Disney appeals to educated, brand-conscious consumers who value safe, imaginative content for their children and resonate with family-oriented

---

[16] *Disney Named World's Most Reputable Company*, THE WALT DISNEY COMPANY (Apr. 15, 2014), https://thewaltdisneycompany.com/disney-namedworlds-most-reputable-company/.

[17] *Disney Named Most Socially Responsible Company*, THE WALT DISNEY COMPANY (Oct. 9, 2013), https://thewaltdisneycompany.com/1030-2/.

[18] Daniel Pereira, *Disney Target Market Analysis*, THE BUSINESS MODEL ANALYST (July 19, 2025), https://businessmodelanalyst.com/disney-target-market-analysis/?srsltid=AfmBOoqqapg4kzMYYBE18DdEu8CnKLzKkcQ9OOlrwAvPvWpkstd82B2i.

[19] *Id.*

[20] *Id.*

[21] *Id.*

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

messaging.[22] Parents often choose Disney content due to its strong focus on family-friendly themes, extensive library of beloved classics and new franchises, strong parental controls for younger viewers, and its ability to educate and promote positive values.[23] Other competitors may lack Disney's curated content, the established trust and brand recognition, or the specific features and content tailored to families with young children. Indeed, the perception among parents is that Disney provides superior educational content to its competitors, including academic and social curriculum that is above and beyond its competition.[24]

50.    Disney's target market is emotionally driven, responding to themes of imagination, family, nostalgia, adventure, and empowerment.[25] These psychographic traits vary by segment, but they all align with Disney's storytelling model.[26] For example, parents value wholesome, safe entertainment and respond to narratives about love, resilience, and community.[27] Films like *Encanto* or *Finding Dory* emphasize these ideals, reinforcing Disney's position as a family-first brand.[28] Disney taps into universal values such as imagination, bravery, and family connection, using storytelling to create emotional bonds.[29]

---

[22] *Id.*

[23] Rujula Rao, *Streaming Wars: Analyzing the Competitive Dynamics of Disney+ vs. Netflix*, MEDIUM.COM (June 18, 2024), https://medium.com/@rujularao/streaming-wars-analyzing-the-competitivedynamics-of-disney-vs-netflix-aad4e42f776f.

[24] Charlene DeLoach, *How Disney Junior Changed Our Disney World Experience*, PLAYROOM CHRONICLES, https://www.playroomchronicles.com/disney-junior-disney-world/ (last accessed Feb. 16, 2026).

[25] *See* Pereira, *supra*.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

–12–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

51.     Despite its wholistic public image, Disney operates with the precision of a data-driven advertising enterprise, consistently prioritizing profit over children's privacy and well-being.

## C.    The YouTube Platform

52.     As part of Disney's media strategy, Disney maintains a direct and lucrative commercial relationship with YouTube, an online video-sharing platform and subsidiary of Google, where users can view videos or upload video content.

53.     YouTube videos are viewable by anyone who accesses YouTube by visiting www.youtube.com or using the YouTube mobile or streaming device app. YouTube does not require individuals to register or sign into its site to watch videos.

54.     YouTube requires that videos intended to be available to the public be uploaded through a channel.

55.     Each channel has a unique account and serves as a personalized space where a particular content creator's videos, playlists, branding, and audience engagement tools are hosted.

56.     Content creators like Disney have full control over the videos uploaded to its channels, including the ability to set titles, thumbnails, descriptions, age designations, and monetization preferences.

57.     Users may find videos on YouTube by navigating to a particular channel's homepage, or users may come across videos uploaded to a particular channel without interacting directly with that channel.

## D.    The YouTube Platform and Data Collection Ecosystem

58.     YouTube operates on an advertising-supported model. Ads displayed before, during, and alongside YouTube videos generate the vast majority of revenue for YouTube and its content creators.

–13–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

59.  YouTube collects data from viewers.[30] Google collects the data generated from YouTube Ads, analyzes the advertisement performance, and provides its advertising customers market analysis. [31] The services associated with YouTube Ads are highly profitable and generated a revenue of $10.4 billion for YouTube in 2024 alone.[32]

60.  YouTube is one of (if not the most) popular video platforms for children today, and it is used by children early and often, with use by children under 2 going from 45 percent to 62 percent in just six years.[33] The numbers only rise with age, as 84 percent of children between the ages of 2-4 use the platform, and 89 percent of children five and older do.

61.  Content creators who upload videos on YouTube, like Disney, financially benefit from this advertising revenue through the YouTube Partner Program, which is a monetization agreement that allows eligible content creators to receive a significant share of advertising revenue generated from videos of their content on YouTube, including pre-roll, mid-roll, banner, and targeted display advertisements.

62.  Advertising on YouTube can be targeted in two ways: behavioral or contextual.

---

[30] Google, *Information Google Collects | Google Privacy Policy*, https://youtu.be/YlmVKT3Zvhw (includes YouTube as a Google service; also available at https://policies.google.com/privacy).

[31] Google, *Measure Your Results*, https://business.google.com/us/resources/articles/measure-your-results/.

[32] Skye Jacobs, *YouTube rakes in record $10.4 billion from ads even as users grumble about aggressive strategy*, TECH SPOT (Feb. 8, 2025), https://www.techspot.com/news/106701-youtube-rakes-record-104-billion-ads-even-users.html.

[33] *From cradle to content: Children under 2 are watching more YouTube than they ever have*, AMERICAN EXPERIMENT (Nov. 25, 2025), https://www.americanexperiment.org/from-cradle-to-content-children-under-2-are-watching-more-youtube-than-they-ever-have/.

–14–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

63. Contextual targeting is the delivery of advertisements to individuals based on the type of content that the user is consuming, as opposed to the specific viewer who is watching it. For example, an advertiser might promote cookware on a recipe blog.

64. Behavioral targeting involves showing ads to users based on their personal data, which is tracked across various websites, apps, and devices.

65. To facilitate behavioral targeting, YouTube collects Personal Information from individuals who access YouTube. That Personal Information includes a person's YouTube viewing history, user activity (searches run, views and interactions with content and ads, etc.), location information (GPS, internet protocol ("IP") address, device sensor data, and data from devices located near a user), and unique identifiers (cookie IDs, advertising IDs, device IDs, and others).

66. YouTube compiles this Personal Information into a user profile, creating an up-to-date and detailed snapshot of each user's preferences and behaviors.

67. YouTube uses these data profiles, and shares them with its partners, to deliver targeted advertisements based on the preferences inferred from the profiles.

68. The information YouTube collects is incorporated into an algorithm which infers which types of advertisements are likely to have the greatest impact on the user associated with the information (i.e., are most likely to be clicked on).

69. YouTube also uses this information to strengthen its powerful recommendation feature, which is built atop algorithms that have been known to transform a search for a single video into a marathon viewing session, where the YouTube platform provides video after video for viewer consumption.

70. This "rabbit hole" effect has been well documented, with researchers finding that the recommendation feature "boosts fringe videos to the mainstream and

–15–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

can unwittingly help spread conspiracies and misinformation about dangerous diseases, jeopardizing public health."[34]

71.    A 2019 report found that 43 percent of children using YouTube watch videos using its "suggested features" function, and this number is almost certainly higher today considering the ever-increasing power of the algorithms powering those suggestions. Algorithms that were developed and refined using data that YouTube and Disney have collected from children without parental consent. As powerful as those algorithms are, they have been unable to prevent obscene and otherwise harmful content from making its way into the recommendations provided to children, with reports finding "hundreds of … videos of children's cartoon characters with inappropriate themes" such as graphic violence.[35]

72.    Advertisers pay YouTube more to run behavioral advertising. YouTube in turn pays content creators, including Disney, more for running behavioral advertising on a channel than YouTube would have paid a creator for only allowing contextual advertising.

**E.    YouTube Disney's YouTube Business and Presence on YouTube**

73.    Disney operates many official YouTube channels, including but not limited to: Disney Channel, Disney Junior, Disney Kids, Disney Animation Studios, Disney Parks, Pixar, and various franchise-specific channels, through which it uploads, promotes, and monetizes video content.

74.    During the Class Period, Disney has operated and uploaded tens of thousands of videos to more than 1,250 YouTube channels through numerous subsidiaries.

---

[34] Max Fisher & Amanda Taub, *What is YouTube Pushing You to Watch Next?*, N.Y. TIMES (Aug. 9, 2019), https://www.nytimes.com/2019/08/09/the-weekly/youtube-brazil-far-right.html.

[35] Anisa Subedar & Will Yates, *The disturbing YouTube videos that are tricking children*, BBC TRENDING (Mar. 27, 2017), https://www.bbc.com/news/blogs-trending-39381889.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

75.    Users can easily discover Disney content on YouTube through YouTube's search function, autoplay suggestions, and algorithmically driven recommendations, which often promote similar or related content once a child begins viewing a Disney video. Young children frequently access this content directly – by searching for characters or titles they recognize – or indirectly through embedded videos in third-party websites, on a variety of platforms including smart TVs, tablets, or the YouTube app.

76.    Disney's videos are extremely popular on YouTube. According to a complaint filed against Disney by the FTC on September 2, 2025, videos on just three dozen of Disney's channels resulted in tens of millions of hours watched worldwide and hundreds of millions of views in the United States in just three months of 2019. The amount of time viewers spent watching videos on these channels soared to over 100 million hours worldwide, with approximately 1.2 billion views in the United States alone, during three months of the early COVID-19 pandemic period of 2020.

77.    Indeed, in many households, Disney videos play continuously via autoplay, leading to extended viewing sessions often without direct parental supervision. These viewing patterns provide high engagement and view counts, generating substantial advertising revenue for Disney while also facilitating the collection of viewer data, including persistent identifiers, unless proper child-directed settings are applied.

78.    Disney profits from YouTube videos in different ways, including the YouTube Partner Program discussed above, which enables Disney to earn a share of the revenue from ads that appear on their videos. YouTube shares 55% of net ad revenue from watch page ads with creators. Disney also receives a portion of YouTube Premium subscription fees from viewers who watch its content, even though these viewers are watching ad-free.

–17–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

79. Disney generates advertising revenues from YouTube videos in two ways. First, it receives a portion of the revenue that YouTube receives from advertising that YouTube places with Disney videos. Second, it places advertisements directly in some of the videos it uploads to YouTube.

80. Disney's presence on the YouTube platform allows it to generate substantial revenue from targeted advertising and to collect significant personal information from its users through the YouTube Partner Program.

81. Disney also has access to YouTube's content management, audience analytics, and monetization tools including settings related to behavioral advertising and indicating whether content is directed at children under the age of 13.

82. These tools allow Disney to benefit from and indirectly access the personal data, especially viewing history and other behavioral data, that YouTube collects from viewers, including children.

83. In addition to revenue received from YouTube for ad sales and subscription fees, Disney profits indirectly from increased fan engagement, converting to merchandise sales and affiliate marketing. Indeed, Disney can sell its own branded merchandise or products directly through YouTube's shopping features.

84. Disney and YouTube also receive valuable viewer data, including metrics like views, watch time, audience demographics (age, gender, geography), and subscriber activity. Defendants share user data with third-party advertisers, brands and platforms, leading to increased earning opportunities from ads, brand deals and shopping affiliate programs.

85. Defendants' unauthorized collection of Plaintiffs' and Class Members' Personal Information has been a key revenue driver. Behaviorally, Defendants track how consumers engage with content—like binge-watching trends—to personalize recommendations. Behavioral segmentation focuses on how consumers interact with a brand—looking at usage habits, purchasing patterns, loyalty behaviors, and

–18–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

product engagement. For Defendants and their advertisers, these insights are central to designing personalized content, fostering brand loyalty, and increasing lifetime customer value. Defendants identify and segment their audience based on frequency of use and platform engagement.

86.    Family income is an important demographic factor in Defendants' ad targeting. For example, Disney's own marketing strategy targets middle to upper-middle-income families, those who can afford streaming subscriptions, theatrical releases, merchandise, and costly vacation packages to Disney theme parks. For example, a family trip to Disney World typically costs several thousand dollars, positioning it as a premium experience.

87.    Geographic segmentation involves tailoring products and marketing efforts based on location—ranging from country and region to urban versus rural areas. Urban areas are a key geographic focus, particularly for streaming, as cities offer higher internet penetration and a greater appetite for streaming content, making them prime targets for digital campaigns.

88.    Purchase behavior is another key signal. Defendants track merchandise buying habits—like which characters are most purchased or what age groups prefer certain toy lines—to inform ad placement.

**F.    The Children's Online Privacy Protection Act ("COPPA")**

89.    The exploitation of children's Personal Information by companies is not new. Indeed, the Children's Online Privacy Protection Act ("COPPA") was enacted in 1998 by Congress to protect the safety and privacy of children online by prohibiting the unauthorized or unnecessary collection of children's personal information online by operators of Internet websites and online services. COPPA directed the Commission to promulgate a rule implementing COPPA. The Commission promulgated the COPPA Rule on November 3, 1999, under Section 1303(b) of COPPA, 15 U.S.C. § 6502(b), and Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553. The Rule went into effect on April 21, 2000. The

–19–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

Commission promulgated revisions to the Rule that went into effect on July 1, 2013. Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

90.    COPPA was passed to codify the societal expectations of privacy with regards to minor children's usage of the Internet. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[36]

91.    COPPA "prohibits unfair … acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1. Moreover, COPPA specifically prohibits "an operator of a website or online service…[from] collect[ing] personal information from a child in a manner that violates the regulations prescribed [by the FTC]" where the website or online service is "directed to children" or the website operator "has actual knowledge that it is collecting personal information from a child[.]" 15 U.S.C. § 6502.

92.    The COPPA Rule applies to any operator of a commercial website or online service directed to children that collects, uses, and/or discloses personal information from children, and to any operator of a commercial website or online service that has actual knowledge that it collects, uses, and/or discloses personal information from children. The Rule requires an operator to meet specific

---

[36] *Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter In the Matter of Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION (Sep. 9, 2019), available online at: https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

requirements prior to collecting online, using, or disclosing personal information from children, including but not limited to:

    a. Providing clear, understandable, and complete notice of its information practices, including specific disclosures, directly to parents (Section 312.4(b) of the Rule, 16 C.F.R. § 312.4(b));

    b. Posting a prominent and clearly labeled link to an online notice of its information practices with regard to children, including what information the website operator collects from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures set forth in the Rule (Section 312.4(d) of the Rule, 16 C.F.R. § 312.4(d)); and

    c. Obtaining verifiable parental consent prior to collecting, using, and/or disclosing personal information from children (Section 312.5(a)(1) of the Rule, 16 C.F.R. § 312.5(a)(1)).

93. When passed in 1998, COPPA defined "personal information" as meaning: individually identifiable information about an individual collected online, including--(A) a first and last name; (B) a home or other physical address including street name and name of a city or town; (C) an e-mail address; (D) a telephone number; (E) a Social Security number; (F) any other identifier that the Commission determines permits the physical or online contacting of a specific individual; or (G) information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph. 15 USCS § 6501 (1998).

94. Then, in 2013, COPPA was enhanced, and its definition of "personal information" was widened to explicitly include "persistent identifier[s] that can be used to recognize a user over time and across different Web sites or online services" including "customer number[s] held in a cookie," "Internet Protocol (IP)

–21–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

address[es]," "processor or device serial number[s]," and "unique device identifier[s.]" 16 C.F.R. § 312.2.

95.    Personal information is "collected or maintained on behalf of an operator when . . . [t]he operator benefits by allowing another person to collect personal information directly from users of" an online service. 16 C.F.R. § 312.2. Personal information includes persistent identifiers that can be used to recognize a user over time and across different websites or online services. Id. (definition of "Personal information").

96.    COPPA reflects a strong public policy interest in shielding children from invasive data practices and commercial exploitation.

97.    The FTC, which enforces COPPA, has made clear that COPPA applies not only to websites and apps that are directed to children, but also to general-audience platforms—like YouTube—when they have actual knowledge that child-directed content is being hosted.

98.    An online service, or portion thereof, is directed to children when considering such factors as the subject matter, visual content, music or other audio content, language, use of animated characters or child-oriented activities, age of models, other characteristics, and evidence regarding the intended and actual audience of the service. 16 CFR § 312.2.

99.    Defendants are operators under the COPPA Rule because they operate online services in the form of streaming content on YouTube that includes portions that are directed to children.

100.    Disney's video content is obviously "directed to children" under the meaning of COPPA, as it involves animated characters and content under the family-friendly Disney brand.

101.    Accordingly, Defendants' collection and disclosure of personally identifiable information from minors, including the minor Plaintiffs, without obtaining parental permission constitutes a violation of COPPA.

–22–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

**G. COPPA Enforcement against YouTube and the Resulting "Made For Kids" Policy**

102. In 2019 the FTC brought a landmark enforcement action against YouTube and Google for widespread violations of COPPA.

103. The FTC alleged that YouTube knowingly collected personal information about children under the age of 13—including Personal Information used for behavioral advertising—without providing notice to parents or obtaining verifiable parental consent, as required by law.

104. Furthermore, the complaint included specific allegations concerning YouTube's and its content creators' practice of hosting and profiting from content clearly directed toward children, while falsely claiming it was a general audience platform.

105. As part of the FTC settlement, YouTube agreed to pay a then-record $170 million fine and implement systemic changes to its platform, including instituting the MFK Policy.[37]

106. Through this action, the FTC action made clear that **both** platform operators and content creators share responsibility under COPPA for protecting children's privacy, especially when monetizing child-directed content through advertising and data collection practices.

107. The intent of YouTube's MFK Policy is to ensure that both YouTube and content creators comply with COPPA and other laws.[38]

---

[37] Press Release, *Better protecting kids' privacy on YouTube*, YOUTUBE (Jan. 6, 2020), https://blog.youtube/news-and-events/better-protecting-kids-privacy-on-youtube/.

[38] Press Release, *Disney to Pay $10 Million to Settle FTC Allegations the Company Enabled the Unlawful Collection of Children's Personal Data*, FED. TRADE COMM'N (Sept. 2, 2025), https://www.ftc.gov/news-events/news/pressreleases/2025/09/disney-pay-10-million-settle-ftc-allegations-company-enabledunlawful-collection-childrens-personal ("Disney Settlement Announcement").

–23–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

108.    In November 2019, YouTube notified content creators, including Disney, that (1) they would be required to inform YouTube whether their content was MFK in order to comply with COPPA and (2) that they could make a MFK designation at the video level or channel level based on the amount of child-directed content made available to its audience.

109.    Content is considered NMFK if it has mature themes like sexual content, violence, or is aimed at a general audience rather than children.[39] This designation affects monetization, as MFK content receives non-personalized ads due to restrictions on collecting personal data from children under 13.[40]

110.    YouTube is supposed to rely on the MFK designation to determine what functionality and advertising YouTube should make available on a content creator's videos in order for YouTube to comply with COPPA.

---

[39] *See* YouTube Settlement Announcement.

[40] *See* YouTube Help Center, Made for kids content, https://support.google.com/youtube/topic/9689353?hl=en&ref_topic=2803240&sjid=765958069651935 0493-NC (last accessed Feb. 16, 2026).

–24–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

111.   YouTube's settings give content creators the choice whether to mark a channel as (1) MFK, (2) NMFK, or (3) to review the setting for every video uploaded to the channel:

| Basic info | **Advanced settings** | Feature eligibility |
|---|---|---|

**Audience**

Simplify your workflow by selecting a channel setting. If you skip this question, you'll be required to identify each video on your channel that's made for kids. This setting will affect existing and future videos. Settings for individual videos will override the channel setting.

**Do you want to set your channel as made for kids?**

Regardless of your location, you're legally required to comply with the Children's Online Privacy Protection Act (COPPA) and/or other laws. You're required to tell us whether your videos are made for kids. What's content made for kids?

○   Yes, set this channel as made for kids. I mostly upload content that's made for kids.

○   No, set this channel as not made for kids. I almost never upload content that's made for kids.

◉   I want to review this setting for every video.

112.   A related setting on the same tab within YouTube's channel settings gives content creators like Disney the power to turn off interest-based (i.e., behavioral) advertising, but emphasizes that doing so "may significantly reduce your channel's revenue":

| Basic info | **Advanced settings** | Feature eligibility |
|---|---|---|

**Advertisements** ⓘ

☐   Disable interest-based ads

If you select this option, personalized ads will not be shown on videos on your channel, such as ads based on a viewer's interests or remarketing ads. This may significantly reduce your channel's revenue. In addition, earned action reports and remarketing lists will stop working for your channel.

–25–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

113.    YouTube purports to enforce its MFK Policy through a combination of creator self-designation, automated machine learning systems, and human review.[41]

114.    Thus, since 2019, YouTube has relied in part on content creators' own management of their settings, and designation of their channels and videos as MFK or NMFK, to determine what functionality and advertising YouTube should make available on videos.

115.    Creators are required to label their content as MFK or NMFK through the YouTube Studio.[42] YouTube's automated systems then review this designation.[43]

116.    If a creator misuses this designation feature or is incorrect, YouTube's systems or human reviewers should override the setting to comply with laws like COPPA.[44] However, YouTube admits that "in most cases, we'll rely on [creators'] audience setting to determine whether a video is Made for Kids."[45]

117.    If a content creator sets the designation at the channel level, then all videos loaded to that channel, by default, inherit the channel's designation. For example, if a channel is designated NMFK, then any video uploaded to that channel will likewise be designated as NMFK by default. After a video has been uploaded, the content creator can change the audience designation for that individual video, but with channel level designation, all videos uploaded on that channel receive the channel's default designation until and unless the content creator changes the designation for an individual video.

---

[41] *See, e.g.*, Video, YouTube Creators, Important Update for All Creators: Complying with COPPA (Nov. 12, 2019), https://www.youtube.com/watch?v=-JzXiSkoFKw.

[42] *See* YouTube Help Center, Set your channel or video's audience, https://support.google.com/youtube/answer/9527654 (last accessed Feb. 16, 2026).

[43] *Id.*

[44] *Id.*

[45] *Id.*

–26–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

118. When a video (or entire channel) is set as MFK certain functionality on that video is disabled by YouTube, including targeted or personalized advertising and the collection of viewing history and personal information that facilitates targeted and personalized advertising.

119. Designating a video or channel as MFK also disables the following features:

a. Live chat;
b. Video comments;
c. Playback in the Miniplayer, which allows a video to continue to play on a small screen as a user browses YouTube;
d. Autoplay from the YouTube home screen;
e. Cards or end screens;
f. Video watermarks;
g. The ability to become a channel "member";
h. A button to solicit donations for a cause;
i. Merchandise and ticketing;
j. Notifications;
k. Super Chat or Super Stickers; and
l. "Save to playlist" and "Save to Watch Later" features.

120. The features disabled when a content creator designates a video or channel as "MFK" are disabled, in part, to prevent the collection of personal information from children that would require operators to provide notice and obtain verifiable parental consent under COPPA and the COPPA Rule.

121. In addition to these features being disabled, the designation of a video as MFK also affects the overall function of autoplay on YouTube, when a new video will automatically play when a user has finished watching a video. When a video is marked as MFK it will exclusively autoplay to other videos marked as "MFK," and will not play videos designated as NMFK.

122. When a content creator like Disney does not designate a video as MFK, these features activate, including collection of Personal Information and viewing history data to enable targeted behavioral advertising directed towards children.

–27–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

123.    Therefore, when a child-directed video is not designated MFK, (1) advertising is then targeted to children using persistent identifiers, (2) those features that would otherwise be disabled to prevent the collection of Personal Information from children are now available to children, and (3) content designated NMFK may automatically play for children even though it is entirely inappropriate for children.

124.    In a guide published by YouTube, YouTube indicates to its content creators that "not serving personalized ads on kids content may result in a decreased revenue for some creators who mark their content as made for kids."[46] YouTube therefore de-incentivizes creators from designating their content as MFK by indicating to creators that they could generate more revenue by mislabeling their content.

**H.    Disney Content on YouTube Kids**

125.    Also in 2019, YouTube launched a separate website platform, YouTube Kids, aimed at children. YouTube Kids contains only videos that target children. Parents use YouTube Kids knowing that the videos contained on the platform are appropriate for, and interesting to, children. YouTube requires that parents/guardians consent to the collection of data before their children use the YouTube Kids app.

---

[46] *Id.*

–28–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

126.    Further, a privacy notice related to the YouTube Kids platform, The YouTube Kids Privacy Notice, communicates to parents that YouTube collects data related to their children's use of the YouTube Kids app.[47]

---

[47] YouTube Kids Privacy Notice, https://kids.youtube.com/t/privacynotice.

–29–

PLAINTIFFS' CONSOLIDATED COMPLAINT



127.   Some videos available on YouTube Kids are available on YouTube but not designated as "Made for Kids." YouTube knows that children are the primary audience of these videos, as evidenced by YouTube making these videos available on their YouTube Kids platform, but YouTube refuses to designate these videos as "Made for Kids."

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

128.   For example, the Disney teaser trailer for a *Moana* film is on YouTube Kids. Parents must consent to data collection before their children can access the Disney video on YouTube Kids.



**PLAINTIFFS' CONSOLIDATED COMPLAINT**

129. However, YouTube does not require parental consent to data collection when children access the same video on YouTube, even though YouTube collects data when children access the video.[48]



130. YouTube has not labeled all videos on YouTube Kids as MFK on YouTube even though YouTube is aware that those videos target children. Without such designation, YouTube collects data related to children's viewing of these videos.

131. As evidenced by its handling of the YouTube Kids platform, YouTube knows that it needs to obtain parental consent and communicate to parents that

[48] The YouTube comments feature is disabled for videos labeled "Made for Kids." The comments section is enabled on this video, indicating that YouTube did not label this video as "Made for Kids."

–32–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

YouTube collects data related to children's use of YouTube, but it does not do so for mislabeled MFK videos.

**A. Disney's Systematic Failure to Appropriately Mark Child-Directed Videos**

132. Based on YouTube's compliance requirements in the aftermath of the FTC's 2019 COPPA enforcement action, Disney had the ability and the duty to designate its videos as MFK. Disney also had the ability to turn off interest-based (i.e., behavioral) advertising for its videos.

133. Nevertheless, Disney failed to properly designate its videos and children-directed content on YouTube as MFK, and/or failed to turn off interest-based advertising on content directed at children.

134. Disney has several channels on YouTube that target different age groups. Some of these channels are designated as MFK while others are designated as NMFK.

135. Upon information and belief, Disney sets the audience designation for a channel as MFK or "NMFK, and adheres to the designation when uploading individual videos to that channel. Accordingly, when a video is uploaded to a channel Disney has designated as NMFK, Disney would often allow videos to remain by default designated as NMFK, even if the individual video were child-directed.

136. Despite producing and uploading vast amounts of content that is unmistakably directed at children under the age of 13, Disney knowingly made false designations, enabling the collection of Personal Information from child viewers and providing Disney with information that assists Disney with its targeted advertising in violation of COPPA.

137. Disney's failure to designate videos as MFK is also demonstrated by inconsistent designations for very similar videos that happen to appear on different channels but that have common child-directed subject matter.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

138. As an example, as a result of Disney's policy not to change the audience designation for an individual video from the default setting for the channel, Disney designated certain child-directed *Cars* movie videos on the Pixar channel as NMFK (e.g., videos of movie clips featuring simple story lines easily understood by children about personified vehicles that learn valuable lessons about integrity, honesty, and true friendship), while very similar *Cars* movie videos on the Pixar *Cars* channel were marked as MFK.

139. Examples of channels that Disney marked NMFK then failed to designate child-directed videos as MFK ("Improperly Managed Channels") include:
a. the Pixar channel;
b. the Disney Animation Studios channel;
c. the Disney Movies channel;
d. the Disney on Ice channel;
e. the Disney on Broadway channel;
f. the Disney Channel channel, which posts video content for Disney's television channel targeted at children ages 6-14;2
g. the Disney Plus channel, which posts video content from Disney's streaming service;
h. the Walt Disney Studios channel, which posts video content from across Disney's various film studios;
i. the Oh My Disney channel, which formerly posted video content for Disney's official blog; and
j. the Disney D23 channel, which formerly posted video content related to the official Disney fan club.

140. Many or all of the videos on these Improperly Managed Channels are unquestionably directed toward children under the age of 13 based on their visual content, subject matter, music, language and other characteristics.

141. Videos uploaded to the Improperly Managed Channels include stories that are read aloud by characters and celebrities who appeal to children; visual content; inclusion of music that is popular with children; or language.

142. The videos frequently feature animated characters like Mickey Mouse, Elsa, Moana, Lightning McQueen, and other iconic figures from Disney's catalog that are specifically marketed to and beloved by young children. In many cases, the

–34–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

characters themselves address children directly or invite interaction, further reinforcing their child-directed nature.

143. These videos often include bright, colorful visuals, simple language, sing along songs, nursery rhymes, basic educational themes, and storylines designed to appeal to preschoolers and early elementary-age viewers.

144. The cumulative effect of these elements – combined with Disney's own branding as a provider of family and children's entertainment—makes it objectively clear that these videos fall squarely within the definition of "child-directed" under COPAA and applicable FTC guidance.

145. Disney also created playlists that consist of videos with child-directed subject matter, visual content, animated characters, and music or other audio content directed to children, among other factors, from movies such as *Frozen*, *Inside Out*, *Finding Dory*, and *Encanto*.

146. Disney was warned in 2019 that not complying with the MFK framework could result in compliance issues with the FTC or other authorities.

147. YouTube warns in its Help Center that:

> we require you to tell us whether or not your videos are made for kids according to an agreement with the US Federal Trade Commission (FTC) and to help you comply with the Children's Online Privacy Protection Act (COPPA) and/or other applicable laws. Failure to set your content appropriately may result in consequences on YouTube or have legal consequences under COPPA and other laws.[49]

148. Even still, Disney failed to take action.

149. Disney's conduct reflects its prioritization of advertising revenue over children's privacy rights.

150. Disney's failure was also not the result of ambiguity, but of calculated avoidance of regulatory compliance.

---

[49] Help Center, YouTube, https://support.google.com/youtube/answer/9528076?hl=en (last accessed Feb. 12, 2026).

–35–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

151. As a result of Disney's mislabeling of its videos and channels: (1) YouTube collected Personal Information and placed targeted advertisements on child-directed ads on Disney's behalf, and (2) features that YouTube would have otherwise disabled for those videos remained available to viewers (e.g., the ability to comment on videos and save videos), which require user data in order to function properly.

152. Disney's mislabeling generated additional revenue from advertising directed at these child users and provide Disney with demographic insights and analytics that assist Disney with its targeted advertising; all of which violate COPPA.

### I. COPPA Enforcement Against Disney

153. On September 2, 2025, the FTC brought an enforcement action against Disney for violating COPPA by failing to properly mark certain YouTube videos as MFK, as described above. According to the FTC, this mislabeling, including content from obvious child-directed videos, allowed the collection of personal data from children under 13 years old without verifiable parental notification or consent and enabled targeted advertising through YouTube that is prohibited under COPPA.

154. Chairman Ferguson, joined by Commissioners Melissa Holyoak and Mark R. Meador, stated:

> "As alleged, Disney circumvented YouTube's data collection safeguards for MFK videos and channels and collected and monetized personal information of those who viewed child-directed videos in violation of COPPA. This conduct is illegal no matter who carries it out. But Disney is no ordinary company. It has made its mark on American society as the world's leading creator of content for children. . . . Given its carefully curated reputation, this alleged conduct by Disney would be particularly troubling."[50]

---

[50] *See* Andrew N. Ferguson, Statement of Chairman Andrew N. Ferguson Joined by Commissioner Melissa Holyoak and Commissioner Mark R. Meador re: United States v. Disney Worldwide Servs., et al. (Sept. 2, 2025), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

155.    FTC chairman Andrew Ferguson sharply criticized Disney's handling of child-directed content on YouTube, stating that the enforcement action "penalizes Disney's abuse of parents' trust."

156.    As discussed above, since the inception of YouTube's MFK Policy, Disney chose to mark all of its videos *at the channel level* and failed to change the default to mark each video individually.[51] As a consequence, Disney uploaded many videos directed to children to Disney channels labeled as NMFK.[52]

157.    The mislabeling allowed Disney, through YouTube, to collect personal data from children viewing child-directed videos and use that data for targeted advertising to children.[53]

158.    The FTC's findings came as no surprise to YouTube because it has been on notice of Disney's noncompliance since at least June 2020, when YouTube informed Disney that YouTube had changed designations on more than 300 Disney videos from NMFK to MFK.[54]

159.    The redesignated videos at the time included videos from *The Incredibles*, *Coco*, *Toy Story*, *Tangled*, *Frozen*, and *Mickey Mouse*.[55]

---

statements/statement-chairman-andrew-n-ferguson-joined-commissioner-melissa-holyoak-commissioner-mark-r-meador-re-united-states-v-disney-worldwide-servs-et-al.

[51] Complaint, ¶¶ 27-39, *U.S.A. v. Disney Worldwide Services, Inc., et al.*, No. 2:25-cv-08223 (C.D. Cal. Sept. 2, 2025), ECF No. 1, available at https://www.ftc.gov/system/files/ftc_gov/pdf/DisneyComplaint.pdf ("*USA v. Disney* Complaint").

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *See* Disney Settlement Announcement.

–37–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

160.    Even after this redesignation by YouTube, Disney did not change its channel level designation policy and continued to fail to properly designate individual videos as MFK.[56].

161.    But Disney's practices were more deliberate than simply indiscriminately marking videos on a channel wide basis as NMFK and failing to individually mark appropriate videos as MFK. Indeed, from 2020 to 2022, the FTC found that Disney affirmatively enabled targeted advertising campaigns on videos that were designated as NMFK but that were uploaded to channels that Disney had designated as MFK including the Disney channel, the Disney Descendants channel, the Disney Family channel, the Disney Games channel, the Disney Junior channel, the Disney Music channel, the Disney XD channel, the *Mickey Mouse* channel, the Pixar *Cars* channel, the Radio Disney channel, and the Nat Geo Kids channel.

162.    The FTC announced Disney would pay $10 million to settle allegations that the company allowed personal data to be collected from children who viewed child-directed videos on YouTube without notifying parents or obtaining their consent as required by COPPA.[57]

163.    Chairman Ferguson noted:

"This settlement follows a thorough investigation carried out by the Commission's intrepid staff. The order imposes on Disney a civil penalty of $10 million. In my view, this civil penalty is fair given Disney's misconduct—illegally enriching itself by monetizing personal information collected from users watching child-directed videos without their parents' consent— in light of its self-curated reputation as one of the world's most trusted brand names in children's entertainment."[58]

[56] *See USA v. Disney* Complaint.

[57] *Id*.

[58] *Id.*

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

164.   Although the FTC has taken enforcement action against Defendants for their widespread violations of COPPA, such regulatory action does not provide compensation or redress for the children and families directly harmed by Defendants misconduct.

165.   Plaintiffs' and Class Members' Personal Information was unlawfully collected and monetized without parental consent.

166.   Plaintiffs and Class Members suffered concrete and particularized injuries: namely, the loss of statutory privacy protections, exposure to surveillance and targeted advertisement, and the exploitation of their online behavior for corporate profit.

167.   Through their conduct and practices, Defendants have unlawfully exploited the Personal Information of Plaintiffs and Class members without their permission and without compensating them for the use of their assets.

**J.     The Collected Data Is Sensitive and Valuable**

168.   The Personal Information of children, and the data collected in this case, holds substantial and growing value in today's data-driven economy.

169.   Even at a young age, children generate digital footprints – through viewing habits, device usage, preferences, and engagement patterns – that are uniquely attractive to advertisers.

170.   Persistent identifiers can be used to track a child's behavior across platforms, building detailed profiles that enable microtargeting and influence over future customer behavior.

171.   This data not only fuels advertising revenue, but helps companies shape long-term brand loyalty, making children a particularly lucrative and vulnerable target.

172.   As such, there is a market for data like the data collected on the YouTube platform when the "not for kids" notation is selected by Disney.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

173. Organizations across every sector use and monetize consumer data to increase profits and the value of such information as a commodity is measurable.

174. Personal Information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

175. In monetary terms, academic research from institutions such as MIT and Carnegie Mellon has estimated that individual user data can be worth $240 or more per year to advertisers, with children's data commanding a premium due to its potential for early brand capture and influence.[59]

176. Google has recognized the value of user data and even instituted a program that would pay users up to $540 a year to allow Google to track their online activities.[60]

177. Several companies have products through which they pay consumers for a license to collect or track their data.

178. Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

179. Facebook also has paid users for their digital information, including browsing history.

---

[59] *See* Acquisti, Allesandro et al., The Economics of Privacy, 54 J. Econ. Lit. 442, 444 (2016); see also Egelman, Serge et al., What's the Value of Your Data?, Carnegie Mellon CyLab (2020).

[60] *See* Google Device Usage Study, https://deviceusagestudy.google/signup/invitecode.

–40–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

180.    Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

181.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

182.    Users young and old highly value their privacy when online—privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

183.    For example, Consumer Reports notes that 92% of Americans believe that internet companies and websites should be required to obtain affirmative consent before selling or sharing their data.[61]

184.    Without the freedom to control what becomes of their data, children are unable to maintain the value of their personal data, which will remain with them for the rest of their lives.

185.    Plaintiffs and Class Members suffered pecuniary losses when their data was collected and shared with third parties in part because of the value of the data itself.

186.    Through their conduct and practices, Defendants have unlawfully exploited the personal information of Plaintiffs and Class Members without their permission and without compensating them for the use of their assets.

---

[61] Katie McInnis, The Evolution of Consumer Attitudes Toward Online Tracking, 1995-2019, Consumer Reports Digital Lab (May 2020), at 36, https://innovation.consumerreports.org/The-Evolution-of-Consumer-Attitudes-Toward-Online-Tracking_5.20.20_FINAL.pdf.

–41–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

### K.    Plaintiffs and Class Members' Have a Reasonable Expectation of Privacy

187.    At all times when Plaintiffs' and Class Members watched Disney's video content, Plaintiffs and Class Members (through their guardians) had a reasonable expectation that their information would remain confidential and that Disney would not collect or share the data with third parties for a commercial purpose, unrelated to providing them with video content.

188.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

189.    Moreover, Americans are particularly sensitive about protecting the privacy of children. In a survey conducted jointly by the Center for Digital Democracy and Common Sense Media, 90% of parents disagreed with the statement: "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content[,]" and 93-percent of parents agreed that "a federal law that says that online sites and companies need to ask parents' permission before they collect personal information from children under age 13" is a "good idea."[62] In light of these results, it is perhaps unsurprising that 80-percent of parents of children 13-years-old or younger report worrying about their child's privacy when using online apps.[63]

---

[62] *Survey on Children and Online Privacy*, CENTER FOR DIGITAL DEMOCRACY & COMMON SENSE MEDIA (2012), available online at: https://democraticmedia.org/assets/resources/COPPA-Executive-Summary-and-Findings-1635879421.pdf.

[63] *Pixalate's Harris Poll Survey Recap: Children's Privacy in Mobile Apps*, PIXALATE (Mar. 1, 2022), https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

190.   Personal data privacy and obtaining consent to share or collect children's data are material to Plaintiffs and Class Members.

**L.      Plaintiff Specific Allegations**

*Plaintiffs E.A. and S.A.*

191.   Plaintiffs E.A. and S.A. are minor children who were under the age of 13 during the Class Period and who bring this action by and through their guardian, Brett Aronson.

192.   Plaintiffs E.A. and S.A. reside in Colorado.

193.   Throughout the Class Period, E.A. and S.A. watched videos on the YouTube platform, including videos on Improperly Managed Channels operated by Defendant Disney, including Disney on Ice and the Pixar Channel.

194.   E.A. and S.A. were drawn to videos on Disney's channels, including Improperly Managed Channels, because they frequently feature some of E.A. and S.A.'s favorite characters and shows, including Mickey Mouse and friends, *Frozen*, *Cars*, and *Encanto*.

195.   Unbeknownst to E.A. and S.A. and or their guardian, Disney improperly designated many of the same videos that it was marketing to children as NMFK, causing YouTube's tracking services to collect personal information from E.A. and S.A., including persistent identifiers that can be used to track E.A. and S.A., and recognize E.A. and S.A.'s activities over time and across different websites and online services.

196.   Defendants collected and enabled the collection of E.A. and S.A.'s personal information for the purposes of tracking, profiling, and targeting E.A. and S.A. with advertisements as they watched videos on the YouTube platform.

197.   Defendants also collected and enabled the collection of E.A. and S.A.'s personal information, and used that personal information, to improve the revenue-generating services offered on the YouTube platform.

–43–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

198. Neither Google nor Disney obtained verifiable parental consent prior to collecting E.A. and S.A.'s personal information.

***Plaintiffs S.K. and E.K.***

199. Plaintiffs S.K. and E.K. are minors who were under the age of 13 during the Class Period and who bring this action by and through their guardian, Richard Kester.

200. Plaintiffs S.K. and E.K. reside in Pennsylvania.

201. Throughout the Class Period, S.K. and E.K. watched videos on the YouTube platform, including videos on Improperly Managed Channels operated by Defendant Disney, including the Disney Movies channel and the Pixar channel.

202. Plaintiffs S.K. and E.K. were drawn to videos on Disney's channels, including Improperly Managed Channels, because they frequently feature some of S.K. and E.K.'s favorite characters and shows, including *Frozen*, *Cars*, and *Toy Story*.

203. Unbeknownst to S.K. and E.K. and or their guardian, Disney improperly designated many of the same videos that it was marketing to children as NMFK, causing YouTube's tracking services to collect Personal Information from S.K. and E.K.., including persistent identifiers that can be used to track S.K. and E.K., and recognize S.K. and E.K.'s activities over time and across different websites and online services.

204. Defendants collected and enabled the collection of S.K. and E.K.'s personal information for the purposes of tracking, profiling, and targeting S.K. and E.K. with advertisements as they watched videos on the YouTube platform.

205. Defendants also collected and enabled the collection of S.K. and E.K.'s personal information, and used that personal information to improve the revenue-generating services offered on the YouTube platform.

206. Neither Google nor Disney obtained verifiable parental consent prior to collecting S.K. and E.K.'s personal information.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

*Plaintiff A.F.*

207. Plaintiff A.F. is a minor who was under the age of 13 during the Class Period and who brings this action by and through A.F's guardian, Veronika Pikeeva.

208. Plaintiff A.F. resides in Pennsylvania.

209. Throughout the Class Period, A.F. watched videos on the YouTube platform, including videos on Improperly Managed Channels operated by Defendant Disney, including Walt Disney Animation Studios.

210. A.F. was drawn to videos on Disney's channels, including Improperly Managed Channels, because they frequently feature some of A.F.'s favorite characters and shows, including characters from Frozen.

211. Unbeknownst to A.F. or A.F.'s guardian, Disney improperly designated many of the same videos that it was marketing to children as NMFK, causing YouTube's tracking services to collect personal information from A.F., including persistent identifiers that can be used to track A.F., and recognize A.F.'s activities over time and across different websites and online services.

212. Defendants collected and enabled the collection of A.F.'s personal information for the purposes of tracking, profiling, and targeting A.F. with advertisements as A.F. watched videos on the YouTube platform.

213. Defendants also collected and enabled the collection of A.F.'s personal information, and used that personal information, to improve the revenue-generating services offered on the YouTube platform.

214. Neither Google nor Disney obtained verifiable parental consent prior to collecting A.F.'s personal information.

*Plaintiffs C.R. and C.R.*

215. Plaintiffs C.R. and C.R. are minors who were under the age of 13 during the Class Period and who bring this action by and through their guardian, Kimberly Sobalvarro.

216. Plaintiffs C.R. and C.R. reside in California.

–45–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

217. Throughout the Class Period, C.R. and C.R. watched videos on the YouTube platform, including videos on Improperly Managed Channels operated by Defendant Disney, including Disney Channel Animation.

218. C.R. and C.R. were drawn to videos on Disney's channels, including Improperly Managed Channels, because they frequently feature some of their favorite characters and shows, including Mickey Mouse and friends.

219. Unbeknownst to C.R. and C.R. and their guardian, Disney improperly designated many of the same videos that it was marketing to children as NMFK, causing YouTube's tracking services to collect personal information from C.R. and C.R., including persistent identifiers that can be used to track C.R. and C.R., and recognize their activities over time and across different websites and online services.

220. Defendants collected and enabled the collection of C.R. and C.R.'s personal information for the purposes of tracking, profiling, and targeting C.R. and C.R. with advertisements as they watched videos on the YouTube platform.

221. Defendants also collected and enabled the collection of C.R. and C.R.'s personal information, and used that personal information, to improve the revenue-generating services offered on the YouTube platform.

222. Neither Google nor Disney obtained verifiable parental consent prior to collecting C.R. and C.R.'s personal information.

## TOLLING

223. Plaintiffs and Class Members could not have reasonably discovered, through the exercise of reasonable diligence, Defendants' conduct and could not have known of the facts stated herein, which were not publicly disclosed until the FTC announced its $10 million settlement with Disney in September 2025.

224. In addition, any applicable statutes of limitations have been tolled or have not run because Defendants knowingly, actively, and fraudulently concealed the facts as alleged herein.

–46–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

225. Plaintiffs and Class Members have been kept in ignorance of information essential to the pursuit of their claims, without any fault or lack of diligence on their part. Defendants' concealment prevented Plaintiffs and Class Members from being on notice of any facts or information that would have required them to inquire whether Defendants fulfilled their duties under the law and, if not, whether Plaintiffs and Class Members had legal recourse.

226. At all times prior to, during, and since the uploading and posting on YouTube of its mislabeled videos, Defendants have been under a continuing duty to disclose the true facts. Because of Defendants' willful concealment of material information concerning the conduct alleged herein, over a period of years, Defendants are estopped from relying on any statute of limitations defense as to the claims of Plaintiffs and Class Members.

## CLASS ACTION ALLEGATIONS

**Class Definitions**

227. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23, on behalf of themselves and all others similarly situated. Plaintiffs seek certification of the following nationwide Class:

> All natural persons in the United States who, at any time during the Class Period, were under the age of thirteen and watched child-directed content uploaded by Defendants on YouTube that was not properly designated as "made for kids." (the "Nationwide Class").

228. In the alternative, Plaintiffs seek certification of appropriate statewide subclasses (together with the Class collectively referred to as the "Classes"), including but not limited to:

A California Subclass, defined as:

> All natural persons in California who, at any time during the Class Period, were under the age of thirteen and watched child-directed content uploaded by Defendants on YouTube that was not properly designated as "made for kids."

–47–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

A Pennsylvania Subclass, defined as:

All natural persons in Pennsylvania who, at any time during the Class Period, were under the age of thirteen and watched child-directed content uploaded by Defendants on YouTube that was not properly designated as "made for kids."

A Colorado Subclass, defined as:

All natural persons in Colorado who, at any time during the Class Period, were under the age of thirteen and watched child-directed content uploaded by Defendants on YouTube that was not properly designated as "made for kids."

229.   Excluded from the Classes are: (1) any Judge presiding over this action, members of their immediate families, and Court staff; and (2) Defendants, their subsidiaries, parents, predecessors, successors, affiliates, and any entity in which Defendants have a controlling interest, as well as their current and former officers and directors.

230.   Plaintiffs reserve the right to amend or modify the Class definitions after discovery.

231.   **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Classes are so numerous that joinder of all members is impracticable. Defendants own, operate, and control some of the most popular children's media channels on YouTube, with billions of cumulative views and millions of subscribers. While the exact number of Class Members is currently unknown, Defendants' misclassified videos were viewed by hundreds of thousands, and more likely millions, of children during the applicable Class Period. Class Members are geographically dispersed throughout the United States, making individual joinder infeasible.

232.   **Commonality. Fed. R. Civ. P. 23(a)(2).** This action presents questions of law and fact regarding Defendants' conduct that common to the Classes including, but not limited to:

–48–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

a. Whether Defendants systematically failed to designate child-directed content as MFK;

b. Whether Defendants allowed the personal identifying information and/or YouTube viewing history and related information of Plaintiffs and Class Members to be collected without verifiable parental consent;

c. Whether Defendants violated Plaintiffs' and Class Members' right to privacy;

d. Whether and to what extent Defendants had a duty to protect the private information of Plaintiffs and Class Members;

e. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that children's data would be disclosed to third parties without their consent as a result of its failure to properly designate its videos;

f. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that children's data was being disclosed without their consent as a result of their failure to properly designate videos MFK;

g. Whether Defendants adequately addressed and fixed the failures which permitted the unauthorized disclosure of Plaintiffs' data;

h. Whether Defendants' practices violated COPPA;

i. Whether Defendants' conduct violated state privacy laws including invasion of privacy and intrusion upon seclusion;

j. Whether Defendants unjustly profited from unlawful data collection and targeted advertising;

k. Whether Plaintiffs and/or Class Members are entitled to relief, including restitution and injunctive relief, to redress the imminent and currently ongoing harm faced as a result of Defendants' conduct; and

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

l. Whether Plaintiffs and Class Members are entitled to damages or other monetary relief, and if so, in what amount.

233. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs and all Class Members were injured by the same uniform course of conduct. Each Plaintiff and Class Member viewed child-directed content that Defendants failed to properly designate, resulting in the unauthorized collection and exploitation of personal information. Plaintiffs' injuries arise from identical legal theories and factual predicates as those of the Classes, including violations of privacy, consumer protection, and children's data protection laws. Plaintiffs' claims are therefore representative of and typical of the claims of all other Class Members.

234. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no interests antagonistic to those of other Class Members and are committed, through their parents and guardians where applicable, and undersigned counsel, to vigorously prosecute this action. Plaintiffs have retained counsel with extensive experience in complex class action, consumer protection, and data privacy litigation, including cases involving unlawful data collection and digital surveillance. Plaintiffs and their counsel possess the financial resources, institutional knowledge, and litigation experience necessary to prosecute this action through trial. The interests of the Class Members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

235. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages suffered by individual Class Members are relatively small compared to the cost and complexity of individual litigation involving sophisticated digital advertising systems and privacy technologies. Absent class treatment, most Class Members would be unable to vindicate their rights. Class treatment will: (i) prevent

–50–
**PLAINTIFFS' CONSOLIDATED COMPLAINT**

inconsistent or contradictory rulings; (ii) reduce litigation costs; (iii) conserve judicial resources; and (iv) promote uniform enforcement of privacy protections for children. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

236. **Predominance. Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact predominate over any questions affecting individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiffs and each Class Member. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that the children's data was unlawfully collected in the same way. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

237. **Ascertainability.** Class Members are readily ascertainable using objective criteria, including from Defendants records including, but not limited to, the YouTube analytics data collected by Defendants for YouTube uploads on Disney-affiliated channels. These records enable Class Members to be identified and notified through reasonable effort.

238. **Issue Certification Under Rule 23(c)(4).** Certification is appropriate under Rule 23(c)(4) because this action presents discrete, common issues suitable for classwide resolution, including: (i) Defendants' liability; (ii) statutory violations; (iii) consent failures; (iv) data collection practices; and (v) entitlement to injunctive relief.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

239. **Injunctive and Declaratory Relief.** Defendants have acted on grounds generally applicable to the Class, making final injunctive and declaratory relief appropriate under Rule 23(b)(2). Absent injunctive relief, Defendants' unlawful practices will continue to harm children and their families.

## CLAIMS FOR RELIEF

## COUNT I
### Intrusion Upon Seclusion (Common Law)

240. Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

241. Plaintiffs bring this count against Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

242. Plaintiffs and Class members have an objective, reasonable expectation of privacy in the online activities of minors and their online communications, including minors' location, personal information, viewing history and browsing activities on YouTube.

243. Plaintiffs' and Class Members' private affairs, concerns, and seclusion includes their interest in their personal information, which includes data points concerning their identity, location and online activity while using internet-connected devices.

244. Plaintiffs and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiffs and Class Members never agreed that Defendants could collect and disclose data regarding their identity, location, viewing history, and other online activity while using internet-connected devices.

245. Plaintiffs and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

right to not have their personal information intercepted and utilized for business gain.

246. Disney intentionally intruded on Plaintiffs' and Class Members' private life, seclusion, or solitude, without consent. The content on Disney's YouTube channels was clearly and unmistakably directed at children, and Disney was well-aware of the demographic that made up the vast majority of its audience. Yet Disney failed to designate this content as MFK thereby enabling the platform and its ad partners to secretly track, profile, and target young viewers for behavioral advertising -- a practice that is both unlawful under COPPA and state law and highly offensive to a reasonable person.

247. YouTube was well-aware of the demographic that made up the vast majority of Disney's audience. Yet YouTube also failed to designate this content as "made for kids," thereby enabling the platform and its ad partners to secretly track, profile, and target young viewers for behavioral advertising – a practice that is both unlawful under COPPA and state law and highly offensive to a reasonable person.

248. Defendants' intrusion upon seclusion of the Plaintiffs and Class Members was substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by consumer surveys, academic studies detailing the harms of tracking children online, centuries of common law, scholarly literature on consumers' reasonable expectations, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and the fines sought by the FTC predicated on Defendants' conduct.

249. Defendants intentionally intruded upon Plaintiffs' and Class Members' seclusion by improperly collecting and using their personal information, without providing direct notice to their parents and obtaining verifiable parental consent, as required by COPPA.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

250.   As minor children, Plaintiffs and Class Members lacked the ability to form expectations about reasonable privacy; their parents and guardians, however, had a reasonable expectation of privacy in their children's online viewing activities, particularly given their children's ages and the nature of the content involved.

251.   Defendants' conduct has needlessly harmed Plaintiffs and the Class by capturing intimately personal facts and data in the form of their online communications. This disclosure and loss of privacy and confidentiality has caused Plaintiffs and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

252.   As a direct and proximate result of Defendants' conduct Plaintiffs and Class Members suffered actual and concrete injury as a result of Defendants' intrusion upon their seclusion.

253.   Further, Defendants have improperly profited from the invasion of Plaintiffs' and Class Members' privacy in their use of their data for its lucrative economic value, in particular for behavioral and targeted advertising.

254.   On behalf of themselves and Class Members, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits realized by Defendants as a result of their intrusion upon seclusion of Plaintiffs' and members of the Class's private affairs, concerns, and seclusion.

255.   Defendants' conduct is ongoing, and it continues to unlawfully intrude upon, intercept, and disclose the communications of Plaintiffs and Class Members without their consent. Plaintiffs and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT II**

–54–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

**Invasion of Privacy (California Constitution)**

256. Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

257. Plaintiffs C.R. and C.R. bring this count on behalf of the California Subclass.

258. California established the right to privacy in Article I, Section 1 of the California Constitution.

259. Plaintiffs and Class Members had a reasonable and legitimate expectation of privacy in the personal information, as defined by COPPA, including data about their respective location and online activity while using an internet connected device. Defendants misappropriated, used, and disclosed that data without authorization.

260. The private affairs of Plaintiffs and Class Members include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Defendants.

261. As minor children, Plaintiffs and Class Members lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions; their parents and guardians, however, had a reasonable expectation of privacy in their children's online viewing activities, particularly given their children's ages and the nature of the content involved.

262. Neither Plaintiffs and the Class Members nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

263. Defendants owed a duty to Plaintiffs and Class Members to keep their personal information confidential.

264. Defendants failed to protect and released to third parties the personal information of Plaintiffs and the Class.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

265. The unauthorized release to, custody of, and examination by unauthorized third parties of the personal information of Plaintiffs and the Class is highly offensive to a reasonable person.

266. As a result of the conduct and practices alleged herein, Defendants intentionally intruded upon the private affairs and matters of Plaintiffs and Class Members, including by electronic means while they were in private and in their personal quarters, by improperly accessing their personal information and using it for improper purposes, including by targeting them with advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and Class Members, as detailed herein.

267. As a proximate result of the above acts and omissions of Defendants, the personal information of Plaintiffs and the Class was disclosed to third parties without authorization, causing Plaintiffs and the Class to suffer damages.

268. Class Members suffered actual and concrete injury as a result of Defendant's intrusions upon the private affairs, conversations, and matters of and Plaintiffs and the Class Members.

269. In failing to protect Plaintiffs' and Class Members' personal information, and in disclosing Plaintiffs' and Class Members' Personal Information, Defendants acted with malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private.

270. Plaintiffs and Class Members are therefore entitled to damages including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Defendants as a result of their invasion of Plaintiffs' privacy.

271. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to

–56–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

Plaintiffs and the Class in that the personal information maintained by Defendants can continue to be used by unauthorized third parties. Plaintiffs and the Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Class. Plaintiffs seek injunctive relief on behalf of the Class, restitution, as well as any and all other relief that may be available at law or equity.

## COUNT III
### Trespass to Chattels

272. Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

273. Plaintiffs bring this count against Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

274. Plaintiffs and Class Members have a property interest in their Personal Information, which is an asset with value that Plaintiffs and Class Members possess.

275. Defendants unlawfully took possession of, and commercially exploited Plaintiffs' and the Class Members' Personal Information and private data without consent and without compensating them for the use of their assets.

276. By intentionally choosing to not designate clearly child-directed content as MFK on YouTube, Defendants enabled and benefited from the surreptitious placement of tracking tools on children's devices through third-party advertising systems. This conduct was done without notice, authorization, or valid parental consent, and was specifically intended to harvest behavioral data from children for advertising and profit.

277. As a result of the conduct and practices alleged herein, Defendants' conduct caused harm, in that it damaged, diminished, impaired, interfered with, and/or destroyed the value of the Personal Information in which Plaintiffs and Class Members have a possessory interest.

–57–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

278. Plaintiffs seek appropriate relief for that injury on behalf of Class Members, including but not limited to (i) damages that will reasonably compensate Class Members for the harm to their interests in their personal information, and (ii) disgorgement of profits made by Defendants as a result of Defendants' intentional interference with the possession of their personal information.

279. Plaintiffs and Class Members are entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Defendants.

## COUNT IV
## Negligence

280. Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

281. Plaintiffs bring this count against Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

282. Defendants owed a duty of care to safeguard the privacy and personal information of children who viewed the child-directed content on YouTube.

283. This duty of care to children was higher than the duty owed to an ordinary consumer because of children's lack of capacity to appreciate and mitigate risks.

284. Defendants had a duty of care to safeguard the Personal Information of Plaintiffs and Class Members, including not to collect, store or otherwise misuse Plaintiffs' and Class Members' Personal Information, nor to cause the collection, storage or misuse of such personal information.

285. Defendants breached these duties by negligently, recklessly, and/or knowingly failing to appropriately mark or correct child-directed videos as MFK and therefore failing to prevent the collection and use of children's Personal Information for targeted advertising purposes.

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

286. Defendants negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' data from being collected and disclosed to third parties, without parental consent.

287. This breach is particularly egregious because Defendants knew or should have known that Disney content was viewed primarily by children under the age of 13, and that failure to properly designate such content as MFK would result in the collection of young viewers' personal information, including persistent identifiers such as cookies and IP addresses, without verifiable parental consent.

288. Defendants knew or acted with reckless disregard of the risks posed to Plaintiffs and Class Members by Defendants' failure to properly label the videos as MFK.

289. But for Defendants' wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

290. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

291. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury, including but not limited to: (i) the loss of the opportunity of how their Personal Information is used; (ii) the compromise, publication, and/or theft of their personal information; (iii) the continued risk to their Personal Information, which may remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Personal Information in their continued possession; and (iv) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest,

–59–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

and repair the impact of the Personal Information compromised as a result of Defendants' breach of their duties for the remainder of the lives of Plaintiffs and Class Members.

292.    Plaintiffs and Class Members are therefore entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Defendants as a result of their negligence.

## COUNT V
## Negligence Per Se

293.    Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

294.    Plaintiffs bring this count against Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

295.    Defendants owed a duty of care to children who viewed its content to safeguard their privacy and personal information.

296.    Defendants also had independent duties under state and federal laws that required Defendants to ensure that personal information of children was not collected without parental consent.

297.    Defendants were required to comply with applicable privacy laws designed to protect children, including COPPA, and to take reasonable steps to protect children's personal information from unlawful collection and use.

298.    Pursuant to COPPA, Defendants were and are required to obtain parental consent prior to the collection of Plaintiffs' and Class Members' personal information. COPPA mandates that websites, apps and other online services that are directed to children under 13 have a privacy policy, notify parents about what personal information they collect, obtain verifiable parental consent before collecting such information, give parents access to their child's information, and maintain reasonable security for collected data.

–60–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

299.    Defendants owed a higher duty of care to children than to an ordinary consumer because of children's lack of capacity to appreciate and avoid risks.

300.    Defendants knew or should have known that Disney content was viewed primarily by children under the age of 13, and that failure to properly designate such content as MFK would result in the collection of young viewers' Personal Information without verifiable parental consent.

301.    Defendants failed to implement or maintain policies, procedures, or oversight mechanisms as needed to comply with COPPA.

302.    Defendants violated COPPA by failing to designate child-directed videos as MFK resulting in the unauthorized collection and use of their personal information. Defendants' conduct was particularly unreasonable given the notice that was given to Disney by YouTube that Disney was not in compliance with COPPA as of the summer of 2020.

303.    A presumption of negligence (negligence per se) is established where a defendant's negligence involves the violation of a statute or regulation, where plaintiff is within the class of persons that the statute or regulation was designed to protect and the violation is a substantial factor in the plaintiff's harm. Therefore, Defendants' violations of COPPA constitute negligence per se.

304.    Disney's violation of COPPA is particularly egregious as YouTube notified Disney of its obligations to comply with COPPA as early as 2019, and informed Disney that it was failing to comply with COPPA as early as 2020.

305.    As a direct and proximate result of Defendants' negligent actions and/or Defendants' violations of COPPA, Plaintiffs and Class Members suffered injury, including the collection, exposure, and exploitation of their intimate personal information.

306.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of its duties. Defendants knew or should have known that it was failing to meet its duties, and that Defendants'

–61–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their personal information.

307.   Plaintiffs and Class Members are therefore entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Defendants as a result of their negligence per se.

**COUNT VI**
**Unjust Enrichment**

308.   Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

309.   Plaintiffs bring this count against Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

310.   Defendants received a benefit from their collection and use of Plaintiffs' and Class Members' data and Personal Information, including the ability to deploy targeted advertising to minor children Plaintiffs and Class Members, in violation of state and federal law.

311.   Upon information and belief, Defendants' collection and use of Plaintiffs' and Class members' information yielded significant monetary benefit to Defendants.

312.   Defendants enriched themselves through advertising targeted to Plaintiffs and Class Members, among various means. Defendants' enrichment came at the direct expense of Plaintiffs and Class Members, whose privacy was compromised and whose Personal Information was wrongfully used to generate corporate profit.

313.   As set forth above, Defendants' ability to engage in targeted and behavioral advertising allowed them to reap significantly higher advertising revenue than if they were only able to engage in contextual advertising on videos; however,

–62–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

if Disney had properly marked its videos as MFK, Defendants could not have been able to engage in behavioral advertising.

314. Plaintiffs and Class Members were harmed because their privacy was violated and their personal information collected in contravention of law and social norms in a way that would be unconscionable to a reasonable person.

315. Defendants knew that Plaintiffs' and Class Members conferred a benefit which Defendants accepted. Defendants profited from the children's data through obtaining compensation for marketing and advertising services as described herein.

316. Defendants' profiting from their unlawful conduct is therefore unjust and unconscionable to Plaintiffs and Class Members, as Defendants were only able to profit from Plaintiffs and Class Members because their privacy was violated and their Personal Information collected in violation of state and federal law.

317. Under the principles of equity and good conscience, Defendants should not be permitted to retain such compensation. Defendants should be compelled to disgorge the profits they accumulated as a result of their unjust and unlawful collection and use of Plaintiffs' and Class Members' Personal Information.

318. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered injuries, including those identified above.

319. Plaintiffs and Class Members are without an adequate remedy at law for Disney's unjust and unconscionable conduct.

320. Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' user data. Retention of those monies under these circumstances is unjust and inequitable because Defendants procured Plaintiffs' and Class Members' user data unlawfully without consent.

321. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class Members is unjust and inequitable, Defendants must

–63–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

pay restitution to Plaintiffs and the Class Members for its unjust enrichment, as ordered by the Court.

322.    Plaintiffs and Class members are entitled to restitution and/or damages from Disney and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Disney from its wrongful conduct.

### COUNT VII
### Unfair Competition Law (UCL)
### Cal. Bus. & Prof. Code §§ 17200 et seq.

323.    Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

324.    Plaintiffs bring this count against Defendants individually and on behalf of the Nationwide Class, or alternatively on behalf of the California Subclass.

325.    Defendants' conduct constitutes unfair, unlawful, and fraudulent business practices within the meaning of the California Business & Professions Code § 17200, et seq. (the "UCL").

326.    Defendants' conduct violated certain laws as alleged herein, including COPPA. By engaging in the said conduct in the course of doing business within California, Defendants engaged in unlawful business practices in violation of the UCL as to Plaintiff and all Class Members.

327.    Defendants' failure to designate their content on YouTube as MFK constitutes a fraudulent act or practice in violation of the UCL. Defendants' failure to adequately protect Plaintiff's and Class members' information, despite assurances they would do so and that Defendants met industry standards for data security, also constitutes a fraudulent act or practice in violation of the UCL.

328.    Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to a particularly vulnerable category of consumers—children. The gravity of harm of Defendants' allowing YouTube to collect, disclose, and otherwise misuse Plaintiff's

–64–

and Class Members' personal information and private data is significant and there is no corresponding benefit resulting from such conduct.

329.    Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

330.    Plaintiff and Class Members suffered injury in fact as a result of Defendants' conduct. Thus, Plaintiffs have standing to pursue this claim because they have been injured by virtue of the wrongful conduct alleged herein.

331.    The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in the other Counts of this Complaint. *See* Cal. Bus. & Prof. Code § 17205.

332.    Plaintiffs and the Class Members have lost money and property as a result of Defendants' conduct in violation of the UCL. The Personal Information and private data that was collected objectively has value.

333.    Plaintiffs and Class Members are thereby entitled to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of monies, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

**COUNT VIII**
**Violations of the Federal Wiretap Act (ECPA)**
**18 U.S.C. §§ 2510–2522**

334.    Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

335.    Plaintiffs bring this count against Defendants individually and on behalf of the Nationwide Class.

336.    Codified under 18 U.S.C. § 2510 et seq., the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

337.    The Wiretap Act was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for

–65–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

private intrusions as though they were government intrusions, and to address Congress' concerns that technological advancements in computers and other methods of communication were rendering the Wiretap Act out-of-date.

338. The Wiretap Act now confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

339. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

340. The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

341. The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

342. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

343. Each Defendant is a person for the purposes of the Wiretap Act.

344. YouTube's user tracking tools that Disney allows YouTube to deploy on videos not marked as MFK constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

345. The confidential communications Plaintiffs and Class Members had with Disney's channels and videos, in the form of their clicks, likes, comments, subscription actions, the videos they chose to watch, other browsing information,

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

and personally identifying information, that were intercepted by YouTube and its advertisers were "electronic communications" under 18 U.S.C. § 2510(12).

346. Plaintiffs and Class Members reasonably expected that YouTube and third-party advertisers were not intercepting, recording, or disclosing their electronic communications to build user profiles for targeted advertising.

347. At no time did Plaintiffs ever provide Defendants with any form of consent, either written or otherwise, to facilitate Defendants' interception of their communications.

348. Moreover, while the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. §2511(2)(d). Defendants' conduct falls within this crime-tort exception, as the FTC has already found that Disney's interception of Plaintiffs' communications violated COPPA.

349. As a result of Defendants' wrongful conduct, Plaintiffs and the Class have had their statutorily defined right to privacy violated through the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520.

350. Plaintiffs seek an injunction to prohibit Defendants' continued violations of the Wiretap Act, as well as the maximum actual, statutory, and punitive damages available under the Wiretap Act.

**COUNT X**
**Violations of the Pennsylvania Wiretap Act**
**18 Pa. Cons. Stat. § 5701 et seq.**

351. Plaintiffs re-allege the foregoing allegations as if fully set forth herein.

352. Plaintiffs S.K., E.K., and A.F. bring this count against Defendants individually and on behalf of the Pennsylvania Subclass.

–67–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

353.    The Pennsylvania Wiretap Act prohibits (1) the interception of any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through interception; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the user knew or should have known was obtained through interception. 18 Pa. Cons. Stat. § 5703.

354.    Any person who intercepts, discloses, uses, or procures another to intercept, disclose, or use a wire, electronic, or oral communication in violation of the Pennsylvania Wiretap Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

355.    "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

356.    "Contents" means "any information concerning the substance, purport, or meaning of [a] communication." 18 Pa. Cons. Stat. § 5702.

357.    "Person" means "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

358.    "Electronic Communication" means "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

359.    Defendants are each a "person" under the Pennsylvania Wiretap Act.

360.    YouTube's user tracking tools that Disney allows YouTube to deploy on videos not marked as MFK constitute a "device" used for the acquisition of the contents of a wire, electronic, or oral communication within the meaning of the Pennsylvania Wiretap Act.

–68–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

361. The confidential communications Plaintiffs and Class Members had with Disney's channels and videos—clicks, likes, comments, subscription actions, the videos they chose to watch, other browsing information, and PII—constitute "contents" of "electronic communication[s]" within the meaning of the Pennsylvania Wiretap Act.

362. Plaintiffs and Class Members, as minors, and their guardians reasonably expected that YouTube and third-party advertisers were not intercepting, recording, or disclosing the contents of their electronic communications, including viewing history and other personal information, to build user profiles for targeted advertising. This expectation is reasonable in light of the societal norms alleged above and Congress' determination, as codified in COPPA, that children have a privacy interest in their online activities and personal information online.

363. At all times relevant to this Complaint, Disney's enabling of YouTube's interception was knowing, willful, and intentional. Disney is a sophisticated party with full knowledge regarding the functionality of YouTube's data collection and tracking tools, and YouTube explicitly informed Disney that Disney was obligated to mark children-directed videos as "made for kids" to prevent interception and real-time sharing of child users' private communications with YouTube and third-party advertisers.

364. On information and belief, Plaintiffs' and Class Members' electronic communications are intercepted contemporaneously with their transmission.

365. At no time did Plaintiffs provide Defendants with any form of consent, either written or otherwise, to allow YouTube's interception of their communications.

366. As a result of Defendants' wrongful conduct, Plaintiffs and the Class have had their statutorily defined right to privacy violated through the unauthorized interception, disclosure, and use of their confidential communications in violation of the Pennsylvania Wiretap Act.

–69–

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

367. Plaintiffs seek an injunction to prohibit Defendants' continued violations, and the maximum actual, statutory, and punitive damages available under 18 Pa. Cons. Stat. § 5725(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class(es), respectfully request that this Court:

A. Certify the Class(es) under Rule 23 of the Federal Rules of Civil Procedure and name Plaintiffs as representatives of the Class(es) and Plaintiffs' attorneys as Class Counsel to represent the Class(es);

B. Declaring that Defendants' conduct violates the statutes referenced herein;

C. Find in favor of Plaintiffs and the Class(es) on all counts asserted herein;

D. Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

E. Issue an order of restitution and all other forms of equitable monetary relief, including but not limited to enjoining Defendants from engaging in the wrongful conduct complained of herein;

F. Award pre-judgment and post-judgment interest as provided by law;

G. Award attorneys' fees, costs, and litigation expenses, as allowed by law;

H. Grant injunctive relief as appropriate; and

I. Grant such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 17, 2026,                    Respectfully Submitted,

                                             */s/ William J. Edelman*
                                             William J. Edelman (SBN 285177)
                                             **MILBERG, PLLC**
                                             227 West Monroe Street, Suite 2100

**PLAINTIFFS' CONSOLIDATED COMPLAINT**

Chicago, IL 60606
Tel: (771) 474-1121
wedelman@milberg.com

Tina Wolfson (SBN 174806)
Robert Ahdoot (SBN 172098)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave. Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com

Jean S. Martin (admitted pro hac vice)
**MORGAN AND MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505
Fax: (813) 223-5402
jeanmartin@forthepeople.com

*Plaintiffs' Interim Co-Lead Counsel*

**PLAINTIFFS' CONSOLIDATED COMPLAINT**