William J. Edelman (SBN 285177)
**MILBERG, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

Tina Wolfson (SBN 174806)
Robert Ahdoot (SBN 172098)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave. Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com

Jean S. Martin (admitted *pro hac vice*)
**AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLC**
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Tel: (850) 202-1010
jmartin@awkolaw.com

*Plaintiffs' Interim Co-Lead Counsel*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| In re Disney Worldwide Services COPPA Litigation | Case No. 2:25-CV-08410-GW-RAO<br><br>Hon. George H. Wu, presiding<br><br>**PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT**<br><br>ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, E.A., S.A., A.F., C.R., and C.R., by and through their respective guardians (collectively "Plaintiffs"), and by and through their undersigned counsel, hereby allege as follows against Defendants Disney Worldwide Services, Inc. ("Disney Worldwide"), Disney Entertainment Operations, LLC ("Disney Entertainment"), and The Walt Disney Company ("TWDC") (collectively, "Disney"), and Defendants Google LLC ("Google") and YouTube LLC (together with Google, "YouTube"):

## I. INTRODUCTION

1. Disney is one of the world's largest media entertainment conglomerates.

2. Disney has built a media empire based on content that is specifically made for children, including the use of globally recognized characters, franchises, and branded content, including Disney Princesses, Pixar, Marvel, and Star Wars.

3. Disney produces and distributes highly popular child-directed content through official services such as YouTube, a video-sharing platform owned and operated by Google.

4. Since November of 2019, YouTube has required content creators such as Disney to indicate whether videos they upload to its platform are "Made for Kids" ("MFK") or "Not Made for Kids" ("NMFK"). YouTube enacted this policy (the "MFK Policy") as part of a historic $170 million settlement with the Federal Trade Commission ("FTC") and the New York Attorney General over allegations that YouTube was violating the Children's Online Privacy Protection Act ("COPPA"), a federal law that protects the online privacy of children under 13 by, among other things, requiring verifiable parental consent for the collection of their personal information.[1]

---

[1] *See* Press Release, Fed. Trade Comm'n, Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law (Sept. 4, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/09/google-youtube-

5. The MFK/NMFK designation is not a label; it is a switch. As explained in detail below, when a video is designated NMFK, YouTube's systems collect personal information — including persistent identifiers such as cookies, device identifiers, and advertising identifiers that federal law expressly defines as children's "personal information" — from every viewer of that video, at the moment the video page loads, on every view, and use that information for tracking, profiling, and behaviorally targeted advertising. When a video is designated MFK, YouTube switches that tracking off — limiting collection to what the law permits for the service's internal operations — and disables the user-visible features that depend on it. The designation therefore determines, viewer by viewer and view by view, whether a child watching a Disney video is tracked.

6. Instead of complying with COPPA and YouTube's MFK Policy, Disney chose to unlawfully profit from the personal information — including persistent identifiers (like cookies and device IDs) and sensitive information (such as identity and location) (together, "Personal Information") — of millions of children who watched Disney videos posted on YouTube containing content directed at children but designated NMFK.

7. Disney enabled that unlawful collection in two distinct ways, each detailed below. *First*, Disney adopted and maintained a corporate policy of designating its YouTube channels at the channel level and then leaving each uploaded video with the channel's default designation. On channels Disney designated NMFK, that policy automatically designated as NMFK every video uploaded to the channel — including videos unmistakably directed at children — thereby switching on data collection from the children who watched them. *Second*, on channels that Disney itself designated MFK — channels with names like Disney Junior, Mickey Mouse, Pixar Cars, and Nat Geo Kids — Disney deviated from its

---

will-pay-record-170-million-alleged-violations-childrens-privacy-law ("YouTube Settlement Announcement").

own policy by designating individual videos NMFK and enabling targeted advertising campaigns to run on those videos.

8. Disney engaged in these intrusive and unlawful business practices without first notifying parents or obtaining verifiable parental consent.

9. From November of 2019 through the present (the "Class Period"), Personal Information of Plaintiffs and Class Members has been collected in violation of COPPA and other state and federal laws: YouTube collected it through the tracking technologies described below, and Disney enabled, benefited from, and shared in the proceeds of that collection.

10. YouTube, for its part, was aware of Disney's noncompliance with the MFK Policy — YouTube itself redesignated more than 300 Disney videos from NMFK to MFK in June 2020 — but failed to take adequate measures to correct it, and continued to collect, use, and monetize the Personal Information of children watching Disney's misdesignated videos.

11. As a result, Disney and YouTube each collected, retained, used, and/or benefited from Plaintiffs' and Class Members' Personal Information without consent, and profited from additional advertising and subscription revenues gained as a result.

12. Disney also generates substantial advertising revenue from exposing its audience to YouTube's targeted advertising algorithm that applies when videos are designated NMFK.

13. In addition to having their Personal Information collected, children who viewed the mislabeled NMFK videos were subjected to adults-only functionality on YouTube, including the ability to interact with, make, and read public user comments, to "follow" and "like" channels, to have successive content "autoplay" when a mislabeled video finishes, and to receive targeted behavioral advertisements

based on their inferred interests and behaviors, collected from their online activities.[2] All these features increase the child's value to advertisers and engagement with Disney's content, thereby increasing Disney's and YouTube's profits at the expense of children's legally protected privacy rights. As set forth below, these same user-visible features also mark, to any viewer, that a video is designated NMFK — and each Plaintiff observed them on the misdesignated Disney videos they watched.

14. Moreover, by Disney's failure to properly adhere to the MFK Policy, children are often served advertisements calibrated for a general or adult audience. As research shows, 95% of early childhood videos on YouTube contain some form of advertising, and one in five videos viewed by children eight and under includes ads that are not age-appropriate — ranging from violent video games and lingerie to alcohol and political messaging. Even videos that are otherwise suitable for children still feature inappropriate ads between 9% and 22% of the time.[3]

15. Protecting children's privacy is a major concern for parents in the modern digital age. In a recent survey, more than 85% of parents said that access to technology is important for their children's future, but more than three quarters of parents are concerned about protecting their family's security, and 73% were concerned about their children's personal data being collected by third parties without their consent.[4]

---

[2]Protecting children watching YouTube videos: Lessons learned from FTC's settlement with Disney, Business Blog, Fed. Trade Comm'n (Sept. 2, 2025), https://www.ftc.gov/business-guidance/blog/2025/09/protecting-children-watching-youtube-videos-lessons-learned-ftcs-settlement-disney.

[3]As Online Videos Dominate Young Kids' Screen Time, YouTube Exposes Them to Age-Inappropriate Content, Common Sense Media (Nov. 17, 2020), https://www.commonsensemedia.org/press-releases/as-online-videos-dominate-young-kids-screen-time-youtube-exposes-them-to-age-inappropriate-content.

[4]Polling Memo: Parents' Views on Children's Digital Privacy and Safety, Trusted Future (July 15, 2022), https://trustedfuture.org/childrens-digital-privacy-and-safety/.

16. These concerns are well founded. "[U]p until age 18, young people are highly vulnerable to advertising."[5] This is why businesses targeting child audiences must be especially careful to avoid the sharing of information about those children with advertisers, and must be upfront with parents about the collection and sharing of information so parents can decide whether an online service is appropriate. Disney and YouTube each failed to comply with these legal obligations.

17. In September 2025, following an FTC investigation, the United States sued Disney for exactly the conduct described in this Complaint, and Disney agreed to a stipulated order requiring it to pay a $10 million civil penalty and to implement a ten-year "Audience Designation Program" to review whether each of its YouTube videos is child-directed. That regulatory action, however, provides no compensation to the children whose Personal Information was taken, no deletion of the data that was collected, no notice to their parents, and no relief at all against Google and YouTube — the entities that actually hold and continue to benefit from the children's data.

18. As a result of this conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of their data to third parties; (iv) loss of benefit of the bargain; (v) diminution of value of the children's private data; (vi) loss of privacy; and (vii) statutory damages. These injuries, and the methods by which the resulting damages can be measured and computed on a classwide basis from Defendants' own records, are detailed in Section IV.T.

---

[5] Exposing the Dangers of Targeting Children as Consumers, UC Irvine Paul Merage School of Business (July 3, 2024), https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html.

19. Therefore, Plaintiffs, on behalf of themselves and the Classes of similarly situated persons defined below, seek to remedy these harms and assert claims for intrusion upon seclusion, invasion of privacy under the California Constitution, negligence (including negligence per se as a theory of that claim), unjust enrichment, violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, violations of the Federal Wiretap Act (ECPA), 18 U.S.C. §§ 2510–2522, and violations of the Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. §§ 5701 *et seq.*

20. To aid the Court, this Amended Consolidated Complaint: explains how YouTube's tracking technology identifies and follows individual viewers — including viewers who never sign in to any account (Section IV.F); explains why, under COPPA and the COPPA Rule since 2013, the persistent identifiers YouTube collects *are* children's "personal information" (Section IV.I); identifies the categories of records in Disney's and YouTube's possession that document which videos were misdesignated, when, and which viewers' identifiers received them (Section IV.J); explains the concrete, multi-factor legal standard that governs the child-directed determination and why this case rests on content that is child-directed under any reasonable application of that standard (Section IV.M); separately details the two distinct mechanisms by which Disney enabled unlawful collection (Section IV.O); differentiates the conduct of Disney and of YouTube (Section IV.Q); alleges the specific videos, dates, channels, and observed functionality for each Plaintiff (Section IV.U); and identifies the specific injunctive relief Plaintiffs seek that is not provided by the existing government consent decrees (Section VII). It also explains why the harms alleged are legally cognizable and how the resulting damages can be measured and computed on a classwide basis from Defendants' own records (Section IV.T).

## II. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because the proposed Class consists of more than 100 members, at least one Class member is a citizen of a state different from at least one Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiffs' claims under the Federal Wiretap Act.

22. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as Plaintiffs' federal claims.

23. This Court has general and specific personal jurisdiction over Defendants because Defendants are domiciled in, incorporated in, maintain principal places of business in, and/or conduct substantial, continuous, systematic business in this District. Defendants have purposefully directed their activities toward residents of this District, have availed themselves of the privileges of conducting business here, and Plaintiffs' claims arise out of and relate to Defendants' contacts with this forum.

24. Defendants operate, manage, and monetize official YouTube channels from offices located within California and/or within this District, maintain substantial corporate operations within this District, and/or derive substantial revenue from activities conducted in this forum, including the distribution and monetization of child-directed video content. The audience-designation decisions, data collection systems, and advertising systems at issue in this Complaint were designed, implemented, and controlled from California.

25. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)-(d) because Defendants reside in this District, are subject to personal jurisdiction here,

conduct substantial business in this District, and/or because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III. PARTIES

26. Plaintiffs E.A. and S.A. are minors who bring this action by and through their guardian, Brett Aronson, and are domiciled in and citizens of Colorado. During the Class Period, E.A. and S.A. viewed Disney's child-directed content that was misclassified as NMFK on YouTube — including the specific videos, on the specific channels and dates, identified in Section IV.U below — resulting in the unlawful collection, use, and monetization of their Personal Information without parental consent.

27. Plaintiff A.F. is a minor who brings this action by and through her guardian, Veronika Pikeeva, and is domiciled in and a citizen of Pennsylvania. During the Class Period, A.F. viewed Disney's child-directed content that was misclassified as NMFK on YouTube — including the specific videos, on the specific channels and dates, identified in Section IV.U below — resulting in the unlawful collection, use, and monetization of A.F.'s Personal Information without parental consent.

28. Plaintiffs C.R. and C.R. are minors who bring this action by and through their guardian, Kimberly Sobalvarro, and are domiciled in and citizens of California. During the Class Period, they viewed Disney's child-directed content that was misclassified as NMFK on YouTube — including the specific videos, on the specific channels and dates, identified in Section IV.U below — resulting in the unlawful collection, use, and monetization of their Personal Information without parental consent.

29. At all relevant times, none of the Plaintiffs or their guardians provided Disney or YouTube with verifiable parental consent to collect, use, disclose, or monetize Plaintiffs' Personal Information. Plaintiffs' guardians place significant value on their children's privacy and would not have consented to the collection and

use of their children's data on Disney channels, nor would they have permitted their children to access YouTube had they known of Defendants' unlawful practices.

30. The Walt Disney Company ("TWDC") is a Delaware corporation with its principal place of business at 500 South Buena Vista Street, Burbank, California. TWDC is the parent company of Disney Worldwide and Disney Entertainment and, at all relevant times, exercised control over the policies, practices, and monetization strategies at issue.

31. Disney Worldwide Services, Inc. ("Disney Worldwide") is a Florida corporation with its principal place of business at 1375 Buena Vista Drive, Lake Buena Vista, Florida. Disney Worldwide maintains a California office at which all its directors and principal officers are located at 500 South Buena Vista Street, Burbank, California.[6] Disney Worldwide also maintains corporate offices at 7 Hudson Square, New York, New York. Disney Worldwide is a wholly owned subsidiary of TWDC and provides centralized administrative, operational, and business services for TWDC's various media and entertainment subsidiaries.

32. Disney Entertainment Operations, LLC ("Disney Entertainment") is a Florida limited liability company with its principal place of business at 500 South Buena Vista Street, Burbank, California. Disney Entertainment is responsible for the creation, distribution, and monetization of Disney's digital video content, including YouTube programming.

33. Defendants TWDC, Disney Worldwide, and Disney Entertainment operate as a unified enterprise and are agents, alter egos, and instrumentalities of one another. Each of these Defendants exercised control over, participated in, and profited from the conduct of Disney alleged herein.

---

[6] *See* Statement of Information filed with the Office of the Secretary of State for the State of California by Disney Worldwide Services, Inc., Entity No. 1653950 (Dec. 12, 2024).

34. Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California. According to YouTube's Terms of Service, Google LLC is the entity providing the YouTube platform and the products, services, and features made available as part of the platform.[7]

35. YouTube LLC is a Delaware limited liability company with its principal place of business at 901 Cherry Ave., San Bruno, California, and owns, operates, and controls the YouTube platform, including its data collection, advertising, and monetization systems. YouTube LLC is a wholly owned subsidiary of Google LLC.

36. *Usage note regarding party references.* Throughout this Complaint, "Disney" refers to TWDC, Disney Worldwide, and Disney Entertainment; "YouTube" refers to Google LLC and YouTube LLC. The conduct giving rise to liability is alleged actor by actor: Disney's conduct (creating child-directed content, controlling and misdesignating its audience settings, and enabling targeted advertising on it) and YouTube's conduct (designing and operating the systems that collect, profile, and monetize viewer data, with knowledge of the misdesignations) are separately alleged throughout, including in Sections IV.O and IV.Q and within each Claim for Relief. The collective term "Defendants" is not used to allege undifferentiated conduct; it appears only in party designations (identifying against whom a count is brought or relief is sought), in jurisdictional and venue allegations, in definitional or distributive allegations expressly applicable to each Defendant, and in summations that rest on the actor-specific conduct alleged elsewhere.

---

[7] *See* YouTube, Terms of Service, https://www.youtube.com/static?template=terms.

# IV. FACTUAL ALLEGATIONS

## A. Children Are Prime Targets of Online Data Collection and Advertising

37. Children are prime targets of the internet's present-day mass surveillance mechanics. As reported by Vox: "[T]oday's kids are the most at risk because they have the largest digital footprint in history. Between the Nest cameras watching kids at home, kids' games that target them with ads, and purchase preferences on Amazon and Google, their data is being harvested at an unprecedented rate."[8]

38. Advertisers have a strong incentive to collect data from minors because children are particularly susceptible to advertising.

39. Research conducted by the American Academy of Pediatrics has found that "[c]hildren are uniquely vulnerable to the persuasive effects of advertising because of immature critical thinking skills and impulse inhibition."[9] As one expert explains:

> There's a lot of neuroscience that explains why adolescents and children are so vulnerable [to advertising]…they're much more attuned to rewards, much less attentive to consequences and risks, much more tolerant of ambiguity, much more sensitive to social cues and much more impulsive, so they don't have a lot of cognitive control…This is an advertiser's dream.[10]

---

[8]Chavie Lieber, Big tech has your kid's data — and you probably gave it to them, Vox (Dec. 5, 2018), https://www.vox.com/the-goods/2018/12/5/18128066/children-data-surveillance-amazon-facebookgoogle-apple.

[9]Jenny Radesky, Yolanda Linda Reid Chassiakos, Nusheen Ameenuddin & Dipesh Navsaria, Digital Advertising to Children, 146 Pediatrics 1681 (Jul. 2020), available at https://pubmed.ncbi.nlm.nih.gov/32571990/.

[10]Exposing the Dangers of Targeting Children as Consumers, UC Irvine Paul Merage School of Business (July 3, 2024),

40. In pursuit of this dream, advertisers spend more and more on advertising directed to children every year. In 2023, United States kids' advertising expenditures totaled nearly $3 billion — by 2031, that number is projected to reach $21 billion.[11]

41. As a result, the National Financial Educators Council notes that: "By the time they turn 21, young people will have been exposed to over one million advertisements – many of which are highly-sophisticated ads that encourage them to make purchases based on wants rather than needs."[12]

42. Researchers have found that exposure to "newer forms of digital marketing" driven by "data collection" and "personalized behavioral marketing driven by machine learning" is "associated with unhealthy behaviors, such as intake of high calorie, low-nutrient food and beverages; use of tobacco products and electronic cigarettes; use of alcohol and marijuana; and indoor tanning."[13]

43. Online child-targeted advertising is a big problem — and without the Personal Information collected by companies like Google and YouTube — with the participation of content owners like Disney — it would not be nearly as effective.

**B. Disney's Business Model**

44. Disney, among the world's most powerful media corporations, operates through numerous subsidiaries and divisions engaged in film and television production, streaming services, theme parks, consumer products, and digital media.

---

https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html.

[11] Stop Advertising to Kids – Stop Predatory Advertising, National Financial Educators Council, https://www.financialeducatorscouncil.org/stop-advertising-to-kids/.

[12] *Id.*

[13] Radesky, *supra*.

45. Disney's operations encompass film and television production (including brands like Marvel and Lucasfilm), streaming services (such as Disney+), theme parks and resorts worldwide, consumer products, and digital media platforms.

46. Founded in 1923, Disney is known for its storytelling and iconic characters, leveraging strategic acquisitions and a diversified portfolio to create a powerful entertainment ecosystem.

47. Disney has built its empire by aggressively targeting children as a primary audience and commercial demographic across multiple platforms — including television, streaming, merchandise, theme parks, and digital media — often without meaningful parental oversight. Through its vast portfolio of globally recognized characters, franchises, and branded content, Disney markets itself as a trusted source of family entertainment while simultaneously leveraging its content to cultivate brand loyalty from a young age. Indeed, Disney prides itself as one of the world's "Most Reputable Companies," claiming "Our commitment to be among the most admired companies in the world guides our actions as a company and our efforts to promote the happiness and wellbeing of kids and families."[14]

48. Disney also touts that it is among the world's "Most Socially Responsible Companies," that it "received top honors in the citizenship category for our philanthropic and environmental efforts," and that it "value[s] our role in being a good corporate citizen in the global community. . . ."[15]

49. At its core, Disney's target market consists of families with young children, particularly those aged 4 to 12, who are introduced to the brand through

---

[14] Disney Named World's Most Reputable Company, The Walt Disney Company (Apr. 15, 2014), https://thewaltdisneycompany.com/disney-namedworlds-most-reputable-company/.

[15] Disney Named Most Socially Responsible Company, The Walt Disney Company (Oct. 9, 2013), https://thewaltdisneycompany.com/1030-2/.

animated films, television series, toys, merchandise, or streaming content.[16] Characters like Elsa from *Frozen* or Lightning McQueen from *Cars* are designed to appeal directly to this age group, with bright visuals, catchy music, and simple yet emotional storylines. Disney leverages these characters in every facet of marketing — from merchandise to theme parks. Disney designs experiences, from movie themes to theme park attractions, that appeal to this dual layer of child excitement and parental trust.

50. Disney appeals to educated, brand-conscious consumers who value safe, imaginative content for their children and resonate with family-oriented messaging. Parents often choose Disney content due to its strong focus on family-friendly themes, extensive library of beloved classics and new franchises, strong parental controls for younger viewers, and its ability to educate and promote positive values.[17] The perception among parents is that Disney provides superior educational content to its competitors, including academic and social curriculum that is above and beyond its competition.[18]

51. Disney's target market is emotionally driven, responding to themes of imagination, family, nostalgia, adventure, and empowerment. Parents value wholesome, safe entertainment and respond to narratives about love, resilience, and community. Films like *Encanto* or *Finding Dory* emphasize these ideals, reinforcing Disney's position as a family-first brand.

---

[16] Daniel Pereira, Disney Target Market Analysis, The Business Model Analyst (July 19, 2025), https://businessmodelanalyst.com/disney-target-market-analysis/.

[17] Rujula Rao, Streaming Wars: Analyzing the Competitive Dynamics of Disney+ vs. Netflix, Medium.com (June 18, 2024).

[18] Charlene DeLoach, How Disney Junior Changed Our Disney World Experience, Playroom Chronicles, https://www.playroomchronicles.com/disney-junior-disney-world/.

52. Despite its wholesome public image, Disney operates with the precision of a data-driven advertising enterprise, consistently prioritizing profit over children's privacy and well-being.

**C. The YouTube Platform**

53. As part of Disney's media strategy, Disney maintains a direct and lucrative commercial relationship with YouTube, an online video-sharing platform owned and operated by Google, where users can view videos or upload video content.

54. YouTube videos are viewable by anyone who accesses YouTube by visiting www.youtube.com, or by using the YouTube mobile app, the YouTube application on a smart TV or streaming device, or a YouTube video player embedded in a third-party website. YouTube does not require individuals to register or sign into its site to watch videos.

55. YouTube requires that videos intended to be available to the public be uploaded through a channel.

56. Each channel has a unique account and serves as a personalized space where a particular content creator's videos, playlists, branding, and audience engagement tools are hosted.

57. Content creators like Disney have full control over the videos uploaded to their channels, including the ability to set titles, thumbnails, descriptions, age designations, and monetization preferences.

58. Users may find videos on YouTube by navigating to a particular channel's homepage, or users may come across videos uploaded to a particular channel without interacting directly with that channel — for example, through YouTube's search function, through YouTube's algorithmic recommendations, through autoplay, or through links and embedded players on other websites.

**D. YouTube's Advertising Business: Behavioral Versus Contextual Advertising**

59. YouTube operates on an advertising-supported model. Ads displayed before, during, and alongside YouTube videos generate the vast majority of revenue for YouTube and its content creators.

60. YouTube collects data from viewers.[19] Google collects the data generated from YouTube ads, analyzes advertising performance, and provides its advertising customers market analysis.[20] The services associated with YouTube ads are highly profitable and generated revenue of $10.4 billion for YouTube in 2024 alone.[21]

61. YouTube is one of (if not the most) popular video platforms for children today, and it is used by children early and often, with use by children under 2 going from 45 percent to 62 percent in just six years.[22] The numbers only rise with age, as 84 percent of children between the ages of 2-4 use the platform, and 89 percent of children five and older do.

62. Content creators who upload videos on YouTube, like Disney, financially benefit from this advertising revenue through the YouTube Partner Program, a monetization agreement that allows eligible content creators to receive a

---

[19] Google, Information Google Collects | Google Privacy Policy, https://policies.google.com/privacy.

[20] Google, Measure Your Results, https://business.google.com/us/resources/articles/measure-your-results/.

[21] Skye Jacobs, YouTube rakes in record $10.4 billion from ads even as users grumble about aggressive strategy, TechSpot (Feb. 8, 2025), https://www.techspot.com/news/106701-youtube-rakes-record-104-billion-ads-even-users.html.

[22] From cradle to content: Children under 2 are watching more YouTube than they ever have, American Experiment (Nov. 25, 2025), https://www.americanexperiment.org/from-cradle-to-content-children-under-2-are-watching-more-youtube-than-they-ever-have/.

significant share of advertising revenue generated from videos of their content on YouTube, including pre-roll, mid-roll, banner, and targeted display advertisements.

63. Advertising on YouTube can be targeted in two ways: behavioral or contextual.

64. Contextual targeting is the delivery of advertisements to individuals based on the type of content the user is consuming, as opposed to the specific viewer who is watching it. For example, an advertiser might promote cookware on a recipe blog. Contextual advertising does not require collecting personal information about the viewer.

65. Behavioral targeting, by contrast, involves showing ads to specific users based on their personal data, which is tracked across various websites, apps, and devices. Behavioral advertising is definitionally individualized: it requires the platform to recognize the specific viewer, associate that viewer with data about that viewer's past behavior, and select advertisements calibrated to that viewer.

66. To facilitate behavioral targeting, YouTube collects Personal Information from individuals who access YouTube. That Personal Information includes a person's YouTube viewing history, user activity (searches run, views and interactions with content and ads, etc.), location information (GPS, internet protocol ("IP") address, device sensor data, and data from devices located near a user), and unique identifiers (cookie IDs, advertising IDs, device IDs, and others).

67. YouTube compiles this Personal Information into a user profile, creating an up-to-date and detailed snapshot of each user's preferences and behaviors.

68. YouTube uses these data profiles, and shares them with its partners, to deliver targeted advertisements based on the preferences inferred from the profiles.

69. The information YouTube collects is incorporated into an algorithm which infers which types of advertisements are likely to have the greatest impact on the user associated with the information (i.e., are most likely to be clicked on).

70. YouTube also uses this information to strengthen its powerful recommendation feature, which is built atop algorithms that have been known to transform a search for a single video into a marathon viewing session, where the YouTube platform provides video after video for viewer consumption.

71. This "rabbit hole" effect has been well documented, with researchers finding that the recommendation feature "boosts fringe videos to the mainstream and can unwittingly help spread conspiracies and misinformation about dangerous diseases, jeopardizing public health."[23]

72. A 2019 report found that 43 percent of children using YouTube watch videos using its "suggested features" function, and this number is almost certainly higher today considering the ever-increasing power of the algorithms powering those suggestions — algorithms that were developed and refined using data that YouTube collected, and Disney enabled YouTube to collect, from children without parental consent. As powerful as those algorithms are, they have been unable to prevent obscene and otherwise harmful content from making its way into the recommendations provided to children, with reports finding "hundreds of … videos of children's cartoon characters with inappropriate themes" such as graphic violence.[24]

73. Advertisers pay YouTube more to run behavioral advertising. YouTube in turn pays content creators, including Disney, more for running behavioral advertising on a channel than YouTube would have paid a creator for only allowing contextual advertising.

---

[23] Max Fisher & Amanda Taub, What is YouTube Pushing You to Watch Next?, N.Y. Times (Aug. 9, 2019), https://www.nytimes.com/2019/08/09/the-weekly/youtube-brazil-far-right.html.

[24] Anisa Subedar & Will Yates, The disturbing YouTube videos that are tricking children, BBC Trending (Mar. 27, 2017), https://www.bbc.com/news/blogs-trending-39381889.

**E. Disney's Presence and Monetization on YouTube**

74. Disney operates many official YouTube channels, including but not limited to: Disney Channel, Disney Junior, Disney Kids, Disney Animation Studios, Disney Parks, Pixar, and various franchise-specific channels, through which it uploads, promotes, and monetizes video content.

75. During the Class Period, Disney has operated and uploaded tens of thousands of videos to more than 1,250 YouTube channels through numerous subsidiaries.

76. Users can easily discover Disney content on YouTube through YouTube's search function, autoplay suggestions, and algorithmically driven recommendations, which often promote similar or related content once a child begins viewing a Disney video. Young children frequently access this content directly — by searching for characters or titles they recognize — or indirectly through embedded videos in third-party websites, on a variety of platforms including smart TVs, tablets, or the YouTube app.

77. Disney's videos are extremely popular on YouTube. Videos on just three dozen of Disney's channels resulted in tens of millions of hours watched worldwide and hundreds of millions of views in the United States in just three months of 2019. The amount of time viewers spent watching videos on these channels soared to over 100 million hours worldwide, with approximately 1.2 billion views in the United States alone, during three months of the early COVID-19 pandemic period of 2020.

78. In many households, Disney videos play continuously via autoplay, leading to extended viewing sessions often without direct parental supervision. These viewing patterns provide high engagement and view counts, generating substantial advertising revenue for Disney while also facilitating the collection of viewer data, including persistent identifiers, unless proper child-directed settings are applied.

79. Disney profits from YouTube videos in different ways, including through the YouTube Partner Program, which enables Disney to earn a share of the revenue from ads that appear on its videos. YouTube shares 55% of net ad revenue from watch page ads with creators. Disney also receives a portion of YouTube Premium subscription fees from viewers who watch its content, even though those viewers are watching ad-free.

80. Disney generates advertising revenues from YouTube videos in two ways. First, it receives a portion of the revenue that YouTube receives from advertising that YouTube places with Disney videos. Second, it places advertisements directly in some of the videos it uploads to YouTube.

81. Disney also has access to YouTube's content management, audience analytics, and monetization tools, including the settings related to behavioral advertising and the settings indicating whether content is directed at children under the age of 13. These tools allow Disney to benefit from and indirectly access the personal data — especially viewing history and other behavioral data — that YouTube collects from viewers, including children.

82. In addition to revenue received from YouTube for ad sales and subscription fees, Disney profits indirectly from increased fan engagement, converting to merchandise sales and affiliate marketing; Disney can sell its own branded merchandise or products directly through YouTube's shopping features.

83. Disney and YouTube also receive valuable viewer data, including metrics like views, watch time, audience demographics (age, gender, geography), and subscriber activity, and user data is shared with third-party advertisers, brands, and platforms, leading to increased earning opportunities from ads, brand deals, and shopping affiliate programs. The unauthorized collection of Plaintiffs' and Class Members' Personal Information has been a key revenue driver: Defendants track how consumers engage with content to personalize recommendations and

advertising, and segment their audiences by usage habits, engagement, family income, geography, and purchase behavior to inform ad placement.

### F. How YouTube Identifies and Tracks Every Viewer — Including Viewers Without Accounts

84. Watching a YouTube video is not like watching a television broadcast, where a signal is transmitted outward to anonymous receivers. It is a continuous, two-way electronic conversation between the viewer's device and Google's servers, in which the viewer's device identifies itself, transmits information about the viewer, and receives content and instructions in return. The mechanics of that conversation are what make both YouTube's advertising business and the COPPA violations alleged in this Complaint possible, and they are set forth here in detail.

85. When any device — a laptop, a tablet, a phone, or a smart TV — requests a YouTube watch page, the device transmits to Google's servers, before any video plays and before any advertisement is displayed, a package of information that includes at least: (a) the device's IP address, which identifies the device's network location and, in most cases, its physical location with considerable precision; (b) the "user agent" and device configuration details describing the device, operating system, browser or app, screen size, and language; (c) the address of the specific video being requested, which identifies the precise content the viewer chose to watch; (d) the referer — the referring page or, in some browsers, only the referring domain — revealing how the viewer arrived at the video; and (e) — critically — every cookie and similar identifier that YouTube, Google, and Google's advertising systems previously stored on that device.

86. The transmission of this information is not incidental to watching a video; it is engineered. Google designed the YouTube platform so that every video view — by every viewer, on every device, whether or not the viewer has ever created or signed into a Google account — transmits identifying information to Google, and

so that Google's servers can set, read, and refresh persistent identifiers on the viewer's device.

87. A "persistent identifier" is a durable label — for example, a unique alphanumeric string held in a browser cookie, an advertising identifier assigned by a mobile operating system, or a device identifier — that allows an online service to recognize that the same device and viewer has returned, and to connect what that viewer does today with what that viewer did before, for as long as the identifier remains in place: months or years, in the case of many of the advertising and analytics identifiers described below. Persistent identifiers are the workhorse of commercial online tracking because they reliably single out one viewer over time. They do not work alone: IP addresses and device characteristics are themselves identifiers — the COPPA Rule expressly lists an "Internet Protocol (IP) address" among the persistent identifiers that constitute children's personal information, 16 C.F.R. § 312.2 — and are used, including by Google, to recognize and track users when cookies alone are insufficient.

88. Google's own privacy disclosures confirm that it collects and stores information from users who watch YouTube videos while signed out. Specifically, Google states that many Google services can be used while signed out, including "watching YouTube videos," and that when a user is not signed in, Google stores collected information with "unique identifiers tied to the browser, application, or device" the user is using. Google also discloses that cookies and similar technologies — including unique identifiers used to identify an app or device — may be stored or used in a user's browser, app, or device for advertising purposes, including serving, personalizing, delivering, and measuring ads.[25]

---

[25] *E.g.*, Google, *Privacy Policy*, https://policies.google.com/privacy?hl=en-US (effective May 26, 2026) (stating that many Google services can be used while signed out, including "watching YouTube videos," and that, when a user is not signed in, Google stores collected information with "unique identifiers tied to the browser, application, or device" being used); Google, *How Google Uses Cookies*,

89. Google's own published disclosures identify the persistent identifiers it sets and reads on YouTube viewers, including viewers who are signed out. Google's "How Google uses cookies" disclosure identifies, among others: the "VISITOR_INFO1_LIVE" cookie, which persists for a minimum of six months by default — and, because its duration resets each time the viewer returns, effectively indefinitely for active users of the service — and which Google uses on YouTube for advertising, for analytics, and to "enable personalized recommendations on YouTube based on past views and searches" — that is, to recognize the returning viewer and connect that viewer's viewing history across sessions; the "YSC" cookie, which uniquely identifies the viewer's browsing session; the "NID" cookie, which persists for six months and whose stated purposes include "show[ing] ads in Google services for signed-out users"; "__Secure-"-prefixed YouTube cookies, including "__Secure-YNID," "__Secure-YENID," and "__Secure-YEC," persisting for up to thirteen months; and, for advertising on non-Google sites, the "IDE" cookie set through the doubleclick.net domain, which persists for up to twenty-four months in the United States.[26] A network capture of an NMFK-designated Disney video watch page loaded in a signed-out browser session in July 2026 confirmed the transmission in practice: the browser transmitted the VISITOR_INFO1_LIVE and YSC cookies, "__Secure-"-prefixed YouTube cookies, and a Google-assigned visitor identifier

---

https://policies.google.com/technologies/cookies?hl=en-US (stating that cookies and similar technologies, including unique identifiers used to identify an app or device, may be stored or used in a user's browser, app, or device, including for advertising purposes).

[26] Google, How Google Uses Cookies, https://policies.google.com/technologies/cookies?hl=en-US (identifying each cookie, its duration, and its function, including that VISITOR_INFO1_LIVE serves YouTube advertising and analytics functions and "enable[s] personalized recommendations on YouTube based on past views and searches," and that NID is used to "show ads in Google services for signed-out users"); see also Google, Privacy Policy, supra (cookies and "unique identifiers used to identify an app or device" may be stored or used for advertising purposes).

with its requests to YouTube's servers. On mobile devices, Google's disclosures likewise describe the use of "unique identifiers" tied to the application or device — on information and belief, including Apple's Identifier for Advertisers (IDFA) on iOS devices and the Google Advertising ID (AAID) on Android devices in the YouTube app, and the advertising identifiers assigned by smart-TV and streaming-device platforms.

90. These identifiers persist across viewing sessions. A child who watches Disney videos on the family tablet on Monday and returns on Friday presents the same identifiers both days; YouTube's systems recognize the returning device and viewer and append the new viewing activity to the accumulated record associated with those identifiers. In this way, YouTube "knows who is watching" in the sense that matters to its business and to the law: it recognizes the same viewer, singles that viewer out from all others, accumulates a history of that viewer's behavior, and acts on that history — whether or not it has ever learned the viewer's legal name. That a family device or browser may sometimes be used by more than one member of a household does not change this: whenever the child watches, the child's viewing activity is collected and appended to the accumulating record associated with the device's identifiers, and COPPA is triggered by the collection of information from a child — not by Defendants' certainty about who else may share the screen. YouTube's own policy resolves any doubt: since January 2020, YouTube has stated that it "treats personal information from anyone watching children's content on the platform as coming from a child, regardless of the age of the user."[27]

91. YouTube's systems also connect activity across sessions, across sign-in states, and across devices for advertising purposes. Google's Privacy Policy

[27] Press Release, Better protecting kids' privacy on YouTube, YouTube (Jan. 6, 2020), https://blog.youtube/news-and-events/better-protecting-kids-privacy-on-youtube/ ("YouTube now treats personal information from anyone watching children's content on the platform as coming from a child, regardless of the age of the user.").

states: "We may use the information we collect across our services and across your devices for the purposes described above. For example, depending on your available settings, if you watch videos of guitar players on YouTube, you might see an ad for guitar lessons on a site that uses our ad products."[28] Google's disclosures distinguish the identifiers it uses for security and fraud prevention (such as session-integrity cookies) from those it uses for advertising, analytics, and personalization; it is the latter — including VISITOR_INFO1_LIVE, NID, and IDE, as described above — through which viewing activity is linked to advertising profiles and followed across the web.

92. The data collected through these identifiers feeds the user profiles described above. Whether or not a viewer is signed in, the viewing history, search activity, click activity, and advertising interactions associated with the viewer's persistent identifiers are compiled and used to infer the viewer's interests, characteristics, and likely responses to advertising — and behaviorally targeted advertisements are then selected and served to that viewer on that basis.

### G. The MFK Designation Is a Switch That Controls Whether This Tracking Occurs

93. The MFK/NMFK designation determines whether the tracking apparatus described above is engaged for a given video. When a viewer loads a video designated NMFK, YouTube's systems collect the viewer's Personal Information — the persistent identifiers, viewing history, and related data described above — and make the video's watch page available with the full suite of engagement features (comments, likes, autoplay, save-to-playlist, and the others identified below), which themselves depend upon and generate user data. When a viewer loads a video designated MFK, YouTube disables the collection and use of viewer data for

[28] Google, Privacy Policy (effective May 26, 2026), *supra*; Google, How Google Uses Cookies, supra (categorizing cookies by function: security, functionality, analytics, advertising, and personalization).

personalized advertising and profiling, disables the data-dependent features listed above, and — in its own words — "limit[s] data collection and use on made for kids content to comply with the law," treating "personal information from anyone watching children's content on the platform as coming from a child, regardless of the age of the user."[29] Limited collection may continue on MFK content for purposes such as security, fraud prevention, and other internal operations, as the COPPA Rule's "support for the internal operations" exception permits, 16 C.F.R. § 312.2; the designation's function is to switch off what COPPA forbids without parental consent — the collection and use of children's personal information for tracking, profiling, and behavioral advertising.

94. The difference between the two data flows is directly observable and testable: loading an MFK-designated Disney video and an NMFK-designated Disney video, and capturing the network traffic each generates, will show the advertising and tracking requests that fire on the NMFK video and are absent or sharply curtailed on the MFK video. YouTube's own disclosures confirm the two states: on MFK content, YouTube "limit[s] data collection and use," serves no personalized ads, and disables the data-dependent features identified above and restricts back-end processing and advertising use of data that may still reach its servers; on NMFK content, the full tracking and behavioral-advertising apparatus described in this Section operates. A July 2026 network capture of an NMFK-designated Disney video watch page loaded in a signed-out browser session showed that data flow in operation: alongside the persistent identifiers described above, the browser transmitted an "ad-signals" payload describing the device and screen, and the page load triggered requests to YouTube playback- and watch-time-tracking

---

[29] YouTube Help Center, Set your channel or video's audience, https://support.google.com/youtube/answer/9527654 ("We limit data collection and use on made for kids content to comply with the law."); Better protecting kids' privacy on YouTube, *supra*.

endpoints recording the video viewed, and to Google advertising endpoints — including requests to the doubleclick.net advertising domain (among them ad-status and view-through-conversion requests) — none of which is necessary simply to play a video.

95. The sequence matters, and it is uniform: the collection comes first. On every view of every NMFK video, the viewer's identifiers and viewing information are transmitted and collected when the page loads — before any advertisement is displayed, whether or not the viewer ever clicks anything, and whether or not a behaviorally targeted advertisement is ultimately served during that viewing session. The behavioral advertising enabled by the NMFK designation is a downstream *use* of the data; the *collection* itself is complete on every view. A child does not avoid YouTube's data collection by ignoring the ads.

96. The collection likewise does not depend on who is holding the device. When a video is designated NMFK, YouTube collects the Personal Information of every viewer of that video — adult or child. That is precisely why the MFK designation exists: because YouTube's tracking is indiscriminate by design, federal law required a mechanism to switch it off for content whose audience is children. When Disney designated child-directed videos NMFK, it left the switch on for an audience Disney knew to be children.

### H. The Many Ways Children Watch — and Why None of Them Involves Parental Consent

97. Children access Disney content on YouTube through multiple modes, each of which results in the collection of Personal Information when the video viewed is designated NMFK: (a) in a web browser, not signed in to any account (a "guest" or signed-out session); (b) in the YouTube mobile app on a phone or tablet, signed out; (c) through the YouTube application on a smart TV or streaming device; (d) through YouTube video players embedded in third-party websites; and (e) on a

device where a parent's or other family member's Google account is signed in — a common circumstance on shared family devices.

98. In every one of these modes, when the video is designated NMFK, YouTube collects persistent identifiers and viewing data associated with the viewing child. In signed-out modes, the collection is tied to the device and browser identifiers described above. In signed-in modes, the collection is additionally tied to the signed-in account, and the child's viewing activity — including the specific videos watched and when — is recorded in the account's watch history in Google's possession.

99. Shared family devices are the norm, not the exception, in households with young children, and young children commonly watch YouTube on devices, screens, and accounts belonging to the household rather than to the child. In Pew Research Center's October 2025 survey of U.S. parents of children age 12 and under, 85% of parents reported that their child watches YouTube — roughly half daily — while children's screen use runs through household televisions (90%), tablets (68%), and smartphones (61%); only about a quarter of children 12 and under have a smartphone of their own, and ownership is concentrated among 11- and 12-year-olds. Children too young for their own devices and accounts are thus precisely the children watching on the family's shared, signed-in, or signed-out screens.[30] [31]

---

[30] Colleen McClain, Olivia Sidoti, Michelle Faverio & Suvi Lama, How Parents Manage Screen Time for Kids, Pew Research Center (Oct. 8, 2025), https://www.pewresearch.org/internet/2025/10/08/how-parents-manage-screen-time-for-kids/.

[31] *See* Supreet Mann, Angela Calvin, Amanda Lenhart & Michael B. Robb, The Common Sense Census: Media Use by Kids Zero to Eight, 2025, Common Sense Media (2025), *available at* https://www.commonsensemedia.org/sites/default/files/research/report/2025-common-sense-census-web-2.pdf (reporting that 96% of households with children ages 0 to 8 have an internet-connected smartphone, 75% have a tablet, 51% of children age 8 or younger have their own mobile device, 47% have their own tablet, television and video account for most young children's screen time, longer-video apps such as YouTube account for 32% of daily television/video viewing,

100. None of these viewing modes involves verifiable parental consent under COPPA. The COPPA Rule requires an operator to make reasonable efforts to ensure that a parent *receives direct notice* of the operator's collection practices as to children and *authorizes* the collection through a method reasonably calculated to ensure the person consenting is the parent. 16 C.F.R. §§ 312.4, 312.5. A parent's ordinary sign-in to a general-audience Google account is none of those things: it involves no direct notice that a child's personal information will be collected through child-directed videos mislabeled NMFK, and no authorization of any such collection. Indeed, Defendants' own conduct confirms the point: as alleged below, when the same Disney videos are offered on the YouTube Kids platform, YouTube *does* require parental consent before children may watch — because YouTube knows that consent obtained from an account holder for general YouTube usage is not COPPA consent for collection from children.

## I. Under COPPA, Persistent Identifiers Are "Personal Information" — the Identifier Is the Child

101. It is no answer to any of this that YouTube may not know the name of the child behind the screen. Congress and the FTC confronted — and closed — precisely that loophole more than a decade ago.

102. When COPPA was enacted in 1998, "personal information" was defined in terms of traditional identifiers: name, address, email address, telephone number, Social Security number, and the like. 15 U.S.C. § 6501(8).

103. In 2013, following an extensive rulemaking, the FTC amended the COPPA Rule to define "personal information" to expressly include "persistent identifier[s] that can be used to recognize a user over time and across different Web sites or online services," including "a customer number held in a cookie, an Internet

short-form video apps including YouTube Shorts account for 16%, and 62% of parents watch YouTube at least occasionally alongside their children).

Protocol (IP) address, a processor or device serial number, or unique device identifier." 16 C.F.R. § 312.2.

104. The 2013 amendments reflect a regulatory determination at the heart of this case: in the modern advertising economy, a persistent identifier is the person. An identifier that recognizes the same child across every video she watches, every search she runs, and every app and website she visits — and that is used to build a profile of her and to target her with advertising — identifies and follows that child as effectively as her name would, and more comprehensively. The COPPA Rule accordingly treats the collection of persistent identifiers from children, including by "[p]assive tracking of a child online," as the collection of children's personal information requiring parental notice and consent. 16 C.F.R. § 312.2 (definitions of "personal information" and "collects or collection").

105. The COPPA Rule also resolves who is responsible when the tracking is performed by one company on another company's content. Personal information is "collected or maintained on behalf of an operator when . . . [t]he operator benefits by allowing another person to collect personal information directly from users of" an online service. 16 C.F.R. § 312.2. Disney benefited — through elevated advertising revenue, analytics, and audience insights — by allowing YouTube to collect Personal Information directly from the children viewing Disney's child-directed videos. YouTube, in turn, collected that information itself, for its own substantial benefit.

106. Both the 2019 consent decree that Google and YouTube signed and the 2025 consent decree that Disney signed adopt these same definitions of "personal information," persistent identifiers included. Each Defendant group has therefore agreed, in a federal consent decree, to the very definitions that make the device-level

and browser-level tracking described above the collection of children's "personal information" under federal law.[32]

### J. Disney and YouTube Possess the Records That Identify the Affected Videos and Viewers

107. Disney's and YouTube's own systems record — at the level of individual videos, individual designation changes, and individual viewers' identifiers — the information that documents the violations alleged in this Complaint.

108. *Designation records.* YouTube's systems necessarily maintain, for each video on the platform, the video's audience designation and the history of changes to that designation, including who made each change and when. That is how YouTube was able to identify and change the designations of more than 300 Disney videos from NMFK to MFK in June 2020, and to redesignate additional Disney videos between 2020 and 2022; it is how YouTube "relies on" creator designations to configure each video's functionality; and it is how the parties to the FTC enforcement actions were able to describe designation practices video-by-video and channel-by-channel. Disney has parallel records: it manages its channels through YouTube Studio, which exposes to Disney each video's designation and settings, and Disney maintained its own written designation policies and compliance program. Indeed, designation status is a recorded, machine-readable attribute of every video on the platform: YouTube's own public Data API returns, for any video, both a "madeForKids" status field and a "selfDeclaredMadeForKids" field reflecting

---

[32] Stipulated Order for Permanent Injunction and Civil Penalty Judgment, Definitions ¶ P, *FTC v. Google LLC*, No. 1:19-cv-02642 (D.D.C. Sept. 10, 2019), ECF No. 5 ("2019 Order"); Order for Permanent Injunction, Civil Penalty Judgment, and Other Relief, Definitions ¶ O, *United States v. Disney Worldwide Servs.*, Inc., No. 2:25-cv-08223 (C.D. Cal. Dec. 23, 2025), ECF No. 25 ("2025 Disney Order").

the creator's own declaration — distinct fields that exist precisely because YouTube separately records the creator's designation and the operative designation.[33]

109. *Serve-time and impression records.* YouTube's advertising systems log the delivery of advertisements — including which advertisement was served, on which video, at what time, to which persistent identifier(s), and under which designation state. The precision of the government's allegations against Disney — for example, that "at least twelve different ad campaigns with over 350,000 ad impressions" ran on videos marked NMFK on Disney's MFK channels — is possible only because these records exist and are queryable.

110. *Viewing records.* YouTube logs video views and watch activity in association with viewer identifiers — for signed-in viewers, in account watch history; for signed-out viewers, in association with the persistent device and browser identifiers described in Section IV.F. YouTube's own product behavior confirms that signed-out viewing is tracked: YouTube tells signed-out users that watch history "isn't viewable when signed out," yet in the same interface offers those users




[33] Google for Developers, YouTube Data API — Videos resource, https://developers.google.com/youtube/v3/docs/videos (status.madeForKids; status.selfDeclaredMadeForKids).

controls to "Pause watch history" and "Clear all watch history" (and to pause and clear search history) — controls that exist only because a watch history associated with the signed-out viewer's identifiers is being recorded and used. YouTube's own confirmation dialog makes the point expressly: clearing the signed-out watch history warns the user that "your video recommendations will be reset," acknowledging that the signed-out viewer's watch history exists and is used to generate personalized recommendations — the function Google attributes to the VISITOR_INFO1_LIVE cookie.[34]

111. *Analytics available to Disney.* Through the YouTube Partner Program and YouTube Studio, Disney receives detailed analytics regarding its videos and their audiences, including viewing metrics and audience demographics such as age, gender, and geography — analytics generated from the very viewer data whose collection is at issue.

112. Accordingly, whether a given video was designated NMFK at a given time, whether targeted advertising ran on it, and which viewer identifiers received it are all questions answerable from YouTube's and Disney's own records. Plaintiffs allege below, from their own knowledge, the videos they watched, when, on what channels, and what they observed; YouTube's and Disney's records contain the authoritative designation-by-designation and view-by-view confirmation.

113. The 2025 Disney Order corroborates the scale of what those records will show: it obligates Disney to implement a ten-year program to review whether *each* of Disney's videos on the YouTube platform is child-directed and to designate it accordingly.[35] A remediation program addressed to Disney's entire YouTube

---

[34] YouTube Help Center, View, delete, or pause watch history, https://support.google.com/youtube/answer/95725 (instructing signed-out users: "Go to YouTube. Select History. Select Pause watch history or Clear all watch history."); Google, How Google Uses Cookies, supra.

[35] 2025 Disney Order § II.

catalog is not the remedy for a handful of stray errors on ten channels; it is the remedy for a designation *system* that failed at scale.

**K. The Children's Online Privacy Protection Act ("COPPA") and the COPPA Rule**

114. The exploitation of children's Personal Information by companies is not new. COPPA was enacted in 1998 by Congress to protect the safety and privacy of children online by prohibiting the unauthorized or unnecessary collection of children's personal information online by operators of Internet websites and online services. COPPA directed the FTC to promulgate an implementing rule. The FTC promulgated the COPPA Rule on November 3, 1999, under Section 1303(b) of COPPA, 15 U.S.C. § 6502(b), and Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553. The Rule went into effect on April 21, 2000, and the FTC promulgated revisions to the Rule that went into effect on July 1, 2013. Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

115. COPPA was passed to codify the societal expectations of privacy with regard to minor children's usage of the Internet. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[36]

116. COPPA "prohibits unfair … acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children

---

[36] Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter, In the Matter of Google LLC and YouTube, LLC, Federal Trade Commission (Sept. 9, 2019), https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf.

on the Internet." 16 C.F.R. § 312.1. COPPA specifically prohibits "an operator of a website or online service…[from] collect[ing] personal information from a child in a manner that violates the regulations prescribed [by the FTC]" where the website or online service is "directed to children" or the operator "has actual knowledge that it is collecting personal information from a child[.]" 15 U.S.C. § 6502.

117. The COPPA Rule applies to any operator of a commercial website or online service directed to children that collects, uses, and/or discloses personal information from children, and to any operator of a commercial website or online service that has actual knowledge that it collects, uses, and/or discloses personal information from children. The Rule requires an operator to meet specific requirements prior to collecting, using, or disclosing personal information from children, including but not limited to:

a. Providing clear, understandable, and complete notice of its information practices, including specific disclosures, directly to parents (16 C.F.R. § 312.4(b));

b. Posting a prominent and clearly labeled link to an online notice of its information practices with regard to children, including what information the operator collects from children online, how it uses such information, and its disclosure practices for such information (16 C.F.R. § 312.4(d)); and

c. Obtaining verifiable parental consent prior to collecting, using, and/or disclosing personal information from children (16 C.F.R. § 312.5(a)(1)).

118. As set forth in Section IV.I above, since 2013 the COPPA Rule's definition of "personal information" has expressly included persistent identifiers — including cookies, IP addresses, device serial numbers, and unique device identifiers — and its definition of "collection" includes the "[p]assive tracking of a child online." 16 C.F.R. § 312.2.

119. Personal information is "collected or maintained on behalf of an operator when . . . [t]he operator benefits by allowing another person to collect personal information directly from users of" an online service. 16 C.F.R. § 312.2.

120. COPPA reflects a strong public policy interest in shielding children from invasive data practices and commercial exploitation.

121. The FTC, which enforces COPPA, has made clear that COPPA applies not only to websites and apps that are directed to children, but also to general-audience platforms — like YouTube — when they have actual knowledge that child-directed content is being hosted, and to content creators — like Disney — whose own content constitutes a child-directed portion of an online service.

122. An online service, or portion thereof, is directed to children when, considering such factors as the subject matter, visual content, music or other audio content, language, use of animated characters or child-oriented activities, age of models, other characteristics, and evidence regarding the intended and actual audience of the service, it is targeted to children. 16 C.F.R. § 312.2.

123. Disney and YouTube are each operators under the COPPA Rule: Google and YouTube because they operate the YouTube platform and collect and maintain personal information from its users, including through portions of the service directed to children; and Disney because it operates its channels and video content on YouTube — portions of an online service directed to children — and because personal information is collected from viewers of its content on its behalf and for its benefit.

124. Disney's video content at issue in this Complaint is "directed to children" under the meaning of COPPA, as it involves animated characters, child-oriented subject matter, and content under the family-friendly Disney brand, as detailed throughout this Complaint.

125. Accordingly, the collection and disclosure of personally identifiable information from children, including the minor Plaintiffs, without parental notice and verifiable parental consent, as alleged herein, violates COPPA and the COPPA Rule.

### L. The 2019 COPPA Enforcement Action Against YouTube and the Resulting "Made for Kids" Policy

126. In 2019, the FTC and the New York Attorney General brought a landmark enforcement action against Google and YouTube for widespread violations of COPPA.

127. The government alleged that YouTube knowingly collected personal information about children under the age of 13 — including Personal Information used for behavioral advertising — without providing notice to parents or obtaining verifiable parental consent, as required by law.

128. The complaint included specific allegations concerning YouTube's and its content creators' practice of hosting and profiting from content clearly directed toward children while claiming YouTube was a general audience platform.

129. As part of the resulting settlement, Google and YouTube agreed to pay a then-record $170 million and to implement systemic changes to the platform, including instituting the MFK Policy.[37]

130. The 2019 stipulated order, entered on September 10, 2019, permanently enjoins Google and YouTube from, among other things: failing to maintain a system for channel owners to designate whether their content is directed to children (2019 Order § I); failing to provide direct notice to parents and to obtain verifiable parental consent before collecting, using, or disclosing personal information from children in connection with operating child-directed portions of the YouTube service (2019 Order § II); and violating the COPPA Rule (2019 Order § II.D). The 2019 Order also required Google and YouTube, on a one-time basis tied to the order's early-2020 compliance date, to stop using or benefiting from personal information previously collected from viewers of content that channel owners designated as child-directed within sixty days of that compliance date (2019 Order § III). The 2019 Order does

[37] Press Release, Better protecting kids' privacy on YouTube, YouTube (Jan. 6, 2020), https://blog.youtube/news-and-events/better-protecting-kids-privacy-on-youtube/.

not require the deletion of, or otherwise address, children's personal information collected *after* that one-time transition window through videos that creators failed to designate as child-directed — that is, the very data at issue in this case.

131. Through the 2019 action, the FTC made clear that both platform operators and content creators share responsibility under COPPA for protecting children's privacy, especially when monetizing child-directed content through advertising and data collection practices.

132. The FTC's leadership said so expressly. In their statement accompanying the 2019 settlement, the FTC's Chairman and a second Commissioner wrote that the enforcement action "puts content creators and channel owners on notice that we consider them to be standalone 'operators' under COPPA, subject to strict liability for COPPA violations." The same statement acknowledged "Commissioner Slaughter's concern that channel creators may not have an incentive to self-designate content as child-directed," and committed that the FTC "routinely conduct[s] sweeps of industries to determine compliance with our Rules" and "plan[s] to conduct a sweep of YouTube channels following implementation of this order's provisions to determine whether there are any further violations of COPPA." From September 2019 forward, every channel owner uploading child-directed content to YouTube — Disney included — was on express notice that it was itself an operator under COPPA, that the FTC understood self-designation to be compromised by creators' incentives, and that the FTC intended to police YouTube designations.[38]

133. The FTC then said the same thing to channel owners in plain language, on a public webpage published November 22, 2019 — the very month the Class

[38] Statement of Joseph J. Simons & Christine S. Wilson Regarding *FTC and People of the State of New York v. Google LLC and YouTube, LLC* (Sept. 4, 2019), at 1–2, https://www.ftc.gov/system/files/documents/public_statements/1542922/simons_wilson_google_youtube_statement.pdf.

Period begins — titled "YouTube channel owners: Is your content directed to children?" Under the heading "How COPPA applies to channel owners," the FTC's Bureau of Consumer Protection explained: "COPPA applies in the same way it would if the channel owner had its own website or app. If a channel owner uploads content to a platform like YouTube, the channel might meet the definition of a 'website or online service' covered by COPPA, depending on the nature of the content and the information collected. If the content is directed to children and if the channel owner, or someone on its behalf (for example, an ad network), collects personal information from viewers of that content (for example, through a persistent identifier that tracks a user to serve interest-based ads), the channel is covered by COPPA. Once COPPA applies, the operator must provide notice, obtain verifiable parental consent, and meet COPPA's other requirements." That guidance has remained publicly available throughout the Class Period. Disney, which operated scores of YouTube channels and maintained its own written designation policy, was among the channel owners to whom it was addressed.[39]

134. The intent of YouTube's MFK Policy is to ensure that both YouTube and content creators comply with COPPA and other laws.[40]

135. In November 2019, YouTube notified content creators, including Disney, that (1) they would be required to inform YouTube whether their content was MFK in order to comply with COPPA, and (2) they could make an MFK

---

[39] Kristin Cohen, FTC Bureau of Consumer Protection, *YouTube channel owners: Is your content directed to children?* (Nov. 22, 2019), https://www.ftc.gov/business-guidance/blog/2019/11/youtube-channel-owners-your-content-directed-children.

[40]Press Release, Disney to Pay $10 Million to Settle FTC Allegations the Company Enabled the Unlawful Collection of Children's Personal Data, Fed. Trade Comm'n (Sept. 2, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/disney-pay-10-million-settle-ftc-allegations-company-enabled-unlawful-collection-childrens-personal ("Disney Settlement Announcement").

designation at the video level or channel level based on the amount of child-directed content made available to their audience.

136. Content is considered NMFK if it has mature themes like sexual content, violence, or is aimed at a general audience rather than children.[41] This designation affects monetization, as MFK content receives non-personalized ads due to restrictions on collecting personal data from children under 13.[42]

137. YouTube relies in part on the MFK designation to determine what functionality and advertising YouTube should make available on a content creator's videos in order for YouTube to comply with COPPA.

138. YouTube's settings give content creators the choice whether to mark a channel as (1) MFK, (2) NMFK, or (3) to review the audience setting for every video




uploaded to the channel.

---

[41] *See* YouTube Settlement Announcement.

[42] *See* YouTube Help Center, Made for kids content, https://support.google.com/youtube/topic/9689353.

139. A related setting on the same tab within YouTube's channel settings gives content creators like Disney the power to turn off interest-based (i.e., behavioral) advertising, but warns that doing so "may significantly reduce your channel's revenue."

140.




141. YouTube purports to enforce its MFK Policy through a combination of creator self-designation, automated machine-learning systems, and human review.[43]

142. Thus, since 2019, YouTube has relied in part on content creators' own management of their settings, and designation of their channels and videos as MFK or NMFK, to determine what functionality and advertising YouTube should make available on videos.

143. Creators are required to label their content as MFK or NMFK through YouTube Studio.[44] YouTube's automated systems then review this designation.

144. If a creator misuses this designation feature or is incorrect, YouTube's systems or human reviewers should override the setting to comply with laws like

[43] *See, e.g.*, Video, YouTube Creators, Important Update for All Creators: Complying with COPPA (Nov. 12, 2019), https://www.youtube.com/watch?v=-JzXiSkoFKw.

[44] *See* YouTube Help Center, Set your channel or video's audience, https://support.google.com/youtube/answer/9527654.

COPPA. However, YouTube admits that "in most cases, we'll rely on [creators'] audience setting to determine whether a video is Made for Kids."[45]

145. If a content creator sets the designation at the channel level, then all videos uploaded to that channel, by default, inherit the channel's designation. For example, if a channel is designated NMFK, then any video uploaded to that channel will likewise be designated NMFK by default. After a video has been uploaded, the content creator can change the audience designation for that individual video, but with channel-level designation, all videos uploaded on that channel receive the channel's default designation until and unless the content creator changes the designation for an individual video.

146. When a video (or entire channel) is set as MFK, certain functionality on that video is disabled by YouTube, including targeted or personalized advertising and the collection of viewing history and personal information that facilitates targeted and personalized advertising.

147. Designating a video or channel as MFK also disables the following features:

a. Live chat;

b. Video comments;

c. Playback in the Miniplayer, which allows a video to continue to play on a small screen as a user browses YouTube;

d. Autoplay from the YouTube home screen;

e. Cards or end screens;

f. Video watermarks;

g. The ability to become a channel "member";

h. A button to solicit donations for a cause;

i. Merchandise and ticketing;

j. Notifications;

[45] *Id.*

k. Super Chat or Super Stickers; and

l. "Save to playlist" and "Save to Watch Later" features.

148. The features disabled when a content creator designates a video or channel as MFK are disabled, in part, to prevent the collection of personal information from children that would require operators to provide notice and obtain verifiable parental consent under COPPA and the COPPA Rule.

149. In addition to these features being disabled, the designation of a video as MFK also affects the overall function of autoplay on YouTube, whereby a new video automatically plays when a user has finished watching a video. When a video is marked MFK, it will exclusively autoplay to other videos marked MFK, and will not play videos designated NMFK.

150. Because these feature differences are visible on the face of every YouTube watch page, the designation status of a video is observable by its viewers: a video displaying public comments, general autoplay, save-to-playlist, notifications, and similar features is a video that is *not* designated MFK — and is therefore a video on which YouTube's data collection is running.

151. When a content creator like Disney does not designate a child-directed video as MFK, these features activate, including the collection of Personal Information and viewing-history data to enable targeted behavioral advertising directed towards children.

152. Therefore, when a child-directed video is not designated MFK: (1) advertising is targeted to children using persistent identifiers; (2) features that would otherwise be disabled to prevent the collection of Personal Information from children are available to children; and (3) content designated NMFK may automatically play for children even though it is entirely inappropriate for children.

153. In a guide published by YouTube, YouTube indicates to its content creators that "not serving personalized ads on kids content may result in a decreased

revenue for some creators who mark their content as made for kids."[46] YouTube thereby de-incentivizes creators from designating their content as MFK by indicating to creators that they could generate more revenue by mislabeling their content.

### M. The "Made for Kids" Standard Is Concrete — and This Case Rests on Content That Is Child-Directed Under Any Reasonable Application of It

154. The legal standard that governs whether content is child-directed is neither novel nor amorphous. It is a defined, multi-factor test that the FTC has administered for a quarter century, that YouTube has reduced to plain-language guidance for millions of creators, that Disney operationalized in a written corporate policy, and that YouTube applies programmatically, at platform scale, every day.

155. Under the COPPA Rule, whether an online service or portion thereof is "directed to children" is determined by considering enumerated factors: its subject matter; visual content; use of animated characters or child-oriented activities and incentives; music or other audio content; age of models; presence of child celebrities or celebrities who appeal to children; language or other characteristics of the service; whether advertising promoting or appearing on the service is directed to children; and competent and reliable empirical evidence regarding audience composition and intended audience. 16 C.F.R. § 312.2.

156. YouTube's own creator-facing guidance, "Determining if your content is 'made for kids,'" instructs creators — in YouTube's own words — that "[i]f your video features actors, characters, activities, games, songs, stories, or other subject matter that reflect an intent to target children, it's likely made for kids," and directs creators to consider, among other factors: the "[s]ubject matter of the video (e.g. educational content for preschoolers)"; "[w]hether children are your intended audience . . . or the actual audience for the video"; "[w]hether the video includes characters, celebrities, or toys that appeal to children, including animated characters

[46] YouTube Help Center, Set your channel or video's audience, *supra*.

or cartoon figures"; "[w]hether the language of the video is intended for children to understand"; "[w]hether the video includes activities that appeal to children, such as play-acting, simple songs or games, or early education"; and "[w]hether the video includes songs, stories, or poems for children."[47]

157. The same guidance warns creators, in bold terms, that "it is your legal responsibility to comply with COPPA and/or other applicable laws and designate your content accurately," and that "[i]f you fail to categorize your content correctly, there may be consequences on YouTube, as well as legal consequences under the Children's Online Privacy Protection Act (COPPA) or other applicable local laws."[48]

158. This standard is administered at massive scale as a matter of routine. Millions of YouTube creators apply it to their uploads; YouTube applies it through automated machine-learning classification systems and human review that check and, where necessary, override creator designations; Disney maintained a written corporate designation policy applying it; and the FTC applies it in enforcement. A standard that Defendants themselves built compliance programs, platform settings, automated classifiers, and creator guidance around is a standard that is workable in practice — and Defendants are in no position to contend otherwise.

159. To be sure, as with any audience-based standard, contestable cases can be imagined at the margins — a general-audience family film, for example, may present a closer question. But this case does not rest on the margins, and the Classes defined below are not built on them. This case rests on content at the core of the definition: Mickey Mouse cartoon clips; *Frozen*, *Cars*, *Toy Story*, and *Encanto* movie clips; sing-alongs, nursery-style songs, and story times with actors reading children's stories; content posted to channels Disney itself branded and operated for

[47] YouTube Help Center, Determining if your content is "made for kids," https://support.google.com/youtube/answer/9528076 (Dkt. No. 62-7, Ex. F to YouTube's Request for Judicial Notice).

[48] *Id.*

child audiences. Such content is child-directed under any reasonable application of the enumerated factors.

160. Objective markers confirm which Disney content sits at that core, without any need for case-by-case aesthetic judgments:

a. *Videos YouTube itself reclassified.* YouTube changed the designations of more than 300 Disney videos from NMFK to MFK in June 2020, and redesignated additional Disney videos between 2020 and 2022 — individualized determinations, made by the platform that wrote the guidance, that those videos were child-directed and had been misdesignated.

b. *Videos Disney published to YouTube Kids.* As alleged below, Disney videos offered on the YouTube Kids platform — a platform that by design contains only videos targeting children — reflect Defendants' own judgment that the content targets children, despite Disney simultaneously designating some of those same videos as NMFK on the regular YouTube platform.

c. *Disney's own child-directed playlists.* Disney created playlists consisting of child-directed sing-alongs and story times drawn from movies such as *Frozen*, *Inside Out*, *Finding Dory*, and *Encanto*.

d. *Disney's own branding and marketing.* Disney brands channels and franchises for children — e.g., Disney Junior (preschoolers), Disney Channel (children ages 6-14), Mickey Mouse, Pixar Cars, Nat Geo Kids — and markets the underlying franchises to children ages 2-12.

161. Where the identical content appears on two Disney channels and is designated MFK on one and NMFK on the other — as with the child-directed *Cars* movie clips designated NMFK on the Pixar channel while very similar *Cars* videos on the Pixar Cars channel were marked MFK — the inconsistency is not evidence that the standard is unadministrable. It is evidence that Disney was not applying the standard at all: it was applying channel-level defaults and revenue preferences to content whose child-directed character its own MFK designations elsewhere conceded.

**N. Disney Content on YouTube Kids: Disney's and YouTube's Own Judgments That Disney Content Targets Children**

162. In 2019, YouTube launched a separate platform, YouTube Kids, aimed at children. YouTube Kids contains only videos that target children. Parents use YouTube Kids knowing that the videos contained on the platform are appropriate for, and interesting to, children. YouTube requires that parents/guardians consent to the collection of data before their children use the YouTube Kids app.

163. A privacy notice related to the YouTube Kids platform, the YouTube Kids Privacy Notice, communicates to parents that YouTube collects data related to their children's use of the YouTube Kids app.[49]

164. Some videos available on YouTube Kids are also available on YouTube but are not designated as MFK. YouTube knows that children are the primary audience of these videos — as evidenced by YouTube making these videos available on its YouTube Kids platform — but has not designated these videos as MFK on YouTube.

165. For example, a Disney teaser trailer for a *Moana* film has been available on YouTube Kids. Parents must consent to data collection before their children can access that Disney video on YouTube Kids.

[49] YouTube Kids Privacy Notice, https://kids.youtube.com/t/privacynotice.

166.


Information we collect
YouTube Kids collects information based on your child's use of the app, like when they watch a video.
**Information about the device and app used to access the service.** This information includes:
• device type and settings, such as hardware model and operating system version;
• log information, including details of how our service is used, device event information, and the device's Internet protocol (IP) address;
• unique application numbers, such as application version number; and
• unique identifiers, which are used to collect and store information about an app or device, such as preferred language, app activity and other settings.
**App activity.** This information includes the videos your child watches, their search terms, and other interactions with content and ads in the app. If a child uses audio features in the app such as voice search, the app briefly collects voice information. This information is processed to allow for use of the audio feature and immediately deleted.
How we use the information we collect
I AGREE

167.


0:04
0:59
9:29
Moana Finds Her Inner Strength! | Moana | Disney Kids
50:45
Create & Learn Colors, Fruits & Shapes with Play Doh Ice Cream ...
Moana | Official Teaser
Disney •
SUBSCRIBE

168. However, YouTube does not require parental consent to data collection when children access the same video on YouTube, even though YouTube collects data when children access the video.[50]

169.




170. YouTube has not labeled all videos on YouTube Kids as MFK on YouTube even though YouTube is aware that those videos target children. Without such designation, YouTube collects data related to children's viewing of these videos.

171. As evidenced by its handling of the YouTube Kids platform, YouTube knows that it needs to obtain parental consent and communicate to parents that YouTube collects data related to children's use of YouTube, but it does not do so for mislabeled videos on YouTube.

[50] The YouTube comments feature is disabled for videos labeled "Made for Kids." The comments section is enabled on this video, indicating that YouTube did not label this video as "Made for Kids."

### O. The Two Distinct Ways Disney Enabled — and YouTube Carried Out — Unlawful Collection From Children

172. Based on YouTube's compliance requirements in the aftermath of the FTC's 2019 COPPA enforcement action, Disney had the ability and the duty to designate its child-directed videos as MFK. Disney also had the ability to turn off interest-based (i.e., behavioral) advertising for its videos.

173. Disney enabled the unlawful collection of children's Personal Information through two distinct mechanisms.

**Mechanism One: Systematic Misdesignation by Default on NMFK Channels**

174. Disney has many channels on YouTube that target different age groups. Some of these channels are designated MFK while others are designated NMFK.

175. Per corporate policy, Disney set the audience designation for each channel as MFK or NMFK and adhered to that designation when uploading individual videos to the channel. Accordingly, when a video was uploaded to a channel Disney had designated NMFK, Disney allowed the video to remain designated NMFK by default — even when the individual video was unmistakably child-directed.[51]

176. This policy was not designation error; it was a designation *system* whose known and intended output was that every child-directed video uploaded to an NMFK channel carried an NMFK designation — and therefore had YouTube's data collection and behavioral advertising switched on — unless someone at Disney affirmatively intervened. Disney thereby made false audience designations at scale, enabling the collection of Personal Information from child viewers and providing

[51]Complaint ¶ 27, *United States v. Disney Worldwide Services, Inc.*, No. 2:25-cv-08223 (C.D. Cal. Sept. 2, 2025), ECF No. 1, available at https://www.ftc.gov/system/files/ftc_gov/pdf/DisneyComplaint.pdf ("USA v. Disney Complaint").

Disney with information and analytics that assist its targeted advertising, in violation of COPPA.

177. Examples of channels that Disney marked NMFK and then failed to designate child-directed videos as MFK (the "Improperly Managed Channels") include:

a. the Pixar channel;

b. the Disney Animation Studios channel;

c. the Disney Movies channel;

d. the Disney on Ice channel;

e. the Disney on Broadway channel;

f. the Disney Channel channel, which posts video content for Disney's television channel targeted at children ages 6-14;

g. the Disney Plus channel, which posts video content from Disney's streaming service;

h. the Walt Disney Studios channel, which posts video content from across Disney's various film studios;

i. the Oh My Disney channel, which formerly posted video content for Disney's official blog; and

j. the Disney D23 channel, which formerly posted video content related to the official Disney fan club.

178. Many videos on these Improperly Managed Channels are unquestionably directed toward children under the age of 13 based on their visual content, subject matter, music, language, and other characteristics.

179. Videos uploaded to the Improperly Managed Channels include stories read aloud by characters and celebrities who appeal to children, child-oriented visual content, music that is popular with children, and language intended for children to understand.

180. The videos frequently feature animated characters like Mickey Mouse, Elsa, Moana, Lightning McQueen, and other iconic figures from Disney's catalog that are specifically marketed to and beloved by young children. In many cases, the

characters themselves address children directly or invite interaction, further reinforcing their child-directed nature.

181. These videos often include bright, colorful visuals, simple language, sing-along songs, nursery rhymes, basic educational themes, and storylines designed to appeal to preschoolers and early elementary-age viewers.

182. The cumulative effect of these elements — combined with Disney's own branding as a provider of family and children's entertainment — makes it objectively clear that these videos fall squarely within the definition of "child-directed" under COPPA and applicable FTC guidance.

183. Disney also created playlists that consist of videos with child-directed subject matter, visual content, animated characters, and music or other audio content directed to children, among other factors, from movies such as *Frozen*, *Inside Out*, *Finding Dory*, and *Encanto*. The playlists' subject matter includes, for example, sing-alongs and story times with actors reading children's stories.

184. Disney's failure to designate videos as MFK is also demonstrated by inconsistent designations for very similar videos that happen to appear on different channels but that have common child-directed subject matter. As one example, as a result of Disney's policy not to change the audience designation for an individual video from the default setting for the channel, Disney designated certain child-directed *Cars* movie videos on the Pixar channel as NMFK (e.g., videos of movie clips featuring simple story lines easily understood by children about personified vehicles that learn valuable lessons about integrity, honesty, and true friendship), while very similar *Cars* movie videos on the Pixar Cars channel were marked MFK.

185. Disney was warned in 2019 that failing to set its content designations accurately could result in compliance issues with the FTC or other authorities, and YouTube's Help Center warns creators that "[f]ailure to set your content

appropriately may result in consequences on YouTube or have legal consequences under COPPA and other laws."[52]

186. The failure to mark child-directed videos appropriately as MFK was brought to Disney's attention as early as June 2020, when YouTube informed Disney that YouTube had changed the designations from NMFK to MFK for more than 300 Disney videos on channels including Pixar, Disney, Disney Movies, Walt Disney Animation Studios, and Oh My Disney. The redesignated videos included videos from *The Incredibles*, *Coco*, *Toy Story*, *Tangled*, *Frozen*, and *Mickey Mouse* that include subject matter, visual content, and music or other audio content directed to children.[53]

187. Despite Disney privacy compliance employees learning in 2020 of YouTube's reclassification of Disney videos as MFK, Disney did not revise its channel-level designation policy and continued to fail to properly designate individual child-directed videos as MFK.[54]

188. Disney's continuation of the same designation policy after express notice that it was producing misdesignations reflects Disney's prioritization of advertising revenue over children's privacy rights, and demonstrates that Disney's failures were not the product of ambiguity at the margins of the child-directed standard, but of a calculated refusal to review and designate its child-directed content accurately.

**Mechanism Two: NMFK Designations and Disney-Enabled Targeted Advertising Campaigns on Disney's Own "Made for Kids" Channels**

189. Disney's practices went beyond leaving channel-level defaults in place. On channels that Disney itself had designated MFK — that is, channels Disney had

[52] YouTube Help Center, Determining if your content is "made for kids," *supra*.

[53] USA v. Disney Complaint ¶ 34; Disney Settlement Announcement.

[54] USA v. Disney Complaint ¶ 35.

determined were directed to children — Disney deviated from its own policy by designating individual videos NMFK.[55]

190. In the 2020 to 2022 period, YouTube redesignated as MFK a number of videos that Disney had uploaded to MFK channels but had marked NMFK. These videos were uploaded to MFK channels such as: Disney XD, Disney Descendants, Disney Channel, Disney Junior, Radio Disney, Disney Princess, Star Wars Kids, Pixar Cars, Mickey Mouse, Nat Geo Kids, Fox Family Entertainment, Disney Games, and DisneyBooks.[56]

191. Disney did not merely mark these videos NMFK; Disney itself enabled targeted advertising campaigns to run on videos that were designated NMFK but that were in fact directed to children, on both MFK and NMFK channels. The targeted advertising campaigns were enabled on NMFK-designated videos uploaded to channels Disney had designated MFK, including the Disney channel, the Disney Descendants channel, the Disney Family channel, the Disney Games channel, the Disney Junior channel, the Disney Music channel, the Disney XD channel, the Mickey Mouse channel, the Pixar Cars channel, the Radio Disney channel, and the Nat Geo Kids channel.[57]

192. During the relevant time period, at least twelve different ad campaigns with over 350,000 ad impressions ran on these MFK channels.[58]

193. To be precise about the mechanism: a video designated MFK cannot carry behavioral advertising — that is the point of the designation. What Disney did was designate individual videos on its kids-branded MFK channels as NMFK — overriding, video by video, the child-directed judgment Disney itself had made for

---

[55] USA v. Disney Complaint ¶¶ 36, 41-42.

[56] USA v. Disney Complaint ¶ 36.

[57] USA v. Disney Complaint ¶¶ 41-42.

[58] USA v. Disney Complaint ¶ 43.

the channel — and run targeted advertising campaigns on those videos. A child browsing the Disney Junior or Mickey Mouse channel had no way to know that particular videos there had been individually switched into the tracked, behaviorally-advertised state. This is exactly how YouTube's settings operate: YouTube's creator documentation states that "[s]ettings for individual videos will override the channel setting," so an NMFK designation applied to an individual video controls that video's data-collection and advertising state even on a channel designated MFK.[59]

194. Designating an individual video NMFK on a channel like Disney Junior is not a default artifact and has no innocent explanation. It is an affirmative, video-specific choice whose commercial function is to enable data collection and behavioral advertising on content residing on a children's channel.

195. In at least one instance, Disney did not mark a channel as either MFK or NMFK, and instead elected the option from YouTube to "review this setting for every video," in contravention of Disney's corporate practice to set the audience level at the channel level. Despite purporting to review each video, Disney still failed to designate all child-directed videos as MFK. Functions that are disabled if a channel or video is marked MFK, such as the ability to comment on videos, were therefore also available on such videos.[60]

**The Consequences of Both Mechanisms**

196. As a result of Disney's misdesignation of its videos and channels through both mechanisms: (1) YouTube collected Personal Information from the children watching those videos and placed targeted advertisements on child-directed videos on Disney's behalf; and (2) features that YouTube would otherwise have disabled for those videos remained available to child viewers (e.g., the ability to

[59] YouTube Help Center, Set your channel or video's audience, supra ("Settings for individual videos will override the channel setting.").

[60] USA v. Disney Complaint ¶ 36.

comment on videos and save videos), which require user data in order to function properly.

197. Disney's misdesignations generated additional revenue from advertising directed at these child users and provided Disney with demographic insights and analytics that assist Disney with its targeted advertising — all of which violate COPPA.

198. YouTube, for its part, collected, retained, used, and monetized the Personal Information of the children watching Disney's misdesignated videos, notwithstanding: its actual knowledge that Disney's catalog was rife with child-directed content; its own redesignation of hundreds of Disney videos beginning in June 2020; its own machine-learning systems for identifying child-directed content; and its obligations under the 2019 Order. YouTube nonetheless continued to rely "in most cases" on Disney's self-designations, continued to collect children's Personal Information through Disney's misdesignated videos, and continued to profit from it.

### P. The FTC's Enforcement Action Against Disney — and the Limits of the Resulting Order

199. On September 2, 2025, upon notification from the FTC, the United States brought an enforcement action against Disney Worldwide and Disney Entertainment for violating COPPA and the COPPA Rule by failing to properly mark certain YouTube videos as MFK, as described above. According to the government's complaint, this misdesignation of obviously child-directed videos allowed the collection of personal data from children under 13 without verifiable parental notification or consent and enabled prohibited targeted advertising through YouTube.[61]

200. FTC Chairman Andrew N. Ferguson, joined by Commissioners Melissa Holyoak and Mark R. Meador, stated: "As alleged, Disney circumvented YouTube's

[61] USA v. Disney Complaint ¶ 2.

data collection safeguards for MFK videos and channels and collected and monetized personal information of those who viewed child-directed videos in violation of COPPA. This conduct is illegal no matter who carries it out. But Disney is no ordinary company. It has made its mark on American society as the world's leading creator of content for children. . . . Given its carefully curated reputation, this alleged conduct by Disney would be particularly troubling."[62] Chairman Ferguson further stated that the enforcement action "penalizes Disney's abuse of parents' trust."

201. On December 23, 2025, this Court entered a stipulated order resolving the government's action. The 2025 Disney Order requires Disney to pay a $10 million civil penalty and, within 180 days, to establish and maintain for ten years an "Audience Designation Program" to review whether each of Disney's videos on the YouTube platform is a "Kids Video" and, if in Disney's assessment it is, to designate it MFK.[63]

202. Disney neither admitted nor denied the allegations of the government's complaint.[64] Plaintiffs therefore do not rest on the government's complaint as an adjudication; the factual allegations of this Complaint are made on Plaintiffs' own behalf, based on counsel's investigation, on Disney's and YouTube's own public statements, guidance, and platform behavior, on the undisputed events described herein (including YouTube's 2020 and 2020-2022 redesignations of Disney videos,

---

[62] Andrew N. Ferguson, Statement of Chairman Andrew N. Ferguson Joined by Commissioner Melissa Holyoak and Commissioner Mark R. Meador re: United States v. Disney Worldwide Servs., et al. (Sept. 2, 2025), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chairman-andrew-n-ferguson-joined-commissioner-melissa-holyoak-commissioner-mark-r-meador-re-united-states-v-disney-worldwide-servs-et-al.

[63] 2025 Disney Order §§ II, III.

[64] 2025 Disney Order, Findings ¶ 3.

which Disney's privacy compliance employees learned of at the time), and on the terms of the consent decrees they signed. That said, the scale of the government's resolution — a $10 million penalty and a decade-long, catalog-wide designation-review program — is itself telling evidence that the misdesignation of Disney's child-directed content was systemic rather than isolated.

203. Although the government has taken enforcement action, that regulatory action does not provide compensation or redress for the children and families directly harmed by the misconduct: it affords no damages, no restitution, no deletion of the children's collected data, and no notice to parents, and — because it binds only Disney — no relief of any kind as against Google and YouTube, the entities that actually collected, hold, and continue to use and benefit from the children's Personal Information. Section VII below details the specific respects in which the relief Plaintiffs seek here is not provided by the 2025 Disney Order or the 2019 Order.

204. Plaintiffs' and Class Members' Personal Information was unlawfully collected and monetized without parental consent.

205. Plaintiffs and Class Members suffered concrete and particularized injuries: namely, the invasion of their legally protected privacy interests, the loss of statutory privacy protections, exposure to surveillance and targeted advertisement, and the exploitation of their online behavior for corporate profit.

206. Through the conduct and practices alleged herein, Disney and YouTube have each unlawfully exploited the Personal Information of Plaintiffs and Class Members without their permission and without compensating them for the use of their assets.

### Q. Disney's Role and YouTube's Role

207. *Disney's role.* Disney: (a) created and uploaded the child-directed content at issue; (b) controlled each video's audience designation and each channel's default designation; (c) adopted and maintained the channel-level default policy

described above, and adhered to it even after express notice in June 2020 that it was producing misdesignations; (d) designated individual videos on its own MFK channels as NMFK and enabled targeted advertising campaigns on them; (e) received a share of the behavioral advertising revenue generated on its misdesignated videos, along with audience analytics and demographic insights derived from the collected data; and (f) benefited, within the meaning of 16 C.F.R. § 312.2, by allowing YouTube to collect Personal Information directly from the children viewing its child-directed videos.

208. Disney's obligations were not abstract regulatory background; Disney had already been sued, in federal court in California, over the same practice in its own child-directed apps. In August 2017, parents sued The Walt Disney Company, Disney Enterprises, Inc., and Disney Electronic Content, Inc., alleging that Disney's child-directed gaming apps — including "Princess Palace Pets" and "Where's My Water?" — "functioned as covert collectors of behavioral data for delivery of targeted advertising to the kids who played the games," through advertising software development kits ("SDKs") embedded in the apps, "without disclosure or consent." *Rushing v. The Walt Disney Co.*, No. 3:17-cv-04419 (N.D. Cal., filed Aug. 3, 2017). The court denied the motions to dismiss and permitted claims against Disney to proceed for intrusion upon seclusion, invasion of privacy under the California Constitution, violation of California's Unfair Competition Law, and violations of New York and Massachusetts consumer-protection and privacy statutes — the same species of claims the children assert here.

209. Disney settled, agreeing to change the practice. Under the settlement, preliminarily approved on September 24, 2020, Disney agreed to provide protections "for dozens of Disney gaming apps," "including removing or disabling any Advertising SDKs or configuring the SDKs so they collect and use personal data only for contextual advertising for those apps whose audiences are primarily under 13." On April 12, 2021, the court granted final approval, certifying a settlement class

— on claims for intrusion upon seclusion, invasion of privacy under the California Constitution, and violations of California's Unfair Competition Law and New York and Massachusetts statutes — and ordering that, for Disney's child-directed apps, Disney either remove or disable any embedded advertising SDKs or configure them to provide only contextual advertising.[65]

210. *Rushing* thus establishes what Disney knew, and when. By 2020, Disney had litigated and settled claims that its child-directed products were covertly collecting children's data for behavioral advertising, and had committed to the remedy that matters: turning behavioral collection off — limiting data use to contextual advertising — for products whose audiences are primarily under 13. Disney knew how to implement that principle at scale; it did so for dozens of apps. Yet in the same period — the very year YouTube redesignated more than 300 of Disney's YouTube videos from NMFK to MFK — Disney continued to designate child-directed YouTube videos NMFK by channel-level default, leaving behavioral-advertising collection switched on for the children watching them, and it maintained that practice for years afterward.

211. *YouTube's role.* Google and YouTube: (a) designed, built, and operate the data collection, identifier, profiling, and behavioral advertising systems described in Section IV.F; (b) set and read the persistent identifiers on viewers' devices and collect viewing data on every view of every NMFK video; (c) configured the platform such that creator designations control whether children are tracked, while warning creators that MFK designation "may significantly reduce

[65] Order re Preliminary Approval of Class Action Settlements at 1–2, 7, *Rushing v. The Walt Disney Co.*, No. 3:17-cv-04419-JD, Dkt. No. 152 (N.D. Cal. Sept. 24, 2020) (also filed at No. 3:17-cv-04492-JD, Dkt. No. 126); Order Granting Plaintiffs' Motion for Final Approval of Class Action Settlement with The Walt Disney Company; Disney Enterprises, Inc.; and Disney Electronic Content, Inc. ¶¶ 12–15, 23, *Rushing*, No. 3:17-cv-04419-JD (N.D. Cal. Apr. 12, 2021), filed at *McDonald v. Kiloo A/S*, No. 3:17-cv-04344-JD, Dkt. No. 406-9.

your channel's revenue"; (d) possessed actual knowledge — from the 2019 enforcement action, from their own machine-learning classification systems, from the YouTube Kids catalog, and from their own June 2020 and 2020-2022 redesignations of Disney videos — that child-directed Disney content on YouTube was designated NMFK and that YouTube was collecting children's Personal Information through it; (e) nonetheless continued to rely "in most cases" on Disney's self-designations and continued to collect, use, disclose, and monetize the resulting data; and (f) retained and continue to hold, use, and benefit from the Personal Information collected from Plaintiffs and Class Members.

212. YouTube's designation-review system is itself a source of video-specific knowledge — and its operation shows a system that is both under-inclusive and slow. Each time YouTube's systems designated or redesignated a Disney video as MFK — including the more than 300 videos YouTube redesignated in June 2020 and the additional videos it redesignated from 2020 to 2022 — YouTube determined, and thereafter knew, that the video was directed to children; those determinations are recorded in YouTube's systems. Yet the same system left unmistakably child-directed Disney videos designated NMFK for years. Archived captures of the watch pages show, for example, that the official Encanto trailer bore the hallmarks of an NMFK designation at every usable capture from October 2021 through late 2024 — and it remains designated NMFK today; the Snow White teaser, likewise, at every capture from August 2024 through June 2026. And the child-directed Disney music videos identified in Plaintiffs' watch histories were corrected only in a staggered series beginning after the government filed suit: "The Place To Be" in mid-September 2025; "Queen of Mean" between August 31 and October 5, 2025; and "We Don't Talk About Bruno" and "Surface Pressure" — videos with hundreds of millions of views — only between late October 2025 and late February 2026, after

the government acted and, for the latter two, in the period surrounding entry of the December 2025 consent order.[66]

213. YouTube's designation-review system is not only under-inclusive and slow — its determinations do not hold. Public archive records show individual Disney videos whose designation state has flipped back and forth, including videos that YouTube's systems treated as made for kids and that nonetheless returned to, and remain in, the full-collection NMFK state. In early June 2026, Disney published the teaser for the next film in one of its animated children's franchises — "Ice Age: Boiling Point | Official Teaser | In Theaters February 5, 2027" — to Disney's flagship "Disney" channel on YouTube. Archived captures of the teaser's watch page show YouTube serving the page with its public comments section enabled on June 6 and June 7, 2026 — a feature YouTube disables on every video designated MFK, and therefore the signature of an NMFK designation, with full data collection running. By the morning of June 8, 2026, the page was served with comments disabled — the state YouTube itself imposes on every MFK video — and it remained in that state through at least July 6, 2026; a contemporaneous designation check on June 15, 2026, confirmed that the video was then designated MFK. Yet by July 7, 2026, the page was served with its public comments section enabled once more, and as of July 31, 2026, YouTube's public Data API reports the teaser's "madeForKids"

---

[66] Internet Archive Wayback Machine captures, each available at https://web.archive.org/web/[timestamp]/https://www.youtube.com/watch?v=[video ID]: Encanto trailer (video ID CaimKeDcudo), timestamps 20211014, 20221201, 20230601, 20231202, and 20240609 (comments section served as enabled at each); Snow White teaser (TbiPcMCz0Ek), timestamps 20240815, 20241101, 20250117, 20250913, and 20260620 (same); "Queen of Mean" (r9o1QS-itsU), timestamps 20250831 (enabled) and 20251005 (disabled); "We Don't Talk About Bruno" (bvWRMAU6V-c), timestamps 20251020 (enabled) and 20260228 (disabled); "Surface Pressure" (tQwVKr8rCYw), timestamps 20251109 (enabled) and 20260226 (disabled). The YouTube comments feature is disabled for videos designated "Made for Kids"; a watch page served with its public comments section enabled reflects a video not then designated "Made for Kids."

status as false. On information and belief, that record reflects a designation that flipped from NMFK to MFK and back to NMFK within roughly five weeks — and the teaser remains NMFK today, with YouTube collecting Personal Information from every child who watches it.[67]

214. The designation history of "Toy Story 5 | Teaser Trailer | In Theaters June 19," on Disney's official Pixar channel, shows the same instability — at least three changes of state in under nine months. Archived captures show the teaser's watch page served with its public comments section enabled — the NMFK signature — on November 11 and 12, 2025; served with comments disabled from November 13, 2025 through at least January 6, 2026; served with comments enabled again from January 13 through at least July 1, 2026; and served with comments disabled again by July 5, 2026. As of July 31, 2026, YouTube's public Data API reports the teaser's "madeForKids" status as true — a determination, standing in YouTube's systems today, that the Toy Story 5 teaser is made for kids. Yet for nearly six months in 2026, after the video had already spent two months in the comments-disabled state consistent with an MFK designation, the same video reverted to the NMFK state —

[67] Internet Archive Wayback Machine captures, each available at https://web.archive.org/web/[timestamp]/https://www.youtube.com/watch?v=3fjmjX0QOIg: timestamps 20260606100348 and 20260607161318 (comments section served as enabled); 20260608104412, 20260617014831, and 20260706031846 (comments section served as disabled); and 20260707115723 (comments section served as enabled). Current designation per YouTube's public Data API ("madeForKids": false), retrieved July 31, 2026. The YouTube comments feature is disabled for videos designated "Made for Kids"; a watch page served with its public comments section enabled reflects a video not then designated "Made for Kids." Because an uploader can also disable comments on a video not designated MFK, the allegations that a video carried an MFK designation during a comments-disabled interval are made on information and belief; for this video, the inference is corroborated by the contemporaneous June 15, 2026 designation check alleged above, and YouTube's designation-change logs record definitively the complete designation history of this video and of each video cited in the two notes that follow.

public comments enabled and, on information and belief, YouTube's full data collection running on every child who watched it. On information and belief, the teaser's designation flipped from NMFK to MFK in November 2025, back to NMFK by mid-January 2026, and to MFK again in early July 2026; YouTube's designation-change logs record each change, its timing, and what effected it.[68]

215. Nor is the pattern confined to new releases. Public archives document the same round trip — years in the NMFK state, an interval in the comments-disabled state consistent with an MFK correction, and a return to NMFK — on catalog Disney videos on the Walt Disney Animation Studios channel: "Frozen 2 | In Theaters November 22," "Frozen 2 | In Theaters Friday," and "Frozen 2 | Now Playing | #1 Movie in the World," and the "Mini Dwayne" Moana featurette. Archived captures show each video's watch page served with its public comments section enabled for years — through at least May 21, 2023 for the three Frozen 2 videos, and through at least January 13, 2024 for the Moana featurette — and thereafter served with comments disabled, by November 2023 for two of the Frozen 2 videos, by February 2024 for the third, and by July 2024 for the Moana featurette. Yet as of July 31, 2026, YouTube's public Data API reports the "madeForKids" status of all four videos — promotional content for Disney's animated children's films Frozen 2 and Moana — as false. On information and belief, each was designated MFK during its comments-disabled interval and thereafter reverted to NMFK, where it remains today, with YouTube's full data collection running. Whether each MFK designation was applied by YouTube's systems or by Disney,

[68] Internet Archive Wayback Machine captures, each available at https://web.archive.org/web/[timestamp]/https://www.youtube.com/watch?v=GGBgf8dcgyY: timestamps 20251111210122 and 20251112231817 (comments section served as enabled); 20251113173112 and 20260106024638 (comments section served as disabled); 20260113182856 and 20260701014559 (comments section served as enabled); and 20260705212116 (comments section served as disabled). Current designation per YouTube's public Data API ("madeForKids": true), retrieved July 31, 2026.

and whether each reversion was effected by YouTube's systems or by a Disney designation choice, are facts recorded in YouTube's designation-change logs; on any version of events, videos the designation system had treated as made for kids were returned to full-collection NMFK status — and YouTube's review system has not corrected them since.[69]

216. That performance is not a reasonable compliance mechanism. A designation-review system that fails for years to identify Disney's most prominent child-directed videos, that corrects piecemeal and principally under government scrutiny, that reverses or permits the reversal of its own corrections — returning videos to the full-collection NMFK state and leaving them there — and that continues collecting children's Personal Information from content its own classifications had already identified as child-directed, is a system whose failures YouTube monetizes — every day of delay was a day of behavioral-advertising revenue on children's viewing. YouTube's designation-change logs record, for every Disney video, each designation the video has carried, when each designation changed, and what effected each change; those records, together with the classifier determinations recorded in YouTube's systems, identify every child-directed Disney video YouTube's own systems flagged, when it was flagged, and what YouTube did — and did not do — in response.

---

[69] Internet Archive Wayback Machine captures, each available at https://web.archive.org/web/[timestamp]/https://www.youtube.com/watch?v=[video ID]: "Frozen 2 | In Theaters November 22" (JntesK7rdTA), timestamps 20230521165830 (comments section served as enabled) and 20231105000738 (disabled); "Frozen 2 | In Theaters Friday" (jkmHLNqxdb8), timestamps 20230521165810 (enabled) and 20231103035258 (disabled); "Frozen 2 | Now Playing | #1 Movie in the World" (NMhqk1lWYKw), timestamps 20230521165745 (enabled) and 20240216065920 (disabled); "Mini Dwayne" Featurette (Logfs9thlcM), timestamps 20240113094430 (enabled) and 20240711204213 (disabled). Current designations per YouTube's public Data API ("madeForKids": false as to each), retrieved July 31, 2026.

217. Each Defendant group therefore independently qualifies as an "operator" collecting children's personal information (or on whose behalf it was collected) under the COPPA Rule, and each engaged in the tortious and unlawful conduct alleged in the Claims for Relief below, in the respects specific to its role.

### R. The Collected Data Is Sensitive and Valuable

218. The Personal Information of children, and the data collected in this case, holds substantial and growing value in today's data-driven economy.

219. Even at a young age, children generate digital footprints — through viewing habits, device usage, preferences, and engagement patterns — that are uniquely attractive to advertisers.

220. Persistent identifiers can be used to track a child's behavior across platforms, building detailed profiles that enable microtargeting and influence over future customer behavior.

221. This data not only fuels advertising revenue, but helps companies shape long-term brand loyalty, making children a particularly lucrative and vulnerable target.

222. As such, there is a market for data like the data collected on the YouTube platform when the NMFK designation is selected by Disney.

223. Organizations across every sector use and monetize consumer data to increase profits, and the value of such information as a commodity is measurable.

224. Personal Information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge — the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

225. In monetary terms, academic research from institutions such as MIT and Carnegie Mellon has estimated that individual user data can be worth $240 or more per year to advertisers, with children's data commanding a premium due to its potential for early brand capture and influence.[70]

226. Google has recognized the value of user data and even instituted a program that would pay users up to $540 a year to allow Google to track their online activities.[71]

227. Several companies have products through which they pay consumers for a license to collect or track their data. Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

228. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages of 13 and 35.

229. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

230. Users young and old highly value their privacy when online — privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

---

[70] *See* Alessandro Acquisti et al., The Economics of Privacy, 54 J. Econ. Lit. 442, 444 (2016); see also Serge Egelman et al., What's the Value of Your Data?, Carnegie Mellon CyLab (2020).

[71] *See* Google Device Usage Study, https://deviceusagestudy.google/signup/invitecode.

231. For example, Consumer Reports notes that 92% of Americans believe that internet companies and websites should be required to obtain affirmative consent before selling or sharing their data.[72]

232. Without the freedom to control what becomes of their data, children are unable to maintain the value of their personal data, which will remain with them for the rest of their lives.

233. Plaintiffs and Class Members suffered pecuniary losses when their data was collected and shared with third parties, in part because of the value of the data itself.

234. Through the conduct and practices alleged herein, Disney and YouTube have each unlawfully exploited the Personal Information of Plaintiffs and Class Members without their permission and without compensating them for the use of their assets.

### S. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy

235. At all times when Plaintiffs and Class Members watched Disney's video content, Plaintiffs and Class Members (through their guardians) had a reasonable expectation that their information would remain confidential and that neither Disney nor YouTube would collect or share their data with third parties for a commercial purpose unrelated to providing them with video content.

236. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

237. Moreover, Americans are particularly sensitive about protecting the privacy of children. In a survey conducted jointly by the Center for Digital

[72] Katie McInnis, The Evolution of Consumer Attitudes Toward Online Tracking, 1995-2019, Consumer Reports Digital Lab (May 2020), at 36.

Democracy and Common Sense Media, 90% of parents disagreed with the statement: "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content[,]" and 93 percent of parents agreed that "a federal law that says that online sites and companies need to ask parents' permission before they collect personal information from children under age 13" is a "good idea."[73] In light of these results, it is perhaps unsurprising that 80 percent of parents of children 13 years old or younger report worrying about their child's privacy when using online apps.[74]

238. These expectations are reinforced by the consent architecture that YouTube itself maintains and in which Disney participates: parents who encounter Disney content on YouTube Kids are affirmatively asked for consent before data is collected from their children, and content properly designated MFK on YouTube carries no tracking. A parent or child encountering Disney's child-directed content on YouTube had no notice — from Defendants or anyone else — that particular Disney videos had been designated into YouTube's tracked, behaviorally-advertised state.

239. Personal data privacy and obtaining consent to share or collect children's data are material to Plaintiffs and Class Members.

### T. The Harms Are Cognizable, and the Damages Are Concrete and Calculable

240. The injuries alleged in this Complaint are neither abstract nor speculative. When YouTube collected — and Disney enabled and profited from the

---

[73] Survey on Children and Online Privacy, Center for Digital Democracy & Common Sense Media (2012), https://democraticmedia.org/assets/resources/COPPA-Executive-Summary-and-Findings-1635879421.pdf.

[74] Pixalate's Harris Poll Survey Recap: Children's Privacy in Mobile Apps, Pixalate (Mar. 1, 2022), https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

collection of — young children's Personal Information without parental notice or consent, Plaintiffs and Class Members suffered the very injury that the common law of privacy, the California Constitution, and the federal and Pennsylvania wiretap statutes each make actionable in itself. And because Defendants monetized that information through systems that meter, log, and price every impression and every view, the resulting damages can be measured, allocated, and computed on a classwide basis using Defendants' own records and established valuation methods.

241. *The invasion is itself the injury.* The common law has long treated an unauthorized intrusion into private affairs as complete upon the intrusion: the victim is entitled to general damages for the loss of privacy and peace of mind and, at minimum, to nominal damages, without any showing of out-of-pocket loss. The same is true of the privacy right secured by the California Constitution. A young child who was tracked, profiled, and behaviorally targeted has been injured even though no bill ever arrives. Plaintiffs and Class Members accordingly seek general and nominal damages for these privacy and dignitary harms, together with damages for the emotional distress, worry, and anguish that Defendants' surveillance and exploitation of children's viewing activity caused Plaintiffs and their guardians.

242. *Statutory damages fix a legislated measure.* Congress and the Pennsylvania General Assembly have already valued the interception of private communications. Under the Federal Wiretap Act, the Court may assess the greater of (i) the sum of the actual damages suffered and any profits made by the violator, or (ii) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, 18 U.S.C. § 2520(c)(2), together with punitive damages, attorneys' fees, and costs, id. § 2520(b). The Pennsylvania Wiretap Act likewise fixes liquidated damages at the greater of $100 per day of violation or $1,000, plus punitive damages, fees, and costs. 18 Pa. Cons. Stat. § 5725(a). These provisions embody a legislative judgment that the unconsented interception and commercial

exploitation of private communications is a concrete injury whose redress does not depend on proof of pecuniary loss.

243. *Defendants' own gains supply a records-based measure.* Behavioral advertising commands a premium over contextual advertising — that is why it exists — and Defendants have said so themselves: YouTube warns creators that disabling interest-based advertising "may significantly reduce your channel's revenue," and YouTube acknowledged when it launched the MFK Policy that limiting data collection on made-for-kids content would reduce revenue on children's content.[75] The unjust gains from the misdesignation of Disney's child-directed videos therefore include: (a) the premium advertising revenue YouTube earned by serving personalized rather than non-personalized advertising on those videos; (b) Disney's contractual share — 55% of net watch-page advertising revenue — of those elevated revenues, together with the revenue and value Disney derived from the targeted campaigns it ran on its own MFK channels; and (c) the enduring value of the Personal Information itself: the identifiers, viewing histories, profiles, and audience insights Defendants retained and continue to use.

244. *Those gains are computable from Defendants' ledgers.* As alleged in Section IV.J, YouTube's advertising systems log every impression served on every video — by video, time, advertiser, price, and designation state — and its analytics systems record views, watch time, and audience composition, video by video. Disgorgement and restitution can therefore be computed from Defendants' own records: the impressions served on Misdesignated Disney Videos, multiplied by the differential between personalized and non-personalized rates reflected in Defendants' own pricing data, plus the Partner Program payments actually made to

---

[75] YouTube Help Center, Set your channel or video's audience, supra ("may significantly reduce your channel's revenue"; "We limit data collection and use on made for kids content to comply with the law."); Better protecting kids' privacy on YouTube, *supra*.

Disney on that inventory. The government's ability to allege "at least twelve different ad campaigns with over 350,000 ad impressions" on Disney's MFK channels alone demonstrates that this accounting exists at campaign-level granularity.[76]

245. *The market prices the asset Defendants took.* As alleged in Section IV.R, individual user data is worth hundreds of dollars per user per year to the companies that harvest it — Google itself has paid users up to $540 per year for permission to track their online activities — and children's data commands a premium.[77] Restitution and damages can accordingly be measured by the reasonable market value of the Personal Information taken from each Class Member during the Class Period: the price of the permission Defendants never sought and never bought. That children's data cannot lawfully be collected at all without parental consent does not diminish its value; it confirms that Defendants took, without asking, an asset for which the market — including Google itself — pays.

246. *Damages can be allocated member by member from Defendants' records.* As alleged in Sections IV.F and IV.J, every view of a Misdesignated Disney Video is logged against persistent identifiers — and, for the many children who watched on a household account, against the account's watch history. Per-member measures (views, watch time, impressions served, and the duration over which each identifier was tracked) reside in Defendants' systems at the level of individual identifiers and accounts, permitting member-level computation and distribution of monetary relief without individualized fact-finding.

247. *The computations are common and formulaic.* Statutory damages apply on terms fixed by statute; disgorgement follows from Defendants' impression and revenue records; market-value restitution follows from per-user valuations applied

---

[76] USA v. Disney Complaint ¶ 43.

[77] *See supra* Section IV.R (collecting sources); Google Device Usage Study, *supra*.

to the class identified through Defendants' logs; and nominal and general damages for the invasion itself require no individualized economic showing at all. Every input to every formula resides in Defendants' own systems, as catalogued in Section IV.J. Plaintiffs and Class Members also suffered economic injury in the form of the diminished value of their Personal Information once captured and exploited, and the loss of the benefit of a regime that promised — through COPPA, the MFK Policy, and Defendants' own public representations — that children would not be tracked without their parents' consent.

248. *Punitive damages are warranted.* Defendants' conduct continued after the 2019 Order, after YouTube redesignated hundreds of Disney videos in June 2020, and after Disney's privacy compliance personnel learned of the misdesignations — willful, oppressive conduct in conscious disregard of children's rights that supports punitive damages under the common-law counts and both wiretap statutes.

249. *Equitable relief completes the remedy.* Monetary relief is complemented by the equitable remedies pled herein: restitution and disgorgement under the unjust enrichment and UCL counts, and the injunctive relief detailed in Section VII — including deletion of the wrongfully collected data and of the profiles and models built from it — which strips Defendants of the ongoing benefit they would otherwise retain. Plaintiffs will elect among available remedies and measures at the appropriate time; each theory above independently demonstrates that the harms alleged here carry real, provable, and calculable value.

## U. Plaintiff-Specific Allegations

### Plaintiffs E.A. and S.A.

250. Plaintiffs E.A. and S.A. are minor children who were under the age of 13 during the Class Period and who bring this action by and through their guardian, Brett Aronson.

251. Plaintiffs E.A. and S.A. reside in Colorado.

252. During the Class Period, E.A. and S.A. regularly watched YouTube videos on multiple devices, including Mr. Aronson's iPhone (including his previous iPhone, which he has since traded in, and his current iPhone), and the family's living-room smart TV.

253. When watching videos on Mr. Aronson's iPhone, the children used the iPhone's browser to watch YouTube.

254. The children were not signed into any account when watching YouTube. Signing out, however, did not stop the collection. As described in Section IV.F, YouTube assigns signed-out browsers and devices persistent identifiers — including the VISITOR_INFO1_LIVE and YSC cookies and the x-goog-visitor-id identifier — and Google's own disclosures state that it uses unique identifiers to recognize signed-out users and to show them ads while they are signed out. YouTube's own controls confirm that it records signed-out viewing: signed-out users are offered "Pause watch history" and "Clear watch history" controls and are warned that clearing will reset their video recommendations, even as YouTube tells them that their watch history "isn't viewable when signed out." What E.A. and S.A. watched was thus recorded by YouTube against the identifiers assigned to the family's devices — it simply was never displayed to the family.

255. Throughout the Class Period, E.A. and S.A. routinely watched videos on channels operated by Disney, with each child favoring content hosted on these channels, including videos featuring characters from Bluey, Cars, Frozen, Encanto, PJ Masks, and Mickey Mouse.

256. Throughout the Class Period, E.A. and S.A. watched Disney's content on several different YouTube channels operated by Disney, including but not limited to the Pixar Channel, the Disney on Ice Channel, the Walt Disney Animation Studios channel, and the Disney channel.

257. When E.A. and S.A. watched Disney's content on YouTube, Mr. Aronson observed certain functionalities that indicate that the videos were designated NMFK, meaning that YouTube's data collection and behavioral advertising functionality was enabled. For example, Mr. Aronson observed the videos playing in Miniplayer mode, as well as instances where the videos would autoplay while on YouTube's homepage.

258. The channels E.A. and S.A. watched sit at the center of the designation practices the FTC documented. Two of the channels identified above — the Pixar channel and the Disney on Ice channel — appear on the FTC's list of channels that Disney marked NMFK and then failed to designate individual child-directed videos as MFK. And the FTC's own illustration of Disney's misdesignation involved the very franchise these children favored: the FTC alleged that child-directed Cars movie videos on the Pixar channel — "videos of movie clips featuring simple story lines easily understood by children about personified vehicles that learn valuable lessons about integrity, honesty, and true friendship" — were designated NMFK, even as very similar Cars videos on the Pixar Cars channel were marked MFK. E.A. and S.A. favored Cars content, and they watched the Pixar channel. On information and belief, among the many Disney videos E.A. and S.A. watched during the Class Period were child-directed videos designated NMFK — including child-directed Cars videos on the Pixar channel of the very kind the FTC identified.

259. One of the videos the children watched can be identified with precision — and the way it was identified shows why the absence of a family-visible watch history means nothing. In 2022, Mr. Aronson sent a link to the official "Disney's Encanto | Official Trailer" video, on Disney's Walt Disney Animation Studios channel, for his then-one-year-old child to watch, and the child watched it. The video was identified not from any viewing record YouTube makes available to signed-out viewers — there is none — but from the family's own contemporaneous text messages. The trailer is child-directed under the audience factors YouTube instructs

creators to apply: its subject matter and visual content are drawn entirely from Encanto, Disney's computer-animated musical about the Madrigal family, released that same autumn and rated PG; its imagery is the film's animated child and family characters; its audio is the film's music; and Disney marketed the film and its characters to young children through toys, dolls, costumes, and children's programming. Archived copies of the trailer's watch page preserved by the Internet Archive's Wayback Machine show that YouTube served the page with its public comments section enabled — displaying approximately 13,000 public comments as of a June 1, 2022 capture — a feature YouTube disables on every video designated MFK.[78] The trailer remains designated NMFK on the Walt Disney Animation Studios channel today: as of July 30, 2026, YouTube's public Data API reports its "madeForKids" status as false — even as Disney designates other kids-film trailers on that very channel, such as the Moana 2 teaser and official trailer, as MFK. On information and belief, the trailer has carried an NMFK designation since Disney uploaded it in September 2021, including in 2022 when the child watched it. When the child watched the Encanto trailer, YouTube collected the child's Personal Information, and YouTube continues to collect Personal Information from every child who watches the trailer today.

260. Beyond that single recovered example, Plaintiffs cannot produce a title-and-date list of the children's viewing — and that, too, is a consequence of Defendants' design. Because the children watched signed out, YouTube displayed

[78] Internet Archive, Wayback Machine capture of https://www.youtube.com/watch?v=CaimKeDcudo ("Disney's Encanto | Official Trailer"), dated June 1, 2022, 08:49 UTC, https://web.archive.org/web/20220601084928/https://www.youtube.com/watch?v=CaimKeDcudo (page served with its public comments section enabled and an approximate public comment count of 13,000). The YouTube comments feature is disabled for videos designated "Made for Kids"; a watch page served with its public comments section enabled accordingly reflects a video that was not then designated "Made for Kids."

no watch history to the family; the one video identified above could be recovered only because a text message happened to preserve it. The viewing records that exist are keyed to the persistent identifiers YouTube assigned to the family's devices and sit in Defendants' systems, which only Defendants can search. The absence of a printable list, however, changes nothing about what YouTube collected or about the plausibility of what these children watched. Throughout the Class Period, E.A. and S.A. watched Disney videos regularly — video after video, session after session, across the family's devices — on Disney-operated channels including channels the FTC itself identified as NMFK-marked. And throughout that same period, the misdesignation of Disney's child-directed videos was not an occasional error but a documented, systemic practice: Disney designated child-directed videos NMFK by channel-level default; YouTube itself redesignated more than 300 Disney videos from NMFK to MFK as early as June 2020; and the FTC alleged in September 2025 that Disney's child-directed uploads were still carrying NMFK designations. Given the volume and regularity of the children's Disney viewing, and the documented breadth of Disney's misdesignation practice across the very channels they watched, the totality of these allegations plausibly establishes that E.A. and S.A. watched misdesignated Disney videos during the Class Period — and that YouTube collected their Personal Information when they did. Plaintiffs' claims do not depend on identifying any particular video; the designation and viewing records that would name every particular video are in Defendants' possession and will be obtained in discovery.

261. While E.A. and S.A. watched Disney videos, YouTube served advertisements with the videos.

262. Unbeknownst to E.A. and S.A. and their guardian, Disney improperly designated many of the same videos that it was marketing to children as NMFK, causing YouTube's tracking systems to collect Personal Information from E.A. and S.A., including persistent identifiers that can be used to recognize E.A. and S.A.'s

devices and activities over time and across different websites and online services, together with their viewing history and related data, as described in Section IV.F.

263. YouTube collected, and Disney enabled the collection of, E.A.'s and S.A.'s Personal Information for the purposes of tracking, profiling, and targeting E.A. and S.A. with advertisements as they watched videos on the YouTube platform, and YouTube used that Personal Information to improve the revenue-generating services offered on the YouTube platform.

264. Neither Google nor Disney obtained verifiable parental consent prior to collecting E.A.'s and S.A.'s Personal Information, and neither provided their guardian the direct notice COPPA requires.

265. E.A. and S.A. continue to watch Disney videos on the YouTube platform, but Mr. Aronson has ongoing concerns about the videos they watch being misdesignated.

**Plaintiff A.F.**

266. Plaintiff A.F. is a minor who was under the age of 13 during the Class Period and who brings this action by and through their guardian, Veronika Pikeeva.

267. Plaintiff A.F. resides in Pennsylvania.

268. During the Class Period, Plaintiff A.F. regularly watched YouTube videos on multiple devices, including Ms. Pikeeva's current phone, as well as her previous cell phone.

269. When watching videos on Ms. Pikeeva's phone, Plaintiff A.F. used the YouTube mobile app, and the phone was signed into Ms. Pikeeva's account. Because these sessions were signed in, A.F.'s viewing activity — including the specific videos watched and the dates they were watched — remains recorded in the account's YouTube watch history, which Ms. Pikeeva has reviewed and preserved.

270. Throughout the Class Period, Plaintiff A.F. regularly watched videos on YouTube on channels operated by Disney, including but not limited to

DisneyMusicVEVO, Disney Jr., Walt Disney Animation Studios, the Disney Channel, and Disney's flagship "Disney" channel.

271. For example, as reflected in the account's preserved YouTube watch history, A.F. watched, among many other videos: the official "Where You Are (From 'Moana'/Sing-Along)" video, on the DisneyMusicVEVO channel, on May 28, 2021; an official "Show Yourself (From 'Frozen 2')" video, on the DisneyMusicVEVO channel, on August 14, 2021; the official "Jessica Darrow – Surface Pressure (From 'Encanto')" music video, on the DisneyMusicVEVO channel, on July 5, 2022; the official "Lava" lyric video, on the DisneyMusicVEVO channel, on November 27, 2023; the official "I've Got a Dream (From 'Tangled'/Sing-Along)" video, on the DisneyMusicVEVO channel, on December 1, 2023; and "Disney's Snow White | Teaser Trailer," on Disney's flagship "Disney" channel, on September 1, 2024. The preserved history also records A.F. watching, on July 5, 2022, the official "We Don't Talk About Bruno (From 'Encanto')" and, on May 28, 2021, "Shiny (from Moana) (Official Video)" music videos on the DisneyMusicVEVO channel. These are examples, not an exhaustive list: A.F. regularly viewed Disney channels and Disney content across the Class Period.

272. When A.F. watched Disney's content on YouTube, Ms. Pikeeva observed certain functionalities that indicate that the videos were designated NMFK, meaning that YouTube's data collection and behavioral advertising functionality was enabled. For example, Ms. Pikeeva observed the videos playing in Miniplayer mode, and Ms. Pikeeva and A.F. were able to make playlists of videos that featured child-directed content.

273. The current audience designations of these videos are themselves telling. As of July 29, 2026, every Disney music video identified above is designated "Made for Kids" in YouTube's own systems, as reported by YouTube's public Data API. What each video's designation was on the days A.F. watched them is recorded in designation histories within Defendants' exclusive possession; the public record

shows only each video's designation today. But the features Ms. Pikeeva observed are designation-dependent: YouTube disables Miniplayer playback and playlist saves on videos designated MFK, so every child-directed Disney video that Ms. Pikeeva and A.F. saved to their playlists carried an NMFK designation at the moment it was saved. On information and belief, one or more of the Disney music videos identified above were designated NMFK at the times A.F. watched them and were redesignated MFK only afterward — consistent with the FTC's September 2025 allegations that child-directed Disney uploads carried NMFK designations, and with the designation-review obligations Disney undertook in its December 2025 consent order.

274. For the two Encanto music videos A.F. watched on July 5, 2022, the public record supplies designation evidence tied to the very day of the viewing. Archived captures of the "We Don't Talk About Bruno" watch page preserved by the Internet Archive's Wayback Machine show that, within a day before A.F.'s July 5, 2022 viewing, YouTube was serving that page with its public comments section enabled and displaying a count of approximately 195,000 public comments; an archived capture of the "Surface Pressure" watch page made on the evening of July 5, 2022 itself likewise shows the page served with its public comments section enabled and displaying a public comment count.[79] YouTube disables public comments on every video designated MFK. Both videos were accordingly

---

[79] Internet Archive, Wayback Machine captures of https://www.youtube.com/watch?v=bvWRMAU6V-c ("We Don't Talk About Bruno"), dated July 5, 2022, 01:33 UTC (the evening of July 4, 2022, Eastern time), https://web.archive.org/web/20220705013321/https://www.youtube.com/watch?v=bvWRMAU6V-c, and of https://www.youtube.com/watch?v=tQwVKr8rCYw ("Surface Pressure"), dated July 6, 2022, 01:42 UTC (the evening of July 5, 2022, Eastern time), https://web.archive.org/web/20220706014224/https://www.youtube.com/watch?v=tQwVKr8rCYw.

designated NMFK when A.F. watched them on July 5, 2022 — and both are designated MFK today, placing them in the redesignated-video category of the Class definition.

275. "We Don't Talk About Bruno" is child-directed under the audience factors YouTube instructs creators to apply. It is the official music video for the signature song from Encanto, Disney's computer-animated musical about the Madrigal family — a film released in November 2021, rated PG, and marketed by Disney to young children through toys, dolls, costumes, and children's programming. The video's visual content consists of the film's animated sequences: the Madrigal children and family performing the song within the film's fairy-tale world. Its audio is a children's-film showtune from the film's Lin-Manuel Miranda soundtrack that became a global hit with children. And Disney's and YouTube's own judgment confirms the classification: the video is designated MFK today. Under any application of the audience factors, the video was made for kids on July 5, 2022 — when its watch page displayed roughly 195,000 public comments — no less than it is today.

276. "Surface Pressure" is child-directed for the same reasons. It is the official music video for another Encanto song, performed by Jessica Darrow, the voice of the film's Luisa Madrigal, and its visual content is likewise the film's animated footage, including the sequence of Luisa dancing amid a line of donkeys that any young Encanto viewer would recognize. Its subject matter, characters, animation, and music are those of a children's animated film that Disney marketed to young children — and it, too, is designated MFK today. Under any application of the audience factors, the video was made for kids on July 5, 2022, the day A.F. watched it, no less than it is today.

277. One video in A.F.'s preserved history requires no designation-history inference at all: "Disney's Snow White | Teaser Trailer," which A.F. watched on September 1, 2024, and which remains designated NMFK on Disney's flagship

"Disney" channel today (as of July 29, 2026, per YouTube's public Data API) — on information and belief, as it has been since Disney uploaded it in August 2024. The video is child-directed under the audience factors YouTube instructs creators to apply. It is the announcement teaser for Disney's live-action remake of Snow White and the Seven Dwarfs (1937), the animated children's classic that Disney's own video description calls "the story that started it all"; that same description promises a "magical music adventure" that "journeys back to the timeless story with beloved characters Bashful, Doc, Dopey, Grumpy, Happy, Sleepy, and Sneezy." The teaser's content is a catalog of child-appealing elements: the fairy-tale princess Snow White — a character Disney has marketed to young children for nearly ninety years and markets to them today through Disney Princess dolls, dress-up costumes, and toy lines tied to this film — singing "Whistle While You Work," the seven computer-animated dwarfs with their child-friendly names, a magic mirror, and an Evil Queen drawn from the 1937 original. Children responded as Disney intended: opening-weekend audience polling graded the film A- among children and teens. Disney's own designations confirm that exactly this kind of content is made for kids: the Moana 2 teaser and official trailer on Disney's Walt Disney Animation Studios channel are designated MFK, and the soundtrack videos for this very film — Rachel Zegler's "Waiting On A Wish" — are designated MFK on Disney's DisneyMusicVEVO channel. Yet the Snow White teaser, the film's "Official Trailer," and Disney's other promotional videos for the film on the flagship "Disney" channel all carry NMFK designations to this day — designations that follow Disney's channel-level default rather than the content of the videos, exactly as the FTC alleged. The consequence is that YouTube treats every viewer of the teaser, including the children at whom Disney aimed it, as a source of Personal Information for tracking and behavioral advertising: when A.F. watched the teaser on September 1, 2024, YouTube collected A.F.'s Personal Information, and

YouTube continues to collect Personal Information from every child who watches it today.

278. The videos identified above are examples, not boundaries. They are simply the viewing that the account's preserved watch history records with a title, a channel, and a date. Throughout the Class Period, A.F. watched far more Disney videos than the examples identified — video after video, session after session, from 2021 through 2024 — on the Disney-operated channels identified above, among others. And throughout that same period, the misdesignation of Disney's child-directed videos was not an occasional error but a documented, systemic practice: Disney designated child-directed videos NMFK by channel-level default; YouTube itself redesignated more than 300 Disney videos from NMFK to MFK as early as June 2020; and the FTC alleged in September 2025 that Disney's child-directed uploads were still carrying NMFK designations. Given the volume and regularity of A.F.'s Disney viewing, and the documented breadth of Disney's misdesignation practice across the same channels, the same content, and the same period, the totality of these allegations plausibly establishes that A.F. watched misdesignated Disney videos during the Class Period — and that YouTube collected A.F.'s Personal Information in the process — whether or not the designation history of any particular identified video is ever reconstructed. The specific examples above illustrate and corroborate that conclusion; Plaintiff's claims do not depend on any one of them.

279. While A.F. watched Disney videos on Ms. Pikeeva's account, YouTube served advertisements with the videos.

280. Unbeknownst to A.F. and their guardian, Disney improperly designated many of the same videos that it was marketing to children as NMFK, causing YouTube's tracking systems to collect Personal Information from A.F., including persistent identifiers that can be used to recognize A.F.'s devices and activities over time and across different websites and online services, together with their viewing history and related data, as described in Section IV.F.

281. YouTube collected, and Disney enabled the collection of, A.F.'s Personal Information for the purposes of tracking, profiling, and targeting A.F. with advertisements as they watched videos on the YouTube platform, and YouTube used that Personal Information to improve the revenue-generating services offered on the YouTube platform.

282. Neither Google nor Disney obtained verifiable parental consent prior to collecting A.F.'s Personal Information, and neither provided their guardian the direct notice COPPA requires.

283. A.F. continues to watch Disney videos on the YouTube platform, but Ms. Pikeeva has ongoing concerns about the videos they watch being misdesignated.

**Plaintiffs C.R. and C.R.**

284. Plaintiffs C.R. and C.R. are minor children who were under the age of 13 during the Class Period and who bring this action by and through their guardian, Kimberly Sobalvarro.

285. Plaintiffs C.R. and C.R. reside in California.

286. During the Class Period, C.R. and C.R. regularly watched YouTube videos on one of several different devices, including Ms. Sobalvarro's iPhone (including her previous iPhone, as well as the current one she traded it in for), the family's iPads, and the family's living-room smart TV.

287. Plaintiffs C.R. and C.R. watched these videos on devices that were signed into their parent's Google Account, sometimes using "kids" profiles that their parent had set up for each of them, and sometimes watching videos using the main profile on the account. Because some of these sessions were signed in, some of the family's viewing activity — including the specific videos watched and the dates they were watched — remains recorded in the account's YouTube watch history, which Ms. Sobalvarro has reviewed and preserved.

288. Throughout the Class Period, C.R. and C.R. routinely watched videos on channels operated by Disney, including but not limited to the Pixar Channel, Disney Movies Channel, Disney Channel, Disney Channel Music, Disney Channel Animation, Mickey Mouse Channel, Disney Junior Channel, Disney Descendants Channel, DisneyMusicVEVO, and Disney Club UK.

289. For example, as reflected in the account's preserved YouTube watch history, C.R. and C.R. watched, among other videos: the official "Dream Come True" music video from ZOMBIES 4: Dawn of the Vampires, on the Disney Channel Music channel, on July 21, 2025; the official "The Place To Be (From 'ZOMBIES 4: Dawn of the Vampires')" music video, on the DisneyMusicVEVO channel, on July 21, 2025; the official "I Always Wanted A Brother (From 'Mufasa: The Lion King')" music video, on the DisneyMusicVEVO channel, on July 26, 2025; "ZOMBIES 4 Cast Watch Party!" on the Disney Channel Music channel and "Cricket Green Calls Malachi Barton from ZOMBIES 4!" on the Disney Channel Animation channel, on August 3, 2025; the official Descendants music videos "Night Falls (From 'Descendants 3')," "Sarah Jeffery – Queen of Mean (From 'Descendants 3')," and "Ways to Be Wicked (from Descendants 2) (Official Video)," on the DisneyMusicVEVO channel, on September 26, 2025; and the official "Dove Cameron – Genie in a Bottle (Official Video)," on the DisneyMusicVEVO channel, on December 30, 2025. These are examples, not an exhaustive list: C.R. and C.R. regularly viewed Disney channels and Disney content throughout the Class Period.

290. As of July 29, 2026, every video identified in the preceding paragraph is designated "Made for Kids" in YouTube's own systems, as reported by YouTube's public Data API. What each video's designation was on the days C.R. and C.R. watched them is recorded in designation histories within Defendants' exclusive possession; the public record shows only each video's designation today. But the designation in effect at the time left observable fingerprints. During the

months the children were watching, Disney videos they watched displayed public comments, played in the Miniplayer, could be saved to playlists, and presented end screens linking to further videos — features YouTube disables on videos designated MFK. And the family saw YouTube's designation gating announce itself: on videos designated MFK, the YouTube app displayed the notice "Miniplayer is off for videos made for kids" and shut the feature off. On information and belief, one or more of the videos identified in the preceding paragraph were designated NMFK at the times C.R. and C.R. watched them and were redesignated MFK only afterward — consistent with the United States' September 2025 allegations that child-directed Disney uploads carried NMFK designations, and with the designation-review obligations Disney undertook in its December 2025 consent order. Each video so redesignated falls within the redesignated-video category of the Class definition.

291. For one of those videos, archived copies of its own watch page confirm the designation timeline directly. Internet Archive Wayback Machine captures of the watch page for "The Place To Be (From 'ZOMBIES 4: Dawn of the Vampires')" — which the preserved watch history records C.R. and C.R. watching on July 21, 2025 — show that on the evening before that viewing, and again on the evening of the viewing date itself, YouTube was serving the page with its public comments section enabled, instructing viewers' browsers to load the video's public comments.[80]

[80] Internet Archive, Wayback Machine captures of https://www.youtube.com/watch?v=Rp-TZPYgsKk, dated July 21, 2025, 02:32 UTC (the evening of July 20, 2025, Pacific time), https://web.archive.org/web/20250721023240/https://www.youtube.com/watch?v=Rp-TZPYgsKk, and July 22, 2025, 00:53 UTC (the evening of July 21, 2025, Pacific time), https://web.archive.org/web/20250722005317/https://www.youtube.com/watch?v=Rp-TZPYgsKk; see also the captures of the same page dated September 1, 2025 (timestamp 20250901005941), September 12, 2025 (20250912215456), September 20, 2025 (20250920005153), and September 28, 2025 (20250928145130), each available at https://web.archive.org/web/[timestamp]/https://www.youtube.com/watch?v=Rp-

Captures of the same page on September 1 and September 12, 2025 show the same: comments enabled. By a September 20, 2025 capture — less than three weeks after the United States announced its enforcement action against Disney — YouTube was instead serving the page with the notice "Comments are turned off." and with the "Choices for families" banner YouTube displays on children's content; and the video is designated MFK in YouTube's systems today. Because YouTube disables public comments on every video designated MFK, the archived record establishes that "The Place To Be" was not designated MFK when C.R. and C.R. watched it on July 21, 2025, and that it was redesignated only afterward — in the weeks immediately following the government's September 2, 2025 announcement, and months before the December 2025 consent order was entered.

292. "The Place To Be" is child-directed under the audience factors YouTube instructs creators to apply. It is the official music video for a song from ZOMBIES 4: Dawn of the Vampires, a Disney Channel Original Movie rated TV-G — a musical made for Disney Channel, Disney's children's television network — and the video's own description announced that the film "premieres July 10 on Disney Channel and next day on Disney+." Its visual content is the film's young cast — Disney Channel stars including Milo Manheim, Meg Donnelly, Freya Skye, and Malachi Barton — performing an ensemble song-and-dance number from the film; its audio is the soundtrack of a children's franchise spanning four ZOMBIES films that Disney markets to children through Disney Channel programming and merchandise. Disney's and YouTube's own designations confirm the classification: the companion ZOMBIES 4 videos in the children's preserved watch history — the official "Dream Come True" music video and "ZOMBIES 4 Cast Watch Party!" on the Disney Channel Music channel — are designated MFK today, and "The Place

TZPYgsKk. The YouTube comments feature is disabled for videos designated "Made for Kids"; a watch page served with its public comments section enabled accordingly reflects a video that was not then designated "Made for Kids."

To Be" itself is designated MFK today. Under any application of the audience factors, the video was made for kids on July 21, 2025, no less than it is today; the only thing that changed in September 2025 was the designation.

293. The videos identified above are examples, not boundaries. They are simply the viewing that the account's preserved watch history records with a title, a channel, and a date. Throughout the Class Period, C.R. and C.R. watched far more Disney videos than the examples identified — video after video, session after session, across the family's devices — on the Disney-operated channels identified above, among others. And throughout that same period, the misdesignation of Disney's child-directed videos was not an occasional error but a documented, systemic practice: Disney designated child-directed videos NMFK by channel-level default; YouTube itself redesignated more than 300 Disney videos from NMFK to MFK as early as June 2020; and the United States alleged in September 2025 that Disney's child-directed uploads were still carrying NMFK designations. Given the volume and regularity of the children's Disney viewing, and the documented breadth of Disney's misdesignation practice across the same channels, the same content, and the same period, the totality of these allegations plausibly establishes that C.R. and C.R. watched misdesignated Disney videos during the Class Period — and that YouTube collected their Personal Information when they did — whether or not the designation history of any particular identified video is ever reconstructed. The specific examples above illustrate and corroborate that conclusion; Plaintiffs' claims do not depend on any one of them.

294. While C.R. and C.R. watched Disney videos on their parent's account, YouTube served advertisements with the videos. The advertisements interrupted the children's videos often enough that the children would ask their mother to skip them so that the video could continue.

295. When Plaintiffs C.R. and C.R. watched videos on YouTube, they observed certain functionalities that indicate that the videos were designated NMFK,

meaning that YouTube's data collection and behavioral advertising functionality was enabled. For example, Plaintiffs C.R. and C.R. were able to add videos to playlists and watch videos in Miniplayer mode. Moreover, Plaintiffs C.R. and C.R. observed cards at the end of the Disney music videos that linked to other videos. All of these are indications that the videos were designated NMFK.

296. Unbeknownst to C.R. and C.R. and their guardian, Disney improperly designated many of the same videos that it was marketing to children as NMFK, causing YouTube's tracking systems to collect Personal Information from C.R. and C.R., including persistent identifiers that can be used to recognize C.R. and C.R.'s devices and activities over time and across different websites and online services, together with their viewing history and related data, as described in Section IV.F.

297. YouTube collected, and Disney enabled the collection of, C.R. and C.R.'s Personal Information for the purposes of tracking, profiling, and targeting C.R. and C.R. with advertisements as they watched videos on the YouTube platform, and YouTube used that Personal Information to improve the revenue-generating services offered on the YouTube platform.

298. Neither Google nor Disney obtained verifiable parental consent prior to collecting C.R. and C.R.'s Personal Information, and neither provided their guardian the direct notice COPPA requires.

299. C.R. and C.R. continue to watch Disney videos on the YouTube platform, but Ms. Sobalvarro has ongoing concerns about the videos they watch being misdesignated.

## V. TOLLING

300. Plaintiffs and Class Members could not have reasonably discovered, through the exercise of reasonable diligence, the conduct of Disney and YouTube alleged herein and could not have known of the facts stated herein, which were not publicly disclosed until the FTC announced its $10 million settlement with Disney in September 2025.

301. In addition, any applicable statutes of limitations have been tolled or have not run because Disney and YouTube each knowingly, actively, and fraudulently concealed the facts alleged herein — Disney by continuing to designate child-directed videos as NMFK without disclosure to parents, and YouTube by continuing to collect children's Personal Information through videos it knew had been misdesignated while publicly maintaining that its MFK Policy protected child viewers.

302. Plaintiffs and Class Members have been kept in ignorance of information essential to the pursuit of their claims, without any fault or lack of diligence on their part. This concealment prevented Plaintiffs and Class Members from being on notice of any facts or information that would have required them to inquire whether Disney and YouTube fulfilled their duties under the law and, if not, whether Plaintiffs and Class Members had legal recourse.

303. At all times prior to, during, and since the uploading and posting on YouTube of the mislabeled videos, Disney and YouTube have each been under a continuing duty to disclose the true facts. Because of their willful concealment of material information concerning the conduct alleged herein, over a period of years, Disney and YouTube are each estopped from relying on any statute of limitations defense as to the claims of Plaintiffs and Class Members.

## V. CLASS ACTION ALLEGATIONS

304. As used in the Class definitions below, "Misdesignated Disney Video" means a video that Disney published to YouTube that (a) was directed to children within the meaning of COPPA and the COPPA Rule, 16 C.F.R. § 312.2, and (b) at the time it was viewed, was designated "Not Made for Kids" or otherwise had the collection of viewer data for interest-based (behavioral) advertising enabled. Misdesignated Disney Videos include, without limitation, each of the following objectively identifiable categories:

a. Disney videos whose audience designation YouTube or Disney changed from NMFK to MFK at any time during the Class Period, including the more than 300 videos redesignated by YouTube in June 2020 and the videos redesignated between 2020 and 2022;

b. Disney videos that were available on the YouTube Kids platform while simultaneously designated NMFK on YouTube;

c. child-directed Disney videos published to the Improperly Managed Channels identified in Section IV.O while those channels bore an NMFK designation; and

d. child-directed Disney videos designated NMFK that Disney published to channels Disney itself had designated MFK.

305. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all others similarly situated. Plaintiffs seek certification of the following nationwide Class:

*Nationwide Class:* All natural persons in the United States who, while under the age of thirteen and during the Class Period, viewed one or more Misdesignated Disney Videos on YouTube.

306. In the alternative, Plaintiffs seek certification of statewide subclasses (together with the Nationwide Class, the "Classes"), including but not limited to:

*California Subclass:* All natural persons in California who, while under the age of thirteen and during the Class Period, viewed one or more Misdesignated Disney Videos on YouTube.

*Pennsylvania Subclass:* All natural persons in Pennsylvania who, while under the age of thirteen and during the Class Period, viewed one or more Misdesignated Disney Videos on YouTube.

*Colorado Subclass:* All natural persons in Colorado who, while under the age of thirteen and during the Class Period, viewed one or more Misdesignated Disney Videos on YouTube.

307. In the further alternative, and without conceding that the foregoing definitions are in any respect improper, Plaintiffs seek certification of a narrower class (with corresponding statewide subclasses) limited to the most objectively verifiable categories of misdesignation:

*Redesignated-Video Class:* All natural persons in the United States who, while under the age of thirteen and during the Class Period,

viewed on YouTube one or more Disney videos that (i) were at the time of viewing designated NMFK (or otherwise had behavioral-advertising data collection enabled) and (ii) were thereafter redesignated from NMFK to MFK by YouTube or Disney, or were simultaneously available on the YouTube Kids platform.

308. Excluded from the Classes are: (1) any Judge presiding over this action, members of their immediate families, and Court staff; and (2) Defendants, their subsidiaries, parents, predecessors, successors, affiliates, and any entity in which Defendants have a controlling interest, as well as their current and former officers and directors.

309. Plaintiffs reserve the right to amend or modify the Class definitions after discovery.

310. *Numerosity. Fed. R. Civ. P. 23(a)(1).* The Classes are so numerous that joinder of all members is impracticable. Disney owns, operates, and controls some of the most popular children's media channels on YouTube, with billions of cumulative views and millions of subscribers. While the exact number of Class Members is currently unknown, Disney's misclassified videos were viewed by hundreds of thousands, and more likely millions, of children during the Class Period. Class Members are geographically dispersed throughout the United States, making individual joinder infeasible.

311. *Commonality. Fed. R. Civ. P. 23(a)(2).* This action presents questions of law and fact regarding Disney's and YouTube's conduct that are common to the Classes including, but not limited to:

a. Whether Disney systematically failed to designate child-directed content as MFK;

b. Whether the videos in the categories identified above were directed to children within the meaning of the COPPA Rule;

c. Whether YouTube collected, and Disney enabled the collection of, the Personal Information of viewers of Misdesignated Disney Videos without verifiable parental consent;

d. Whether the persistent identifiers and related data YouTube collects from viewers of NMFK videos constitute personal information;

e. Whether Disney's and YouTube's conduct violated Plaintiffs' and Class Members' right to privacy;

f. Whether and to what extent Disney and YouTube each had a duty to protect the Personal Information of Plaintiffs and Class Members;

g. Whether Disney's and YouTube's practices violated COPPA and the COPPA Rule;

h. Whether Disney's and YouTube's conduct constituted intrusion upon seclusion and/or invasion of privacy;

i. Whether Disney and YouTube unjustly profited from unlawful data collection and targeted advertising;

j. Whether YouTube intercepted, and Disney and YouTube used or disclosed, Plaintiffs' and Class Members' electronic communications in violation of the Federal Wiretap Act and/or the Pennsylvania Wiretap Act;

k. Whether Plaintiffs and Class Members are entitled to relief, including damages, restitution, and injunctive relief; and

l. Whether Plaintiffs and Class Members are entitled to damages or other monetary relief, and if so, in what amount.

312. *Typicality. Fed. R. Civ. P. 23(a)(3)*. Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs and all Class Members were injured by the same uniform course of conduct: each viewed one or more Misdesignated Disney Videos, and each thereby had Personal Information collected through the same designation-controlled tracking systems described herein, without parental notice or consent. Plaintiffs' injuries arise from the same legal theories and factual predicates as those of the Classes.

313. *Adequacy. Fed. R. Civ. P. 23(a)(4)*. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no interests antagonistic to those of other Class Members and are committed, through their parents and guardians where applicable, and undersigned counsel, to vigorously prosecute this action. Plaintiffs have retained counsel with extensive experience in complex class action,

consumer protection, and data privacy litigation, including cases involving unlawful data collection and digital surveillance. Plaintiffs and their counsel possess the financial resources, institutional knowledge, and litigation experience necessary to prosecute this action through trial.

314. *Superiority. Fed. R. Civ. P. 23(b)(3).* A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages suffered by individual Class Members are relatively small compared to the cost and complexity of individual litigation involving sophisticated digital advertising systems and privacy technologies. Absent class treatment, most Class Members would be unable to vindicate their rights. Class treatment will: (i) prevent inconsistent or contradictory rulings; (ii) reduce litigation costs; (iii) conserve judicial resources; and (iv) promote uniform enforcement of privacy protections for children.

315. *Predominance. Fed. R. Civ. P. 23(b)(3).* Common questions of law and fact predominate over any questions affecting individual Class Members. Whether the videos in the enumerated categories were child-directed, whether they were misdesignated, what data YouTube's systems collect from viewers of NMFK videos, and whether that collection was lawful are all questions with common, classwide answers derived from Disney's and YouTube's own uniform systems, policies, and records. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

316. *Ascertainability.* Class Members are readily ascertainable using objective criteria and Disney's and YouTube's own records. As set forth in Section IV.J, YouTube's systems record each video's designation history, the advertising served on each video, and the viewer identifiers and accounts associated with views of each video, and Disney receives detailed audience analytics for its channels. These records — together with class-member self-identification aided by the user-visible NMFK functionality described herein — enable Class Members to be

identified and notified through reasonable effort, including through the same targeted digital notice techniques Defendants themselves pioneered.

317. *Issue Certification Under Rule 23(c)(4).* Certification is appropriate under Rule 23(c)(4) because this action presents discrete, common issues suitable for classwide resolution, including: (i) whether the enumerated categories of videos were child-directed and misdesignated; (ii) what data YouTube collects from viewers of NMFK-designated videos; (iii) Defendants' liability; (iv) consent failures; and (v) entitlement to injunctive relief.

318. *Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).* Disney and YouTube have each acted on grounds generally applicable to the Classes, making final injunctive and declaratory relief appropriate with respect to the Classes as a whole. As set forth in Section VII, absent injunctive relief from this Court, the Personal Information already taken from Class Members will remain in their possession and use, and the gaps left by the existing consent decrees will persist.

## VI. CLAIMS FOR RELIEF

319. *Governing law.* Unless otherwise stated, Plaintiffs bring their common-law claims under the law of California, and the Court may assess them under California law. California is the state with the most significant relationship to the conduct at issue: TWDC and Disney Entertainment are headquartered in Burbank, California; Disney Worldwide's directors and principal officers are located in Burbank, California; Google and YouTube are headquartered in Mountain View and San Bruno, California; and the audience-designation decisions, data collection systems, advertising systems, and monetization practices at issue were designed, implemented, and controlled in California. In the alternative, and only to the extent the Court determines that the law of a Class Member's home state governs that member's common-law claims, Plaintiffs bring the common-law claims on behalf of the Colorado Subclass under Colorado law and on behalf of the Pennsylvania

Subclass under Pennsylvania law, whose elements for the claims pled herein parallel California's in all respects material to this Complaint.

320. *Independence of the state-law claims.* Plaintiffs' state-law claims do not depend on a private right of action under COPPA, and several do not depend on a COPPA violation at all. The collection, tracking, profiling, and commercial exploitation of young children's Personal Information, without notice to or consent from their parents, would be highly offensive, unfair, and tortious under the state-law standards pled below even if COPPA had never been enacted: it violates longstanding societal norms concerning children, deceives the parents who relied on Disney's family-trusted brand and on the visible architecture of parental consent that YouTube maintains and in which Disney participates elsewhere (YouTube Kids and MFK designations), and appropriates valuable property and privacy interests of children who are legally incapable of consenting. COPPA, the COPPA Rule, the 2019 Order, and the 2025 Disney Order are pled as evidence of the governing standard of care, of the offensiveness of the conduct, and of Disney's and YouTube's knowledge — and as statutory predicates where a claim element calls for one — but Counts I, II, IV, and the "unfair" prong of Count V stand independently of any COPPA violation.

**COUNT I — Intrusion Upon Seclusion (California common law; in the alternative, the common law of Colorado and Pennsylvania for the respective Subclasses)**

321. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 320 as if fully set forth herein, including in particular the allegations in Sections IV.F, IV.G, IV.H, IV.M, IV.N, IV.O, IV.Q, IV.S, IV.T, and IV.U.

322. Plaintiffs bring this count against all Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

323. Plaintiffs and Class Members have an objective, reasonable expectation of privacy in the online activities of minors and their online communications, including minors' location, Personal Information, viewing history, and browsing activities on YouTube.

324. Plaintiffs' and Class Members' private affairs, concerns, and seclusion include their interest in their Personal Information, which includes data points concerning their identity, location, and online activity while using internet-connected devices.

325. Plaintiffs and Class Members did not consent to, authorize, or know about the intrusions alleged herein at the time they occurred. Plaintiffs and Class Members never agreed that Disney or YouTube could collect and disclose data regarding their identity, location, viewing history, and other online activity while using internet-connected devices, and their parents and guardians were never asked.

326. Plaintiffs and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right not to have their Personal Information intercepted and utilized for business gain.

327. Disney intentionally intruded on Plaintiffs' and Class Members' private life, seclusion, or solitude, without consent: the content on Disney's YouTube channels at issue was clearly and unmistakably directed at children; Disney was well aware of the demographic that made up the vast majority of its audience for that content; and Disney nonetheless designated that content NMFK — through the channel-level default policy and the MFK-channel overrides detailed in Section IV.O — thereby switching on the tracking, profiling, and behavioral targeting of the young viewers it was simultaneously courting. That practice is highly offensive to a reasonable person, independent of its unlawfulness under COPPA and state law.

328. YouTube intentionally intruded on Plaintiffs' and Class Members' private life, seclusion, or solitude, without consent: YouTube designed and operated the tracking systems that collected Plaintiffs' and Class Members' Personal Information on every view of the misdesignated videos; YouTube knew — from the 2019 enforcement action, from its own classification systems, from the YouTube Kids catalog, and from its own redesignations of Disney videos — that child-directed Disney content was designated NMFK and that YouTube was therefore tracking children; and YouTube collected, profiled, and monetized those children's data anyway.

329. Each of Disney's and YouTube's intrusions upon the seclusion of Plaintiffs and Class Members was substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as evidenced by consumer surveys, academic studies detailing the harms of tracking children online, centuries of common law, scholarly literature on consumers' reasonable expectations, state and federal statutes and regulations including COPPA and the FTC's regulations, legislative commentaries, the enforcement actions undertaken by the FTC against both YouTube and Disney, industry standards and guidelines, and the penalties imposed on Disney and on YouTube predicated on this very conduct.

330. As minor children, Plaintiffs and Class Members lacked the capacity to form or waive expectations of privacy; their parents and guardians had a reasonable expectation of privacy in their children's online viewing activities, particularly given their children's ages and the nature of the content involved.

331. Disney's and YouTube's conduct has needlessly harmed Plaintiffs and the Class by capturing intimately personal facts and data in the form of their online activities and communications. This loss of privacy and confidentiality has caused Plaintiffs and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

332. As a direct and proximate result of Disney's and YouTube's conduct, Plaintiffs and Class Members suffered actual and concrete injury.

333. Further, Disney and YouTube have each improperly profited from the invasion of Plaintiffs' and Class Members' privacy through the use of their data for its lucrative economic value, in particular for behavioral and targeted advertising.

334. On behalf of themselves and Class Members, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, the risk of future invasions of privacy, and the mental and emotional distress caused by these invasions of privacy, as well as disgorgement of profits realized by Disney and YouTube as a result of their intrusions upon seclusion.

335. The wrong is ongoing: the Personal Information taken from Plaintiffs and Class Members remains in YouTube's possession and use, and Disney continues to benefit from the analytics and insights derived from it. Plaintiffs and Class Members are entitled to declaratory and injunctive relief as set forth in Section VII and the Prayer for Relief.

336. The intrusion is highly offensive by any measure: the collection YouTube carried out, and Disney enabled, reached young children in their homes, in secret, on content that YouTube's own systems and Disney's own marketing identified as child-directed — and it continued after a federal consent decree governed YouTube's treatment of child-directed content, after YouTube's own 2020 corrections of Disney's designations, and after Disney had settled Rushing by committing to end the same practice in its child-directed apps.

## COUNT II — Invasion of Privacy (California Constitution, Article I, Section 1)

337. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 320 as if fully set forth herein, including in particular the allegations in Sections IV.F, IV.G, IV.H, IV.M, IV.O, IV.Q, IV.S, IV.T, and IV.U.

338. Plaintiffs C.R. and C.R. bring this count on behalf of the California Subclass.

339. California established the right to privacy in Article I, Section 1 of the California Constitution.

340. Plaintiffs and California Subclass Members had a reasonable and legitimate expectation of privacy in their Personal Information, including data about their respective locations and online activity while using internet-connected devices. YouTube misappropriated, used, and disclosed that data without authorization, and Disney enabled and benefited from that misappropriation and use.

341. The private affairs of Plaintiffs and California Subclass Members include their behavior on their mobile devices and computers, as well as any other behavior monitored by the surreptitious tracking employed by YouTube and enabled by Disney.

342. As minor children, Plaintiffs and California Subclass Members lacked the ability to form expectations about reasonable privacy or to consent to these practices; their parents and guardians had a reasonable expectation of privacy in their children's online viewing activities, particularly given their children's ages and the nature of the content involved.

343. Neither Plaintiffs and California Subclass Members nor their parents and/or guardians consented to the intrusions upon their private affairs, concerns, and seclusion.

344. Disney and YouTube each owed a duty to Plaintiffs and California Subclass Members to keep their Personal Information confidential.

345. YouTube collected, used, and disclosed to advertising partners, and Disney enabled the collection and use of and benefited from, the Personal Information of Plaintiffs and the California Subclass, as alleged herein.

346. The unauthorized collection, use, and disclosure of young children's Personal Information for tracking, profiling, and behavioral advertising, without

parental notice or consent, is highly offensive to a reasonable person and constitutes an egregious breach of the social norms underlying the constitutional right — norms reflected in, but not dependent upon, COPPA.

347. As a proximate result of the above acts and omissions of Disney and YouTube, the Personal Information of Plaintiffs and the California Subclass was collected, used, and disclosed to third parties without authorization, causing Plaintiffs and the California Subclass to suffer damages.

348. In failing to protect Plaintiffs' and California Subclass Members' Personal Information, and in collecting, using, and disclosing it, Disney and YouTube each acted with malice and oppression and in conscious disregard of Plaintiffs' and California Subclass Members' rights to have such information kept confidential and private.

349. Plaintiffs and California Subclass Members are therefore entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Defendants as a result of their invasion of privacy.

350. Unless and until enjoined and restrained by order of this Court, Disney's and YouTube's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the California Subclass, in that the Personal Information already collected remains in their possession and use. Plaintiffs and the California Subclass have no adequate remedy at law for these ongoing injuries, in that a judgment for monetary damages will not end Defendants' retention and exploitation of the data. Plaintiffs seek the injunctive relief set forth in Section VII, restitution, and all other relief available at law or equity.

**COUNT III — Negligence (including negligence per se as a theory of breach) (California law; in the alternative, the law of Colorado and Pennsylvania for the respective Subclasses)**

351. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 320 as if fully set forth herein, including in particular the allegations in Sections IV.F, IV.G, IV.K, IV.L, IV.M, IV.O, IV.P, IV.Q, IV.T, and IV.U.

352. Plaintiffs bring this count against all Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

353. Disney and YouTube each owed a duty of care to safeguard the privacy and Personal Information of children who viewed child-directed content on YouTube. Disney's duty arose from, among other things, its creation and monetization of child-directed content, its exclusive control over the audience designations that determined whether its child viewers would be tracked, and its undertaking — reflected in its own corporate designation policy — to designate its content. YouTube's duty arose from, among other things, its design and operation of the data collection systems at issue, its control over platform-level enforcement of the MFK Policy, and its actual knowledge that child-directed content on its platform was misdesignated.

354. This duty of care to children was higher than the duty owed to an ordinary consumer because of children's lack of capacity to appreciate and mitigate risks.

355. YouTube had a duty of care not to collect, store, or misuse Plaintiffs' and Class Members' Personal Information without parental notice and consent; Disney had a duty of care not to cause or enable such collection or misuse.

356. Disney breached these duties by negligently, recklessly, and/or knowingly failing to appropriately designate or correct the designations of child-

directed videos as MFK — including through the channel-level default policy it maintained even after express notice of misdesignations in June 2020, and through the MFK-channel NMFK overrides described in Section IV.O — thereby causing the collection and use of children's Personal Information for targeted advertising purposes.

357. YouTube breached these duties by negligently, recklessly, and/or knowingly continuing to collect, use, and monetize children's Personal Information through Disney videos YouTube knew or should have known were misdesignated, and by failing to employ its own classification systems and review processes to prevent that collection.

358. These breaches are particularly egregious because Disney and YouTube each knew that the Disney content at issue was viewed primarily by children under the age of 13, and that failure to properly designate such content as MFK would result in the collection of young viewers' Personal Information, including persistent identifiers such as cookies and IP addresses, without verifiable parental consent.

359. *Negligence per se.* Plaintiffs further allege, as a theory of this negligence claim and not as a separate cause of action, that Disney's and YouTube's respective violations of COPPA and the COPPA Rule give rise to a presumption of negligence. Plaintiffs and Class Members — children under 13 whose personal information was collected without parental notice or consent — are precisely the class of persons COPPA and the COPPA Rule were designed to protect, and the harm alleged — the unlawful collection and commercial exploitation of children's personal information — is precisely the harm those provisions were designed to prevent. Disney and YouTube each violated COPPA and the COPPA Rule as alleged throughout this Complaint, and those violations proximately caused Plaintiffs' and Class Members' injuries.

360. Disney and YouTube each knew or acted with reckless disregard of the risks posed to Plaintiffs and Class Members by the failure to properly designate the videos as MFK. Disney's violations are particularly unreasonable given that YouTube notified Disney of its obligations in 2019 and informed Disney in June 2020 that Disney's designations were incorrect; YouTube's violations are particularly unreasonable given the 2019 Order and YouTube's own knowledge and tools.

361. But for these wrongful and negligent breaches of the duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured; the injuries were the reasonably foreseeable result of the breaches.

362. As a direct and proximate result of Disney's and YouTube's negligent conduct, Plaintiffs and Class Members have suffered injury, including but not limited to: (i) the loss of control over the use of their Personal Information; (ii) the unauthorized collection and commercial exploitation of their Personal Information; (iii) the continued risk to their Personal Information, which remains in Defendants' possession and is subject to further unauthorized use and disclosure so long as Defendants fail to undertake appropriate measures; and (iv) the diminution in value of their Personal Information.

363. Plaintiffs and Class Members are therefore entitled to damages, including but not limited to compensatory, punitive, and/or nominal damages, in an amount to be proven at trial, and disgorgement of profits realized by Disney and YouTube as a result of their negligence.

364. Each Defendant's breach is specified in Section IV.Q. Disney's includes adopting and maintaining the channel-level default designation policy, adhering to it after the June 2020 redesignations put Disney on notice of its consequences, and designating individual videos on its own MFK channels as NMFK. YouTube's includes operating a designation-review system that was under-inclusive and slow — leaving unmistakably child-directed Disney videos designated

NMFK for years and correcting others only after the United States filed suit — while continuing to collect children's Personal Information from content its own systems had identified as child-directed. Plaintiffs' resulting damages are the present, non-speculative harms catalogued in Section IV.T, including the diminished economic value of their Personal Information and the loss of the protective no-tracking regime to which they were entitled.

**COUNT IV — Unjust Enrichment (California law; in the alternative, the law of Colorado and Pennsylvania for the respective Subclasses)**

365. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 320 as if fully set forth herein, including in particular the allegations in Sections IV.D, IV.E, IV.F, IV.O, IV.Q, IV.R, and IV.T.

366. Plaintiffs bring this count against all Defendants individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of their respective State Subclasses.

367. Disney and YouTube each received a benefit from the collection and use of Plaintiffs' and Class Members' Personal Information, including the ability to deploy targeted advertising to minor children, in violation of state and federal law: YouTube received elevated behavioral-advertising revenue and the enduring value of the data itself; Disney received its revenue share, audience analytics, and enhanced engagement and monetization of its content.

368. This collection and use of Plaintiffs' and Class Members' information yielded significant monetary benefit to each of Disney and YouTube, at the direct expense of Plaintiffs and Class Members, whose privacy was compromised and whose Personal Information was wrongfully used to generate corporate profit.

369. As set forth above, the ability to engage in targeted and behavioral advertising allowed Disney and YouTube to reap significantly higher advertising revenue than contextual advertising alone would have produced; had Disney properly marked its child-directed videos as MFK, neither Disney nor YouTube

could have engaged in behavioral advertising on that content or collected the underlying data.

370. Plaintiffs and Class Members were harmed because their privacy was violated and their Personal Information was collected in contravention of law and social norms in a way that would be unconscionable to a reasonable person.

371. Disney and YouTube each knew of and accepted the benefits conferred by Plaintiffs' and Class Members' Personal Information, and profited from the children's data through the marketing and advertising services described herein.

372. The retention of those benefits is unjust and inequitable because Disney and YouTube procured Plaintiffs' and Class Members' data unlawfully and without consent. Under principles of equity and good conscience, neither Disney nor YouTube should be permitted to retain the profits and benefits derived from the unlawful collection and use of children's Personal Information.

373. Plaintiffs and Class Members lack an adequate remedy at law with respect to the equitable relief sought by this count, including restitution and disgorgement of the specific benefits Disney and YouTube each derived from the children's data and the profits attributable to it. Damages cannot reach what equity can: restitution of the value Defendants derived from Class Members' own Personal Information and viewing activity — value conferred directly from their devices and attention — and an accounting and disgorgement of gains that individual damages awards cannot measure; nor can any award of damages compel Defendants to disgorge, delete, or cease profiting from the data itself.

374. Plaintiffs and Class Members are entitled to restitution and/or damages, and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Disney and YouTube from their wrongful conduct.

**COUNT V — Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.**

375. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 320 as if fully set forth herein, including in particular the allegations in Sections IV.F, IV.K, IV.L, IV.M, IV.O, IV.P, IV.Q, IV.R, IV.T, and IV.U.

376. Plaintiffs bring this count against all Defendants individually and on behalf of the Nationwide Class, or alternatively on behalf of the California Subclass. Application of the UCL to the claims of the Nationwide Class is appropriate because the conduct at issue — the designation decisions, the design and operation of the data collection and advertising systems, and the monetization of the resulting data — emanated from Defendants' California headquarters and operations.

377. Disney's and YouTube's conduct constitutes unlawful and unfair business practices within the meaning of the UCL; Plaintiffs proceed under the UCL's unlawful and unfair prongs.

378. *Unlawful prong.* Disney's and YouTube's conduct — in the respects specific to each Defendant's role, as detailed in Section IV.Q — violates multiple laws independently actionable through the UCL, including: COPPA and the COPPA Rule (15 U.S.C. § 6502; 16 C.F.R. Part 312); the Federal Wiretap Act (18 U.S.C. §§ 2510-2522) as alleged in Count VI; the constitutional right to privacy (Cal. Const. art. I, § 1) as alleged in Count II; and the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. §§ 5701 et seq., as alleged in Count VII. Each violation independently supports the unlawful-prong claim.

379. *Unfair prong.* Independent of any statutory violation, Disney's and YouTube's business acts and practices — Disney's misdesignation of child-directed content, and YouTube's collection and monetization of children's data through it — are "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to a particularly vulnerable category of consumers — young

children — and to their parents. The gravity of the harm from secretly tracking, profiling, and behaviorally targeting children who cannot consent, without asking their parents, vastly outweighs any purported utility of the practice, which serves no interest other than Disney's and YouTube's advertising revenue; and YouTube's operation of a designation-review system that for years failed to protect children on Disney's most prominent child-directed videos, and that allowed corrected videos to revert to the full-collection NMFK state — while YouTube monetized each failure — is independently unfair; the same conduct offends established public policies protecting children even apart from COPPA, including the policies embodied in California's constitutional privacy right.

380. These violations were, and are, willful, deceptive, unfair, and unconscionable.

381. Plaintiffs and Class Members suffered injury in fact and lost money or property as a result of this conduct: their Personal Information — property with objectively measurable economic value, as alleged in Section IV.R — was taken and monetized without consent or compensation, and they were deprived of the benefit of the privacy protections to which they were entitled.

382. The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common-law remedies alleged in the other Counts of this Complaint. *See* Cal. Bus. & Prof. Code § 17205.

383. Plaintiffs and Class Members lack an adequate remedy at law with respect to the equitable relief sought under the UCL. The restitution and disgorgement Plaintiffs seek under the UCL are restitutionary: the return of the monetized value of Class Members' own Personal Information and viewing activity — value taken directly from them — not nonrestitutionary disgorgement of Defendants' general profits. And no damages remedy can compel Defendants to delete the identifiers, viewing histories, profiles, and models built from Class

Members' data, halt ongoing collection on still-misdesignated videos, or restore the protective no-tracking regime to which Class Members are entitled; only equitable relief can. Plaintiffs and Class Members are entitled to restitution and equitable relief, including disgorgement of ill-gotten gains, refunds of monies, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as injunctive relief as set forth in Section VII, and all other relief available at law or equity.

**COUNT VI — Violations of the Federal Wiretap Act (ECPA), 18 U.S.C. §§ 2510–2522**

384. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 320 as if fully set forth herein, including in particular the allegations in Sections IV.F, IV.G, IV.H, IV.K, IV.O, IV.Q, and IV.U.

385. Plaintiffs bring this count against all Defendants individually and on behalf of the Nationwide Class.

386. Codified at 18 U.S.C. §§ 2510 et seq., the Federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without lawful consent, as well as the intentional disclosure or use of the contents of any such intercepted communication.

387. The Wiretap Act was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions, and to address Congress' concerns that technological advancements in computers and other methods of communication were rendering the Wiretap Act out of date.

388. The Wiretap Act confers a civil private right of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

389. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any

electronic, mechanical, or other device." 18 U.S.C. § 2510(4). It defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication," 18 U.S.C. § 2510(8), and "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce," 18 U.S.C. § 2510(12).

390. Each Defendant is a "person" for purposes of the Wiretap Act. 18 U.S.C. § 2510(6).

391. The tracking technologies that YouTube deploys on videos not designated MFK — and that Disney, by its designations, caused to be deployed on the child-directed videos at issue — constitute "device[s] or apparatus[es] which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

392. The communications Plaintiffs and Class Members exchanged with Disney's channels and videos — including the specific videos they requested and watched (whose titles and URLs disclose the substance of the communication), their search queries, their clicks, "likes," comments, and subscription actions, and related browsing information — constitute the "contents" of "electronic communications" under 18 U.S.C. §§ 2510(8) and (12). By way of illustration from YouTube's own publicly observable architecture: the URL of every watch page contains the unique identifier of the requested video (youtube.com/watch?v=[video identifier]), and thereby communicates precisely which video the viewer asked to watch; the URL of every search-results page contains the viewer's search terms verbatim in its query string (youtube.com/results?search_query=[the child's own words]); and the viewer's interaction events — plays, pauses, watch time, "likes," comments, and subscription actions — are transmitted to YouTube's logging and advertising systems during playback. When a video is designated NMFK, these communications and their contents are acquired by and made available to YouTube's advertising and

tracking systems — over and above the systems needed simply to deliver the requested video — and are reflected in the viewing histories, profiles, and ad-targeting data described in Section IV.F.

393. These communications were intercepted contemporaneously with their transmission and were acquired, used, and disclosed for advertising and profiling purposes by YouTube's tracking and advertising systems, distinct from and in addition to the systems necessary to deliver the requested videos. As alleged in Section IV.F, that separate acquisition is observable in the network traffic itself: loading an NMFK-designated Disney watch page causes the viewer's browser, during and because of that communication, to transmit the viewer's persistent identifiers and an 'ad-signals' payload describing the device and screen to Google advertising endpoints — including requests to the doubleclick.net advertising domain (among them ad-status and view-through-conversion requests), a domain distinct from youtube.com through which Google sets the 'IDE' cookie it uses for advertising across non-Google sites — none of which is necessary simply to play the requested video, and each of which issues from a watch page whose URL identifies the video the child asked to watch.

394. YouTube intentionally intercepted these communications through the tracking systems it deploys on NMFK-designated videos, including the transmissions to its advertising endpoints and the doubleclick.net domain described in Section IV.F, and intentionally used and disclosed their contents for profiling and advertising purposes. Disney intentionally used the contents and fruits of the intercepted communications — including the analytics, audience insights, and campaign-targeting data derived from them — and caused and enabled the interceptions by designating child-directed videos NMFK and enabling targeted advertising campaigns to run on them.

395. Plaintiffs and Class Members reasonably expected that their electronic communications were not being intercepted, recorded, or disclosed to build user profiles for targeted advertising.

396. At no time did Plaintiffs, or their parents or guardians on their behalf, provide Disney or YouTube with any form of consent to the interception of their communications. As minors under the age of 13, Plaintiffs could not and did not consent as a matter of law, and no verifiable parental consent was sought or obtained.

397. Moreover, while the Wiretap Act permits a party to a communication to intercept it, that party exception is unavailable where the communication is "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). As alleged herein, the interceptions were undertaken for the purpose of collecting and monetizing children's personal information in violation of COPPA and the COPPA Rule, in violation of Plaintiffs' and Class Members' privacy rights under the California Constitution, and in furtherance of the tortious conduct alleged in Counts I through III — bringing the interceptions within the crime-tort exception.

398. As a result of this wrongful conduct, Plaintiffs and the Class have had their statutorily protected privacy rights violated through the unauthorized interception, disclosure, and use of their confidential communications, in violation of 18 U.S.C. § 2520.

399. Plaintiffs seek an injunction prohibiting Disney's and YouTube's continued violations of the Wiretap Act, as well as the maximum actual, statutory, and punitive damages available under the Wiretap Act.

**COUNT VII — Violations of the Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. §§ 5701 et seq.**

400. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 320 as if fully set forth herein, including in particular the allegations in Sections IV.F, IV.G, IV.H, IV.K, IV.O, IV.Q, and IV.U.

401. Plaintiff A.F. brings this count against all Defendants individually and on behalf of the Pennsylvania Subclass.

402. The Pennsylvania Wiretapping and Electronic Surveillance Control Act (the "Pennsylvania Wiretap Act") prohibits: (1) the interception of any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through interception; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the user knew or should have known was obtained through interception. 18 Pa. Cons. Stat. § 5703.

403. Any person who intercepts, discloses, uses, or procures another to intercept, disclose, or use a wire, electronic, or oral communication in violation of the Pennsylvania Wiretap Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred. 18 Pa. Cons. Stat. § 5725(a).

404. "Intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702. "Contents" means "any information concerning the substance, purport, or meaning of [a] communication," and "electronic communication" means "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." *Id.*

405. Defendants are each a "person" under the Pennsylvania Wiretap Act. *Id.*

406. The tracking technologies that YouTube deploys on videos not designated MFK — and that Disney, by its designations, caused to be deployed on the child-directed videos at issue — constitute "device[s]" used for the acquisition

of the contents of electronic communications within the meaning of the Pennsylvania Wiretap Act.

407. The communications Plaintiff A.F. and Pennsylvania Subclass Members exchanged with Disney's channels and videos — including the specific videos they requested and watched, their search queries, their clicks, "likes," comments, and subscription actions, and related browsing information — constitute "contents" of "electronic communication[s]" within the meaning of the Pennsylvania Wiretap Act.

408. Plaintiffs and Pennsylvania Subclass Members, as minors, and their guardians reasonably expected that their electronic communications were not being intercepted, recorded, or disclosed to build user profiles for targeted advertising. This expectation is reasonable in light of the societal norms alleged above and Congress' determination, as codified in COPPA, that children have a privacy interest in their online activities and personal information.

409. At all times relevant to this Complaint, Disney's enabling of YouTube's interception was knowing, willful, and intentional. Disney is a sophisticated party with full knowledge regarding the functionality of YouTube's data collection and tracking tools, and YouTube explicitly informed Disney that Disney was obligated to designate child-directed videos as MFK to prevent the collection of child users' information and its real-time sharing with YouTube's advertising systems.

410. Plaintiffs' and Pennsylvania Subclass Members' electronic communications were intercepted contemporaneously with their transmission.

411. YouTube intercepted the communications of Plaintiff A.F. and Pennsylvania Subclass Members; Disney procured YouTube to intercept them, within the meaning of 18 Pa. Cons. Stat. § 5725(a), by designating child-directed videos NMFK and enabling targeted advertising campaigns on them; and each of YouTube and Disney used and disclosed the contents of those communications.

412. At no time did Plaintiff A.F., or their guardian on their behalf, provide Disney or YouTube with any form of consent to the interception of their communications, and no statutory exception applies; to the extent any party-consent exception is invoked, the interceptions were undertaken for the purpose of committing criminal or tortious acts as alleged in Count VI, rendering any such exception unavailable.

413. As a result of this wrongful conduct, Plaintiff A.F. and the Pennsylvania Subclass have had their statutorily protected privacy rights violated through the unauthorized interception, disclosure, and use of their confidential communications, in violation of the Pennsylvania Wiretap Act.

414. Plaintiffs seek an injunction prohibiting Disney's and YouTube's continued violations, and the maximum actual, statutory, and punitive damages available under 18 Pa. Cons. Stat. § 5725(a).

## VII. THE INJUNCTIVE RELIEF SOUGHT IS NOT PROVIDED BY THE EXISTING CONSENT DECREES

415. Plaintiffs seek injunctive relief that is not covered by the terms of the negotiated resolutions of the government's enforcement actions against YouTube and Disney, and that neither decree's beneficiaries can obtain elsewhere.

416. *What the 2019 Order provides — and does not.* The 2019 Order requires Google and YouTube to maintain a designation system and creator training, to comply with COPPA's notice and consent requirements as to child-directed portions of the YouTube service, and — on a one-time basis tied to the order's early-2020 compliance date — to refrain from using or benefiting from personal information previously collected from viewers of content that channel owners designated as child-directed within sixty days of that date.[81] The 2019 Order does not require Google or YouTube to identify, cease using, or delete children's personal

[81] 2019 Order §§ I-III.

information collected *after* that one-time transition window through videos that creators failed to designate as child-directed — the data at issue here. Nor does it require any notice to the parents of the affected children, provide any mechanism for private enforcement, or address in any way the profiles, audience segments, or algorithmic models built with such data.

417. *What the 2025 Disney Order provides — and does not.* The 2025 Disney Order requires Disney to pay a $10 million civil penalty and to operate, for ten years, a self-administered Audience Designation Program — documented internally, coordinated by a Disney employee, and self-assessed annually — subject to escape clauses that suspend the program entirely if YouTube changes its designation or age-assurance features.[82] The 2025 Disney Order binds only the two Disney entities that signed it. It does not: (a) bind Google or YouTube in any respect; (b) require the identification, sequestration, or deletion of any personal information already collected from children through Disney's misdesignated videos; (c) restrict Disney's continued use of, or benefit from, the audience insights, analytics, or profiles derived from that information; (d) require notice to the parents of affected children; (e) provide for any independent, third-party audit or verification of Disney's designations; or (f) confer any enforcement rights on the children affected or on anyone other than the government.

418. Indeed, in response to comments raising the absence of a deletion provision, the United States told this Court that a deletion requirement was unnecessary in its action against Disney precisely "because the United States did not allege that Disney itself has collected and retained children's personal information," the government having alleged instead that YouTube collected children's

[82] 2025 Disney Order §§ II, III.

information "on Disney's behalf."[83] The government's position confirms the gap this action must fill: the children's data resides with Google and YouTube — entities the 2025 Disney Order does not touch — and no existing decree requires anyone to delete it, stop using it, or tell the affected parents it exists.

419. *Plaintiffs cannot enforce the existing decrees.* Plaintiffs and Class Members are not parties to either consent decree, and neither decree confers third-party enforcement rights on them. If the practices at issue continue or recur, Plaintiffs and Class Members have no ability to compel compliance with either decree.

420. *There is reason to doubt that the decrees will be enforced as to the conduct at issue.* YouTube possessed actual knowledge of Disney's misdesignations no later than June 2020 — within months of the 2019 Order's compliance date — and continued for years to collect children's personal information through Disney's misdesignated videos; yet the government's subsequent enforcement action was brought against Disney alone, and no proceeding has sought to enforce the 2019 Order against Google or YouTube with respect to this conduct. The government retains complete discretion over whether ever to do so. Plaintiffs do not ask this Court to duplicate the decrees; they ask for relief the decrees do not contain, running to parties the decrees do not reach, enforceable by the children the decrees do not protect.

421. *The specific relief sought.* Plaintiffs accordingly seek, for themselves and the Classes, injunctive relief including the following, none of which is provided by the 2019 Order or the 2025 Disney Order:

a. An order enjoining Google and YouTube from any further use, disclosure, or monetization of Personal Information collected from Class Members through Misdesignated Disney Videos, and enjoining

---

[83]Pl. United States of America's Resp. to November 10, 2025 Order at 2-3, *United States v. Disney Worldwide Servs., Inc.*, No. 2:25-cv-08223 (C.D. Cal. Dec. 1, 2025), ECF No. 19.

Disney from any further use of or benefit from analytics, insights, or data derived from such information;

b. An order requiring Google and YouTube to identify, and to delete (such that the information is not maintained in retrievable form and cannot be retrieved in the normal course of business), all Personal Information collected from viewers of Misdesignated Disney Videos during the Class Period — including persistent identifiers, viewing and watch-history records, and ad-serving and impression logs associated with such viewing — and requiring Disney to delete all such information and derived analytics in its possession, with certification of completion to the Court;

c. An order requiring the deletion, destruction, or retraining of user profiles, audience segments, advertising models, and algorithms to the extent they were built with or incorporate Personal Information collected from Class Members through Misdesignated Disney Videos, or, in the alternative, disgorgement of the value attributable to such data;

d. An order requiring Disney and YouTube to provide clear and conspicuous notice, through means subject to Court approval, to the parents and guardians of affected children of the collection that occurred and the disposition of the collected data;

e. An order requiring, for an appropriate period, independent third-party auditing and verification — with reporting to the Court — of (i) Disney's audience designations of its YouTube content and (ii) YouTube's enforcement of its MFK Policy as applied to Disney content, including verification that data collection remains disabled on child-directed Disney videos;

f. An order prohibiting Disney from designating child-directed videos as NMFK and from enabling interest-based advertising on child-directed content, and prohibiting YouTube from collecting Personal Information through Disney videos that YouTube's own systems identify as child-directed, pending completion of the audits described above;

g. Retention of jurisdiction by this Court, with the injunction enforceable by Plaintiffs and Class Members; and

h. Such other and further injunctive relief as the Court deems just, appropriate, and necessary to remedy the practices alleged herein and protect the Classes, to the extent such relief is not duplicative of obligations under the 2019 Order or the 2025 Disney Order — including relief that becomes necessary in the event the practices recur

or the existing decrees are suspended by their own terms, expire, or go unenforced.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, respectfully request that this Court:

A. Certify the Classes under Rule 23 of the Federal Rules of Civil Procedure, name Plaintiffs as representatives of the Classes, and appoint Plaintiffs' counsel as Class Counsel;

B. Declare that Disney's and YouTube's conduct, as alleged herein, violates the statutes, constitutional provisions, and common-law duties referenced herein;

C. Find in favor of Plaintiffs and the Classes on all counts asserted herein;

D. Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class Members are entitled;

E. Award restitution and all other forms of equitable monetary relief, including disgorgement of profits, benefits, and other compensation obtained by Disney and YouTube through the conduct alleged herein;

F. Grant the injunctive relief set forth in Section VII, including without limitation: (i) prohibiting further use, disclosure, or monetization of Class Members' collected Personal Information; (ii) requiring identification, deletion, and certified disposition of that information and of profiles, models, and analytics derived from it; (iii) requiring notice to parents and guardians of affected children; (iv) requiring independent auditing and verification of Disney's designations and YouTube's enforcement; and (v) awarding such other and further injunctive relief as the Court deems appropriate, to the extent not duplicative of the existing consent decrees;

G. Award pre-judgment and post-judgment interest as provided by law;

H. Award attorneys' fees, costs, and litigation expenses, as allowed by law; and

I. Grant such other and further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 31, 2026

Respectfully Submitted,

/s/ *William J. Edelman*
William J. Edelman (SBN 285177)
**MILBERG, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

Tina Wolfson (SBN 174806)
Robert Ahdoot (SBN 172098)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave. Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com

Jean S. Martin (admitted *pro hac vice*)
**AYLSTOCK WITKIN KREIS**
**& OVERHOLTZ, PLC**
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Tel: (850) 202-1010
jmartin@awkolaw.com

*Plaintiffs' Interim Co-Lead Counsel*